**Nos. 25-1212, 25-1213**
_____

**UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT**
_____

NEW ENGLAND FISHERMEN'S STEWARDSHIP ASSOCIATION,

*Plaintiff-Appellant / Cross-Appellee*,

JERRY LEEMAN,

*Plaintiff*,

v.

HOWARD LUTNICK, in his official capacity as Secretary of Commerce;
NATIONAL MARINE FISHERIES SERVICE; EMILY MENASHES, in
her official capacity as Acting Assistant Administrator for Fisheries at
NMFS; SAMUEL D. RAUCH, III, in his official capacity as Deputy
Assistant Administrator for Regulatory Programs at NMFS,

*Defendants-Appellees / Cross-Appellants*.

_____

On Appeal from the U.S. District Court for the District of Maine
No. 23-cv-339
Hon. John A. Woodcock, Jr., District Judge
_____

**PRINCIPAL BRIEF OF APPELLANT / CROSS-APPELLEE
NEW ENGLAND FISHERMEN'S STEWARDSHIP ASSOCIATION**
_____

Donald F. McGahn, II
John M. Gore
John Henry Thompson
Louis J. Capozzi, III
JONES DAY
51 Louisiana Avenue, NW
Washington, D.C. 20001
(202) 879-3939
jmgore@jonesday.com

*Counsel for New England Fishermen's Stewardship Association*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Plaintiff-Appellant New England Fishermen's Stewardship Association (NEFSA) certifies that it does not have a parent corporation and no entity or individual currently owns more than 10% of NEFSA's stock.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT .............................................. i

STATEMENT REGARDING ORAL ARGUMENT ................................. ix

INTRODUCTION ............................................................................... 1

JURISDICTIONAL STATEMENT ......................................................... 6

STATEMENT OF THE ISSUES ............................................................. 6

STATEMENT OF THE CASE ............................................................... 7

    A.    The Regional Fishery Management Councils And Their Significant Powers Under The Act ........................................ 7

    B.    The Council .............................................................. 13

    C.    The Challenged Regulations .......................................... 15

    D.    NEFSA ................................................................... 17

    E.    Procedural History .................................................... 17

SUMMARY OF ARGUMENT ............................................................... 22

STANDARD OF REVIEW ................................................................... 25

ARGUMENT .................................................................................... 25

I.    NEFSA IS ENTITLED TO RELIEF ON ITS SUCCESSFUL APPOINTMENTS CLAUSE CLAIM. ........................................... 25

    A.    The Council's Actions Are Void Because Members Lack Article II Appointments. ............................................. 27

        1.    *Council Members are principal officers.* ...................... 28

        2.    *Without a constitutional appointment, Members' actions are void.* ............................................. 32

        3.    *Vacatur of the Final Rule, not severance of the Act, is the only lawful and appropriate remedy.* ......... 36

    B.    The District Court's Remedy Perpetuates, Rather Than Cures, The Appointments Clause Violation. ..................... 45

        1.    *Council Members retain significant authority under the district court's remedy.* .............................. 46

       2.    *The district court's contrary reasoning fails.* .............. 48

II.    Council Members are Unconstitutionally Insulated from Removal. ................................................................ 60

CONCLUSION ........................................................................ 65

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Alfa Int'l Seafood v. Ross,*
264 F. Supp. 3d 23 (D.D.C. 2017) ........................................................... 8

*Aurelius Investment, LLC v. Puerto Rico,*
915 F.3d 838 (1st Cir. 2019) ......................................................... 29, 30

*Bandimere v. SEC,*
844 F.3d 1168 (10th Cir. 2016) ........................................................... 50

*Buckley v. Valeo,*
424 U.S. 1 (1976) (per curiam) ..................................................... 28, 46

*Burgess v. Fed. Deposit Ins. Corp.,*
871 F.3d 297 (5th Cir. 2017) .............................................. 49, 50, 51, 54

*C&W Fish Co. v. Fox,*
931 F.2d 1556 (D.C. Cir. 1991) ............................................................ 8

*Collins v. Mnuchin,*
938 F.3d 553 (5th Cir. 2019) (*en banc*) .......................................... 35, 36

*Collins v. Yellen,*
594 U.S. 220 (2021) ................................................................... *passim*

*Conn. v. Daley,*
53 F. Supp. 2d 147 (D. Conn. 1999) .................................................... 58

*Conservation Law Found. of New England, Inc. v. Franklin,*
989 F.2d 54 (1st Cir. 1993) ............................................................ 9, 53

*Edmond v. United States,*
520 U.S. 651 (1997) ................................................................... *passim*

iv

*Esparraguera v. Dep't of the Army*,
    981 F.3d 1328 (Fed. Cir. 2020) ................................................... 63, 64

*Free Enter. Fund v. PCAOB*,
    561 U.S. 477 (2010) ................................................... *passim*

*Freytag v. Comm'r*,
    501 U.S. 868 (1991) ................................................... *passim*

*Hall v. Evans*,
    165 F. Supp. 2d 114 (D.R.I. 2001) ....................................... 53

*Hardy v. Loon Mountain Recreation Corp.*,
    276 F.3d 18 (1st Cir. 2002) ............................................. 25

*Humphrey's Ex'r v. United States*,
    295 U.S. 602 (1935) ................................................... 61

*Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*,
    684 F.3d 1332 (D.C. Cir. 2012) ................................... *passim*

*Landry v. FDIC*,
    204 F.3d 1125 (D.C. Cir. 2000) .................................... 35, 36

*Lofstad v. Raimondo*,
    117 F.4th 493 (3d Cir. 2024) ...................................... *passim*

*Lucia v. SEC*,
    585 U.S. 237 (2018) ................................................... *passim*

*Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*,
    53 F.4th 869 (5th Cir. 2022) ....................................... 53, 54

*NLRB v. Noel Canning*,
    573 U.S. 513 (2014) ................................................... 36, 37

*Oceana, Inc. v. Evans*,
  2005 WL 555416 (D.D.C. Mar. 9, 2005) ............................................. 55

*Ryder v. United States*,
  515 U.S. 177 (1995) ..................................................................... 36, 37

*Seila Law LLC v. CFPB*,
  591 U.S. 197 (2020) .......................................................... 37, 40, 60, 61

*United States v. Arthrex, Inc.*,
  594 U.S. 1 (2021) ................................................................... *passim*

*United States v. Diggins*,
  36 F.4th 302 (1st Cir. 2022) .............................................................. 25

*United States v. Siciliano*,
  578 F.3d 61 (1st Cir. 2009) ............................................................... 44

CONSTITUTIONAL AND STATUTORY AUTHORITIES

U.S. Const. art. II, § 2, cl. 2 ............................................................. *passim*

5 U.S.C. § 557 ....................................................................................... 52

5 U.S.C. § 3132 ..................................................................................... 63

5 U.S.C. § 3995 ..................................................................................... 63

5 U.S.C. § 7542-43 ............................................................................... 64

5 U.S.C. § 7512-13 ............................................................................... 64

15 U.S.C. § 7217 ................................................................................... 51

16 U.S.C. § 1801 ..................................................................................... 8

16 U.S.C. § 1852 ........................................................................... *passim*

16 U.S.C. § 1853 ............................................................................. 10, 56

16 U.S.C. § 1854.................................................................... *passim*

16 U.S.C. § 1855............................................................ 13, 45, 54, 55

16 U.S.C. § 1856........................................................................ 7, 13

16 U.S.C. § 1861............................................................................... 6

28 U.S.C. § 1291............................................................................... 6

28 U.S.C. § 1331............................................................................... 6

43 U.S.C. § 1312............................................................................... 7

Magnuson-Stevens Fishery Conservation and Management
   Act of 1976, Pub. L. No. 94-265, 90 Stat. 331 ................................... 1, 7

*The Unique Federalism of the Regional Councils Under the*
   *Fishery Conservation and Management Act of 1976,*
   9 B.C. ENV'T AFFS. L. REV. 163 (1980) ................................................... 7

**OTHER AUTHORITIES**

5 C.F.R. § 752.604........................................................................ 64

5 C.F.R. § 752.605........................................................................ 64

17 C.F.R. § 201.360....................................................................... 56

48 Fed. Reg. 10605 (Mar. 10, 1983) ........................................................ 7

1996 U.S.C.C.A.N. 4120, 1996 WL 787969 (Oct. 11, 1996) ................................... 31

D. Christie, *Comments on Fisheries Management Without*
   Courts, 32 J. LAND USE & ENV'T L. 423 (2017) ...................................... 9

Fed. R. App. P. 4 ......................................................................... 6

H.R. Rep. No. 97-549, 97th Cong., 2d Sess. (1982) ................................... 52

R. Sando, *Rauch, Sam: Oral History Interview*
(June 30, 2016) ................................................................ 11, 12

## STATEMENT REGARDING ORAL ARGUMENT

Appellant New England Fishermen's Stewardship Association requests oral argument. This case raises important questions about an ongoing violation of the Constitution's separation of powers. The district court held that certain components of the statutory regime governing federal fishery regulation are unconstitutional, upheld other provisions, and denied any meaningful relief. Oral argument would assist the Court in resolving complex questions of constitutional law and remedies.

## INTRODUCTION

The New England Fishermen's Stewardship Association (NEFSA) represents the interests of local commercial fishermen—the backbone of the Nation's domestic fishing fleet.  Commercial fishing in New England for offshore species like those harvested by NEFSA's members is subject to strict federal catch limits developed by the New England Fishery Management Council (the Council).  The Magnuson-Stevens Fishery Conservation and Management Act (the Act) grants the Council broad authority to set and adjust fishery policies.  Exercising that authority, the Council has embarked on a campaign to slash catch limits, crippling NEFSA members' ability to profitably harvest important groundfish stocks, including haddock, cod, and white hake.

This destructive campaign is not just bad policy.  It is also multiply unconstitutional:  The Council's Members wield significant executive power but were installed in office in ways alien to the Appointments Clause and enjoy a phalanx of protections against removal.  The Act thus *doubly* insulates them from Presidential control in violation of Article II.

The Act's constitutional defects are not subtle.  On the appointment side, it empowers *state* officials—not the President or any other federal

1

officer—to select several Council Members. And while it nominally permits the Secretary of Commerce (the Secretary) to appoint other Members, it restricts the Secretary's choices to individuals identified by state governors.

On the removal side, the Act ousts, or at least strictly constrains, the President's authority to remove *every* Council Member. The Act shields several Members from removal by *any* federal official at all. The regional director of the National Marine Fisheries Service (NMFS), who serves on the Council, is a career Senior Executive Service official and, thus, enjoys robust protections against firing and reassignment. And the remaining Members are generally removable only by a two-thirds vote of their Council colleagues.

Faced with all this, the Government staked its defense solely on its assertion that Council Members are mere employees, not "Officers of the United States" subject to the Appointments Clause and the President's removal power. U.S. Const. Art. II, § 2, cl. 2. The district court roundly, and rightly, disagreed. The district court correctly held that Council Members are principal officers of the United States because they hold "continuing position[s] established by law," Addendum ("Add.") 125; *see*

2

*Lucia v. SEC*, 585 U.S. 237, 245 (2018), and the Council wields unreviewable "significant federal authority"—including even the power to "restrict the actions of the Secretary" in certain circumstances, Add.126-27.  It therefore (again correctly) concluded that the Act's appointment and removal provisions violate Article II.  *See* Add.133-34.

That should have been the end of this case.  Because its composition violates Article II, the Council had no lawful authority to develop the policies harming NEFSA's members and other fishermen, much less to trigger the Act's mechanisms requiring the Secretary to instigate promulgation of those policies as binding federal regulations.  *See, e.g.*, *Collins v. Yellen*, 594 U.S. 220, 259 (2021).  The district court therefore should have vacated the catch limits.  *See, e.g.*, *Lucia*, 585 U.S. at 251.

The district court, however, took a different tack.  In fact, it adopted a "remedy" that no party sought, that left NEFSA with no remedy at all, and that directly contravenes controlling Supreme Court precedent.

The district court thought it could solve the Act's constitutional problems by severing a few of its provisions.  The district court struck the provisions that, in its view, conferred significant federal authority on the Council—but it left in place the Act's remaining grants of authority to the

Council and appointment and removal provisions.  It reasoned that this judicial rewriting of the Act meant that Council Members were no longer officers covered by Article II but instead mere employees.

The sole Council power NEFSA challenged—the power to develop the catch limits—was among the powers the district court deemed not significant and did not strike from the Act.  Thus, the district court's remedy for the constitutional violation it *agreed* NEFSA had shown was to strike Council powers that were *not even at issue* and to uphold the Council power and actions that harm NEFSA and its members.

The district court did this despite acknowledging that "officials cannot be 'an officer on Monday and an employee on Tuesday'; once significant authority is delegated, the official is a federal officer." Add.127; *see also Freytag v. Commissioner*, 501 U.S. 868, 882 (1991) (An official qualifies as an officer even if the office also entails "duties that may be performed by an employee"); *Lucia*, 585 U.S. at 247 n.4.  Yet its remedy does precisely that:  It deems Members officers at the time they developed the catch limits—and even the day *before* judgment issued— and employees on the day of the judgment.

Unsurprisingly, Supreme Court precedent expressly forecloses the district court's attempt to cure the Appointments Clause violation by severing the statutory scheme. As the Supreme Court has explained, the "editorial freedom" to "blue-pencil a sufficient number of the [challenged entity's] responsibilities so that its members would no longer be 'Officers of the United States' … belongs to the Legislature, not the Judiciary." *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 509-10 (2010). The district court did not even *mention* this rule, let alone explain how its slicing-and-dicing of the Act could possibly survive it.

Reversal is warranted for this reason alone. *See id.* Yet even if the Court believes that severing parts of a statute could be an appropriate remedy for an Appointments Clause violation, it still should reverse. The district court was simply wrong when it concluded that the Council's power to develop the challenged catch limits is not significant. Thus, even after its severing of the Act, Council Members' actions remain invalid because they lack valid Article II appointments.

Finally, the district court also erred in denying NEFSA a remedy on its separate meritorious removal-power claim. The Court should vacate the judgment and remand for entry of appropriate relief.

5

## JURISDICTIONAL STATEMENT

NEFSA filed its operative Amended Complaint in the U.S. District Court for the District of Maine on September 22, 2023. Joint Appendix ("JA") 018. The district court had subject-matter jurisdiction under 28 U.S.C. § 1331 and 16 U.S.C. § 1861. On December 31, 2024, the district court entered final judgment for NEFSA on its Appointments Clause and removal-restriction claims and enjoined certain Council powers, but ordered none of NEFSA's requested relief. Add.001. The district court entered judgment for the Government on the remaining counts. *Id.* NEFSA filed a timely notice of appeal on February 28, 2025. JA.016; *see* Fed. R. App. P. 4(a)(1)(B). This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.    Can a court "remedy" an Appointments Clause violation by severing a constitutional officer's significant executive authority from the statutory scheme enacted by Congress?

2.    Do Council Members retain significant executive authority under the district court's remedy such that their lack of valid appointments voids their actions?

**3.** Did the district court err in denying NEFSA relief on its meritorious removal-restriction claim?

## STATEMENT OF THE CASE

### A. The Regional Fishery Management Councils And Their Significant Powers Under The Act

**1.** For much of its history, the United States claimed only a narrow strip of territorial waters, leaving fishing regulation to the States. Today, the States govern out to three nautical miles, while federal authority extends from the edge of state waters to 200 miles offshore. *See* 43 U.S.C. § 1312; 16 U.S.C. § 1856(a)(1); 48 Fed. Reg. 10605 (Mar. 10, 1983). Commercial and recreational fishing in these waters is governed by the Magnuson-Stevens Fishery Conservation and Management Act of 1976, Pub. L. No. 94-265, 90 Stat. 331.

The Act installed "an entirely new[ ] regional management system," Cong. Rsch. Serv., R43565 *Reauthorization Issues for the Magnuson Stevens Fishery Conservation and Management Act*, 31 (2014), and established the Regional Fishery Management Councils to operate it, 16 U.S.C. § 1852(a). These councils are the Act's "primary policy makers." W. Rogalski, *The Unique Federalism of the Regional Councils Under the Fishery Conservation and Management Act of 1976*, 9 B.C. ENV'T AFFS. L.

REV. 163, 177-78 (1980). Congress created the councils to "exercise sound judgment in the stewardship of fishery resources through the preparation, monitoring, and revision of" fishery management plans and other policies. 16 U.S.C. § 1801(b)(5). By contrast, the Act assigns the Commerce Department an important—but ultimately secondary—role in these fishery management policies.[1]

**2.** The Act vests the councils with an array of policy-making powers—including even a power to develop binding federal regulations. Principally, the councils have the power to create and amend fishery management plans, which serve as the basis for, and constrain, implementing regulations that bind private parties. 16 U.S.C. § 1852. A council's exercise of these powers *compels* the Secretary to take certain actions, and the policies and rules a council develops are subject only to deferential review by the Secretary, as explained below.

---

[1] The Secretary has delegated his duties under the Act to the Under Secretary for Oceans and Atmosphere at the National Oceanic and Atmospheric Administration (NOAA), "a sub-agency of the Department." *Alfa Int'l Seafood v. Ross*, 264 F. Supp. 3d 23, 37-38 (D.D.C. 2017). NOAA, "in turn, has delegated [its] authority to the Assistant Administrator for Fisheries"—*i.e.*, the NMFS Director. *C&W Fish Co. v. Fox*, 931 F.2d 1556, 1558 (D.C. Cir. 1991).

With respect to the first step, the creation or amendment of fishery management plans, if a council finds that any "fishery under its authority … requires conservation and management," it must "prepare and submit" to the Secretary a fishery plan and any plan amendments it deems "necessary." *Id.* § 1852(h)(1). Each council must also "develop annual catch limits" for its fisheries. *Id.* § 1852(h)(6).

When councils are developing plans and amendments, the Secretary (through NMFS) merely "assist[s]" the councils by issuing "advisory guidelines" that lack "the force and effect of law." *Id.* § 1851(b). When a council develops a policy, the Secretary "review[s]" that policy "to determine whether it is consistent with national standards," the Act, and other "applicable law." *Id.* § 1854(a)(1)(A); *see also Conservation Law Found. of New England, Inc. v. Franklin*, 989 F.2d 54, 57 (1st Cir. 1993) (NMFS "reviews … for compliance with statutory mandates"). The Secretary "shall" promulgate all legally compliant plans or amendments after notice and comment. 16 U.S.C. § 1854(a)(1), (a)(3); *see also* D. Christie, *Comments on Fisheries Management Without Courts*, 32 J. LAND USE & ENV'T L. 423, 424 (2017) (explaining that the Secretary "*must*

*approve or partially approve*" a policy if he finds it consistent with applicable law).

By contrast, if the Secretary identifies a legal defect, he must offer "recommendations … that could be taken by the Council to conform" its policy to applicable law.    16 U.S.C. § 1854(a)(3)(C).    Notably, if the Secretary does not "notify [the] Council" of his decision "within 30 days," the "plan or amendment shall take effect as if approved." *Id.* § 1854(a)(3).

**3.**    The Act then grants each council authority to develop any implementing regulations it "deems necessary or appropriate for … implementing" a "plan or plan amendment" within its jurisdiction. *Id.* § 1853(c)(1).    These implementing regulations, ordinarily submitted along with the plan or amendment, write the catch limits or other substantive requirements contained in a plan or amendment into the Code of Federal Regulations. *See id.*; *see also e.g.*, JA.149-51.

As with the councils' power to make or amend plans, a council's exercise of this rule-developing power triggers mandatory action by the Secretary, and council-developed rules are subject only to deferential review.    A council first "deems" implementing regulations "necessary" and drafts them for review.    16 U.S.C. § 1853(c)(1).    The Secretary then

"*shall* immediately initiate an evaluation" of a council-developed regulation (1) to "determine whether [it is] consistent with" the underlying council policy, and (2) as before, to ensure its consistency with "applicable law." *Id.* § 1854(b)(1) (emphasis added).

If the answer to both questions is *yes*, "the Secretary *shall* publish" the council's "regulation[]" for notice and comment. *Id.* § 1854(b)(1)(A) (emphasis added). If either answer is *no*, the Secretary "*shall*" explain the "inconsistencies," "recommend[]" curative "revisions," and remand to the council. *Id.* § 1854(b)(1)(B) (emphasis added). If minor revisions that do not trigger such a remand prove necessary, the Secretary still must "consult with the Council before making any." *Id.* § 1854(b)(3).

After completion of this process and notice and comment, the Secretary promulgates the council-developed rule as a binding federal regulation. *See id.* § 1854(b)(3). As one high-ranking agency official has explained, the "council process" is where "policy-level decisions" are made, while NMFS plays an "auditor[]" role, "resolv[ing] what [the councils] do as legal."[2]

---

[2] R. Sando, *Rauch, Sam: Oral History Interview* at 15, 19 (June 30, 2016),                 https://voices.nmfs.noaa.gov/sites/default/files/2018-

**4.** The Act also grants councils the authority to *block* actions by the Secretary—what the Third Circuit has termed "pocket-veto powers." *Lofstad v. Raimondo*, 117 F.4th 493, 499 (3d Cir. 2024).

*First*, once a council's fishery management plan takes effect, the council can block the Secretary from repealing it. In the language of the Act, "[t]he Secretary may repeal or revoke a [plan] for a fishery under the authority of a Council only if [that] Council approves the repeal or revocation by a three-quarters majority." 16 U.S.C. § 1854(h).

*Second*, the Act constrains what the Secretary may do if a council fails to develop a plan—and once again grants the council a veto power over the Secretary's action. The Secretary may develop his own plan or amendment governing a council's fishery only in narrow circumstances: (1) where a council fails to do so "after a reasonable period of time," or (2) where a council does not "submit a revised or further revised [plan] or amendment" after a remand. *Id.* § 1854(c)(1)(A)-(B). Even then, councils enjoy unilateral authority to decide at least one crucial policy issue: The

---

09/rauch_samuel.pdf. Mr. Rauch, the regulatory chief at NMFS, also described the Councils as "mini legislative bod[ies]" that decide "who, when, and where people get to fish." *Id.*

Secretary cannot impose a controversial "limited access system" (essentially, a cap-and-trade style regime) until it is "approved by a [Council] majority." *Id.* § 1854(c)(3).

*Third*, a council can also block the Secretary from delegating fishery management to a State. The Act permits such a delegation to some States, but only if three-quarters of the relevant council approves. *See id.* § 1856(a)(3)(B).

**5.** Finally, the Act grants councils power to compel the Secretary to take action in at least one more scenario. "If a Council finds that an emergency exists or that interim measures are needed to reduce overfishing for any fishery … whether or not a [plan] exists for such fishery," "the Secretary shall promulgate" rules "to address the emergency or overfishing if the Council, by unanimous vote," demands "such action." *Id.* § 1855(c)(2)(A).

## B. The Council

The Council "ha[s] authority over the [federal] fisheries … seaward of" Maine, New Hampshire, Massachusetts, Rhode Island, and Connecticut, and has "18 voting members." 16 U.S.C. § 1852(a)(1)(A). These Members fall into three categories.

13

*First*, five Members serve automatically because they are "[t]he principal State official with marine fishery management responsibility and expertise in [a] constituent State, who is designated as such by the Governor," "or the designee of such official." *Id.* § 1852(b)(1)(A). These state-bureaucracy Members serve "so long as" they occupy their predicate state positions. *Id.* No other statutory provision governs their appointment to, tenure on, or removal from the Council: They serve indefinitely, at the pleasure of other state officials, without any threat of dismissal by anyone in the federal Executive Branch.

*Second*, the Act provides seats for 12 Members nominated by governors of the States within the Council's jurisdiction. Each governor must submit a list of "not less than three individuals" he deems "qualified" under the Act. *Id.* § 1852(b)(2)(C). The Secretary "review[s] each list … to ascertain if the individuals on [it] are qualified." *Id.* If so, the Secretary must appoint one. If he "determines that any individual" on a list is unqualified, the governor may "submit a revised list or resubmit the original list with an additional explanation of the [nominee's] qualifications." *Id.* The Secretary cannot bypass a list and make his own choice for any of these 12 seats. And he may *remove* such

a Member only "for cause" if the Member, "after notice and an opportunity for a hearing," is found to have violated a conflict-of-interest provision. *Id.* § 1852(b)(6)(B). For anything else, only the Council *itself* can initiate removal by a two-thirds vote. *Id.* § 1852(b)(6)(A).

*Third*, the final Member is the NMFS "regional director" or "his designee." *Id.* § 1852(b)(1)(B). Like the five state-agency officials, this Member is not independently appointed to (or removable from) the Council; he fills a seat automatically thanks to his agency role. This seat is currently filled by Mike Pentony, a career Senior Executive Service (SES) official. *See* JA.163-69.

### C.    The Challenged Regulations

The Council recently developed Framework Adjustment 65, which was implemented in a Final Rule making numerous changes to federal groundfishing regulations under the Northeast Multispecies fishery management plan. Most notably, it slashed haddock catch limits: For the Georges Bank stock, it cut the limit by 85%, from over 79,000 metric tons to 11,901. JA.136 (Table 2). For Gulf of Maine haddock, the cut was about 83%. JA.137 The policy also lowered the white hake limit by 13

percent, *id.*, and imposed a 10-year "rebuilding plan" on the cod fishery, JA.135.

The Council submitted Framework Adjustment 65 to NMFS in April 2023, and NMFS engaged the Act's review process for Council-developed implementing regulations laid out above. *See supra*, at 7-10.[3] Regional Administrator (and Council Member) Pentony found it "consistent with" the plan, the Act, and "other applicable law." JA.091, 157-58. The NMFS Director concurred via email 22 minutes after receiving Pentony's memo, JA.098, and NMFS published Framework Adjustment 65's limits as a Proposed Rule, JA.100-11.

NEFSA submitted a comment raising its constitutional objections to the Act's process for imposing fishery regulations. JA.112-15. In his post-comment decision memorandum, Pentony adhered to his view that Framework Adjustment 65 is lawful, explaining that "[n]one of the comments compel[led] [him] to disapprove any Council-recommended measure." JA.118. The NMFS Director again accepted the results of

---

[3] The version submitted by the Council to NMFS is available at https://d23h0vhsm26o6d.cloudfront.net/230418_Groundfish_FW65_Final_Submission_2023-07-11-170642_mnbx.pdf.

Pentony's review.  JA.132.  NMFS issued the Framework Adjustment 65 Final Rule on August 18, 2023.  JA.134-51.

### D.    NEFSA

NEFSA is an alliance of local fishermen dedicated to protecting the future of family-run commercial fishing in New England and educating the public about seafood resource management.  NEFSA seeks to promote economic growth, ecosystem sustainability, and American food security. NEFSA's members include commercial fishermen adversely affected by the catch reductions and other regulations contained in Framework Adjustment 65 and implemented in the Final Rule.  Among them, David Osier and Devyn Campbell operate fishing businesses that are suffering because the Rule cripples their ability to profitably harvest haddock, hake, and other groundfish species.  *See* JA.76-86.

### E.    Procedural History

On September 8, 2023, NEFSA sued the Secretary of Commerce, NMFS, and NMFS's director and regulatory chief in the U.S. District Court for the District of Maine.  The parties briefed cross-motions for summary judgment on an expedited schedule.  NEFSA argued that the Act's Council Member provisions violate the Appointments Clause and

the Executive Vesting Clause (by restricting the President's removal power). Accordingly, NEFSA argued that the Council lacked lawful authority to develop Framework Adjustment 65 and, thus, that the Secretary never received a valid Council-developed rule that compelled evaluation or could be approved and issued as a Final Rule.

The Government offered only two arguments in response. *First*, it disputed NEFSA's Article III standing to challenge the legality of the Final Rule, despite conceding that the Final Rule was the cause of NEFSA members' injuries. After the Third Circuit rejected an identical argument, however, the Government declined to press it. *See Lofstad*, 117 F.4th at 497-98; JA.175:20-176:2. The district court rejected it, too. *See* Add.103-10.

*Second*, the Government asserted that neither the Appointments Clause nor the President's at-will removal authority applies to Council Members in the first place, on the theory that Members are not "Officers of the United States." Instead, it argued, the Council is a mere advisory body with "no authority to do anything." ECF No. 41 at 29. The Government offered no defense of the Act's appointment provisions *or*

removal restrictions if, in fact, Members are "Officers."  Nor did it make any backup remedial arguments.

The district court issued an opinion partially granting and partially denying each summary-judgment motion on December 30, 2024.  After confirming its jurisdiction, the court addressed NEFSA's Appointments Clause claims.  It first determined that Council seats are "continuing office[s] established by law," *Lucia*, 585 U.S. at 247, by virtue of the duration of Members' terms and the "continuing duties" Congress assigned to these offices, Add.123-25.  Next, it held that Council Members exercise "significant authority in certain contexts by virtue of the [Act's] grant of authority to the Councils to restrict the actions of the Secretary." Add.126 (citing 16 U.S.C. §§ 1854(c)(3), (h)).  In particular, the district court concluded that the Council's pocket-veto powers qualify as significant executive authority.  *See* Add.126-27.

Thus, the district court held that "Council Members constitute officers of the United States and must comport with its constitutional requirements."  Add.127.  Given the unilateral nature of the Council's pocket-veto powers "to restrict the actions of the Secretary," Add.126, the district court further held that Council Members are "principal officers of

the United States" who must be "appointed by the President and confirmed by the Senate," Add.133.

The district court, however, rejected NEFSA's argument that the Council's role in developing fishery regulations is a "significant" exercise of federal power. It first concluded that the Secretary's review of Council-developed rules is effectively plenary, not limited to legal errors. Add.129. It then attempted to distinguish *Lucia*—which held that "final decisionmaking authority" is *not* a requirement for officer status (*Lucia*, 585 U.S. at 247 n.4)—by contrasting the adjudicatory role of ALJs and the rule-developing role of the Council. Add.130-31.

Turning to the Members' insulation from removal, the district court noted that the Government "d[id] not engage with this argument, instead relying on [its] position that Council Members do not constitute federal officers"—and thus had "forfeited [its] right" to defend the removal restrictions on other grounds. Add.133-34. In any event, the district court had little difficulty finding that the Act's tenure protections—some of which are absolute—plainly "interfere[] with the ability of the President to take care the laws of the United States are being faithfully executed." Add.134.

20

Finally, the district court denied NEFSA its requested relief (*i.e.*, vacatur, an injunction, or declaratory relief) in favor of "severing" those pocket-veto powers of the Council that, in the district court's view, make the Members principal officers. Add.134-36. While acknowledging that the Government never requested this approach, the district court modeled its disposition on the Third Circuit's decision in *Lofstad*. According to the district court, striking the pocket-veto powers "addresse[d] both the Appointments Clause and constitutional removal claims, as, without these provisions, the Council Members do not exercise any significant authority." Add.136.

Thus—despite concluding that NEFSA had standing and had established violations of the Appointments Clause and the Executive Vesting Clause—the district court left in place the Final Rule that harms NEFSA's members and is the entire object of NEFSA's suit. The district court nonetheless purported to enter "judgment for [NEFSA]" and "order[ed] 16 U.S.C. §§ 1854(c)(3), (h) to be severed from the [Act] as unconstitutional." *Id.*; *see also* Add.001 (final judgment).

The district court entered final judgment for the Government on the remaining counts. Add.001, 136-43. The parties filed timely notices of

21

appeal.  JA.013-17.  In this appeal, NEFSA does not challenge the district court's rejection of the constitutional removal-restriction claim as to Deputy Assistant Administrator Samuel D. Rauch, III.  *See* Add.136-38.

## SUMMARY OF ARGUMENT

**I.**  NEFSA has established an Appointments Clause violation and is entitled to relief from the Final Rule.

**A.  1.**  As the district court correctly concluded, Council Members are principal "Officers of the United States."  Council seats are continuing positions established by federal law.  And Congress assigned these offices significant authority, including by empowering them to pocket-veto the Secretary's actions on critical questions of fishery policy.

**2.**  Officer status is categorical under the Appointments Clause: Any office on which Congress bestows significant authority is subject to the Clause.  Anyone who fills such an office "must be properly appointed," even if the office also comes with "duties that may be performed by an employee."  *Freytag*, 501 U.S. at 882.  In short, an office cannot be filled until Congress legislates an appointment mechanism that complies with Article II.  Thus, any individual "appointed in violation of the Appointments Clause" merely *purports* to "exercise … power that the

22

actor d[oes] not lawfully possess." *Collins*, 594 U.S. at 258.  None of that individual's *ultra vires* acts has any legal effect.  Thus, the Council lacked authority to develop Framework Adjustment 65, and the Secretary never received a valid Council-developed rule that compelled evaluation, could be published as a proposed rule, or could be promulgated as a Final Rule.

**3.**  Severability doctrine does not provide a way around these basic principles.  Congress—"*not the Judiciary*"—has the power to "blue-pencil a sufficient number of the [Council's] responsibilities so that its members [are] no longer … 'Officers.'"  *Free Enter. Fund*, 561 U.S. at 509-10 (emphasis added).  The district court violated that instruction.  And it did not explain how severing the Council's principal-officer-level power after the fact could retroactively bestow valid Article II authority on Council Members at the time they developed Framework Adjustment 65.

**B.**  Even if severing the statutory powers that make Council Members Article II officers were a legally defensible remedy, the district court's remedy here still fails as a matter of law.

**1.**  The district court's remedy left in place the Council's rule-developing powers whose exercise prompted promulgation of the Final Rule that harms NEFSA's members.  Those powers confer significant

23

executive authority on the Council: They authorize the Council to compel the Secretary to act and are circumscribed only by the Secretary's deferential review of Council-developed rules. Thus, even under the district court's order, Council Members' lack of valid appointments violates Article II, and NEFSA is entitled to relief from the Final Rule.

**2.** The district court both misapplied Supreme Court precedent and misinterpreted the Act when it concluded otherwise.

**II.** As the district court correctly held, NEFSA also established that the Act violates the President's Article II removal authority. Five Council Members are immune from removal by *anyone* in the Executive Branch for *any reason*; 12 Members are generally removable only with the consent of their Council colleagues; and one enjoys robust protections against firing or reassignment as a career SES appointee. Indeed, the Government has "forfeited [its] right to contest" NEFSA's argument "that the constitutional limits on removal protections apply." Add.134. The district court declined to grant relief only on the basis of its severance remedy, so if the Court agrees that this remedy fails as a matter of law on either basis NEFSA explains, it should remand for entry of appropriate relief on NEFSA's removal claim, too.

24

## STANDARD OF REVIEW

This Court does not defer to a district court's summary-judgment rulings. *See Hardy v. Loon Mountain Recreation Corp.*, 276 F.3d 18, 20 (1st Cir. 2002). This Court likewise "review[s] the constitutionality of federal statutes de novo." *United States v. Diggins*, 36 F.4th 302, 306 (1st Cir. 2022).

## ARGUMENT

### I.     NEFSA IS ENTITLED TO RELIEF ON ITS SUCCESSFUL APPOINTMENTS CLAUSE CLAIM.

The district court correctly concluded that the Council's Members qualify as "Officers" subject to the Appointments Clause (and in fact, *principal officers* who must be appointed by the President with Senate confirmation). Just so: Congress has bestowed on the Council authority to make final decisions for the Executive Branch.

The district court, however, erred in its response to that conclusion. Rather than set aside the Council's *ultra vires* action and the resulting Final Rule, the district court severed from the Act what it saw as the Council's only significant powers. Through this alchemy, it purported to transmogrify *constitutional officers* into *employees*—mere "lesser functionaries" to whom the Clause does not even apply. *Lucia*, 585 U.S.

25

at 245.  The upshot?  A "victory" for NEFSA that did not provide a shred of judicial redress for the constitutional violations that it established and that harm its members.

The district court's reasoning fails at each step.  *First*, the district court's (correct) holding that Council Members are officers should have been the end of this case:  The actions of would-be officers without valid Article II appointments are void *ab initio*.  That is why the appropriate remedy for Appointments Clause violations is vacatur of such actions. And as the Supreme Court has explained, only Congress, "not the Judiciary," enjoys the power to "blue-pencil" an officer's powers and thus convert him into an employee.  *Free Enter. Fund*, 561 U.S. at 509–10. The district court violated this rule without even *acknowledging* it.

*Second*, even if a court *could* solve an Appointments Clause violation by blue-penciling statutory provisions granting a federal official officer-level authority, the Final Rule still should be set aside.  That is because the Council's rule-developing power is a significant executive authority—and the district court erred in concluding otherwise.  In fact, that power is indistinguishable from powers the Supreme Court has deemed significant in other cases. *See Lucia*, 585 U.S. at 247-49; *Freytag*,

501 U.S. at 881-82.  Thus, the Council could exercise that power and develop Framework Adjustment 65 only through officers appointed in accordance with Article II.  The absence of such officers therefore renders invalid both Framework Adjustment 65 and the resulting Final Rule. And the district court's remedy guarantees a repeat of this constitutional violation because it leaves the Council's rule-developing power in place. Thus, at a minimum, the Court should vacate and remand on this alternative basis.

## A.    The Council's Actions Are Void Because Members Lack Article II Appointments.

As the district court held—and the Third Circuit has agreed, *see Lofstad*, 117 F.4th at 501—Council Members are principal officers because Congress vested them with the authority to make final decisions for the Executive Branch.  But under the Act, Council Members are *not* appointed by the President with Senate confirmation.  They are not even appointed in accordance with Article II's rule for appointing inferior officers.  Thus, their actions—including the development of Framework Adjustment 65—were *ultra vires*, and NEFSA merits relief from the product of those actions.

Rather than grant relief, the district court purported to convert Council Members from constitutional officers to employees by severing the pocket-veto powers it viewed as the only significant executive authority the Act grants them. That reasoning suffers from at least two defects. *First*, it ignores the Supreme Court's instruction that Article II "Officer" status is categorical, not situational. *Second*, it extends severability doctrine in ways the Supreme Court has expressly forbidden. This Court should vacate and remand for the entry of appropriate relief.

### 1.    *Council Members are principal officers.*

Because the Government offers no defense of the Act's appointment mechanisms as applied to officers of any stripe, the question of "officer" status resolves NEFSA's Appointments Clause challenge. That inquiry has two steps. *First*, the court determines whether the official in question holds a "continuing office established by law." *Lucia*, 585 U.S. at 247. *Second*, if so, the court determines whether Congress granted the office "significant authority pursuant to the laws of the United States." *Buckley v. Valeo*, 424 U.S. 1, 126 (1976) (per curiam). If these tests are met, the official "must ... be appointed in the manner prescribed by" Article II. *Id.*

Officers who enjoy unreviewable authority are necessarily principal officers. *United States v. Arthrex, Inc.*, 594 U.S. 1, 23 (2021). Principal officers must be appointed by the President and confirmed by the Senate. *See* U.S. Const. art. II, § 2, cl. 2.

By contrast, an officer "whose work is directed and supervised" by officials "who were appointed by [the] President[]" and confirmed by the Senate qualifies as an "inferior [O]fficer." *Edmond v. United States*, 520 U.S. 651, 663 (1997); U.S. Const. art. II, § 2, cl. 2. The power to appoint an inferior officer may be vested in "the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. art. II, § 2, cl. 2. That power may not be vested in governors or other state officials. *See id.*

a.     Council Members are principal officers under this framework. *First*, Council Members "occupy 'continuing positions' under a federal law" for the same reasons as the Board Members in *Aurelius Investment, LLC v. Puerto Rico*, 915 F.3d 838, 856 (1st Cir. 2019). Like those Board Members, the governor-nominated Council Members are "appoint[ed] to an initial term of three years and can thereafter be reappointed." *Id.*; *see* 16 U.S.C. § 1852(b)(3). Meanwhile, Council Members drawn from state

29

regulatory agencies serve *indefinitely*—"so long as" they hold their state positions. 16 U.S.C. § 1852(b)(1).

As in *Aurelius*, "[t]he continuity of the [Council] Members' position is fortified by" the Act's restrictions on their removal. 915 F.3d at 856; *see supra*, at 12-13. And most important, as the district court explained, the Council's statutory responsibilities are "'continuing and permanent,'" not "'occasional or temporary.'" *Lucia*, 585 U.S. at 245 (quoting *United States v. Germaine*, 99 U.S. 508, 511-12 (1879)); *see* Add.125. Just to illustrate: The Council analyzes stock assessments "on a *continuing* basis," "develop[s] *annual* catch limits," and oversees "*multi-year* research." 16 U.S.C. § 1852(h)(5)-(7) (emphases added).

**b.**    *Second*, the Council has "significant authority" to "block the Secretary of Commerce from acting." *Lofstad*, 117 F.4th at 499. Among other significant powers, the Council possesses the final say on whether to "repeal or revoke a fishery management plan," 16 U.S.C. § 1854(h), and whether to adopt a controversial "limited access system" for one of its fisheries, *id.* § 1854(c)(3). As the Third Circuit recently explained, these pocket-veto provisions bestow significant—indeed, unreviewable— authority on councils: By empowering councils to override the

30

Secretary's policy judgments, the Act "thwart[s]" the democratic "chain of command" from the President that Article II dictates. *Lofstad*, 117 F.4th at 500.

The Government did not meaningfully contest the significance of this unilateral authority below. Nor could it credibly do so, given the Executive Branch's recognition that the Act's "prohibition" on the Secretary's "ability to repeal a [plan] without [Council] approval … raises serious concerns under the Appointments Clause." 1996 U.S.C.C.A.N. 4120, 4120-21, 1996 WL 787969 (Oct. 11, 1996) (signing statement of President Clinton). Nor could it correctly do so, since a council's exercise of any of these pocket-veto powers "issue[s] a final decision binding the Executive Branch." *Arthrex*, 594 U.S. at 23.

While issuing final decisions for the Executive Branch alone is enough to render Council Members principal officers, *see id.*, the other considerations reflected in Supreme Court case law point in the same direction. Most important, neither the President nor any other Article II officer may remove Members at will—strong, nearly dispositive evidence of their principal-officer status. *See Edmond*, 520 U.S. at 664 (citing this "powerful tool for control."). Moreover, no principal officer oversees the

31

Council's operations on a day-to-day basis by, *e.g.*, "prescrib[ing] uniform rules of procedure" for the Council. *Id.* The Council controls its own procedures, policy priorities, agendas, and staffing, *see* 16 U.S.C. § 1852(e)-(i), and decides whether to trigger the Act's rulemaking processes, *see id* § 1854(a)(1).

### 2. *Without a constitutional appointment, Members' actions are void.*

In the Act, Congress granted the Council significant, unreviewable authority while dictating appointment mechanisms that do not comply with the Appointments Clause's requirements for principal officers (or even inferior officers). In other words, Congress created Article II offices, but did not legislate any lawful means by which to *fill* those offices. Accordingly, there are simply no validly appointed Council Members with authority to execute *any* of the official duties specified in the Act.

Indeed, an individual "appointed" to an Article II office "in violation of Appointments Clause" merely purports to "exercise … power that the actor d[oes] not lawfully possess." *Collins*, 594 U.S. at 258. Thus, where there is a "constitutional defect in the statutorily prescribed method of appointment to [an] office," the actions of the would-be officer are simply "void." *Id.* at 257; *see also id.* at 266-67 (Thomas, J., concurring)

32

("[W]hether an officer can lawfully exercise the statutory power of his office at all" turns on whether he was "properly appointed"; if not, his "authority … is legally deficient[.]").

This is true of *all* actions taken by the would-be officer, not only those actions that, in a court's after-the-fact view, involve the exercise of "significant executive authority." *Freytag*, 501 U.S. at 881. In other words, an Executive Branch official's status is categorical: He either qualifies as an officer who must be appointed in accordance with Article II to perform *any* duty Congress has bestowed on him, or he qualifies as an employee who must not be so appointed. *See id.* at 882. Thus, the Appointments Clause is violated *any* time a would-be officer lacking an Article II appointment purports to exercise *any* authority or to take *any* action on behalf of the Executive Branch. *See, e.g.*, *id.*

The Supreme Court explained as much in *Freytag*, where it considered the "officer" status of certain Executive Branch tax judges. *See id.* at 868. The challenged action was a tax judge's issuance of a nonfinal ruling. *Id.* at 880. The Supreme Court concluded that the authority to issue a nonfinal ruling was "significant" and made the tax judge an Article II officer. *See id.* at 881-82.

33

But it further explained that, "[e]ven if" this authority were not significant—and, therefore, would not alone be sufficient to make the tax judge an officer—its "conclusion" on officer status "would be unchanged." *Id.* at 882. That was because Congress had also authorized tax judges to issue final decisions, a quintessentially significant authority that made them Article II officers. *Id.*

The Supreme Court thus rejected the Government's argument that the power to issue a final judgment was not relevant to the Appointments Clause question in that case. *See id.* As the Supreme Court explained, officials cannot be "officers for purposes of some of their duties …, but mere employees with respect to other[s]." *Id.* "The fact that an … officer on occasion performs duties that may be performed by an employee not subject to the Appointments Clause does not transform his [officer] status under the Constitution." *Id.* Instead, that status is categorical: If an official has been granted significant authority, "he is an officer within the meaning of the Appointments Clause and he must be properly appointed." *Id.*

Lower courts have long understood *Freytag* to establish that the Appointments Clause is violated whenever a would-be officer *possesses*

significant executive authority, regardless of whether his specific challenged action involved the *exercise* of such authority. *See, e.g.*, *Collins v. Mnuchin*, 938 F.3d 553, 591 (5th Cir. 2019) (*en banc*) ("If by statute [an official] perform[s] at least some duties of an Officer ... , his appointment must accord with Article II."); *Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 684 F.3d 1332, 1338 (D.C. Cir. 2012) ("*Freytag* calls on us to consider all the [official's] powers ... not just those applied to the litigant ...."). As the D.C. Circuit put it, the *Freytag* Court "made plain that ... it was ready to throw out the Tax Court's decision simply on the ground that special trial judges ... held what it viewed as clearly" officer-level authority "to make final decisions[], even though the [judge] had not exercised any power to make final decisions in Freytag's case." *Landry v. FDIC*, 204 F.3d 1125, 1131-32 (D.C. Cir. 2000).

Council Members' actions—including their development of Framework Adjustment 65—are "void." *Collins*, 594 U.S. at 257-58. Council Members are (principal) officers, but they were not appointed in accordance with Article II, so they cannot exercise any of the powers Congress conferred in the Act. *Id.* at 258; *Freytag*, 501 U.S. at 881-82. They therefore may not exercise the Act's rule-developing powers, even if

the district court were correct that those powers are not significant (which it was not, *see infra* Part I.B). *See Freytag*, 501 U.S. at 881-82; *see also Collins*, 938 F.3d at 591; *Intercollegiate Broad. Sys.*, 684 F.3d at 1338; *Landry*, 204 F.3d at 1131-32.

### 3. *Vacatur of the Final Rule, not severance of the Act, is the only lawful and appropriate remedy.*

Because an improperly appointed would-be officer's actions are void, the remedy for such actions is judicial vacatur. *See, e.g.*, *Lucia*, 585 U.S. at 251 (vacating agency "adjudication tainted with an appointments violation"); *Ryder v. United States*, 515 U.S. 177, 188 (1995) (ordering a new "hearing before a properly appointed panel"); *NLRB v. Noel Canning*, 573 U.S. 513, 557 (2014) (upholding vacatur of agency order); *Intercollegiate Broad. Sys.*, 684 F.3d at 1342 (vacating board's determination). Thus, because the Council's development of Framework Adjustment 65 was void, Framework Adjustment 65 could not trigger the Act's rulemaking mechanisms, compel the Secretary's evaluation, or authorize the Secretary to publish and promulgate it as a binding federal regulation. Accordingly, the Final Rule, too, is void, and the Court should either vacate the Final Rule or remand to the district court to do so. *See,*

*e.g.*, *Lucia*, 585 U.S. at 251; *Ryder*, 515 U.S. at 188; *Noel Canning*, 573 U.S. at 557; *Intercollegiate Broad. Sys.*, 684 F.3d at 1334.

The district court's attempt to end-run these fundamental principles by purporting to "sever" Members' officer-level authority from the Act fails as a matter of law.  The Supreme Court has *expressly rejected* that approach, explaining that the "editorial freedom" needed to "blue-pencil a sufficient number of the [entity's] responsibilities so that its members would no longer be 'Officers of the United States' … belongs to the Legislature, not the Judiciary." *Free Enter. Fund*, 561 U.S. at 509-10.  This makes perfect sense:  Because Article II vests Congress with exclusive authority to "establish by Law" Executive Branch offices, U.S. Const. art. II, § 2, cl. 2, it inexorably follows that federal courts may not "re-write Congress's work by creating offices, terms, and the like," *Seila Law LLC v. CFPB*, 591 U.S. 197, 238 (2020).

Thus, the Supreme Court has *never* remedied an Appointments Clause violation by severing an official's powers to transform him from a principal officer into a mere employee.  It therefore has not invoked—and, to the contrary, has *foreclosed* invoking—judicial severance to transform a constitutional officer whom Congress has vested with

37

significant executive authority into an employee lacking such authority. *See, e.g.*, *Free Enter. Fund*, 561 U.S. at 509-10. The district court did not even *mention* this prohibition on the Judiciary blue-penciling away an Appointments Clause violation, much less explain how its remedy could possibly escape it.

The district court's remedy is also untenable for yet another reason: After-the-fact judicial severance of the statutory scheme cannot retroactively validate an action tainted by a contemporaneous Appointments Clause violation. Rather, one reason vacatur is the appropriate remedy is that "the Appointments Clause violation" existed "*at the time*" of the challenged action. *Intercollegiate Broad. Sys.*, 684 F.3d at 1334 (emphasis added); *see also Collins*, 594 U.S. at 258 (vacatur would be appropriate where the would-be officer "lacked the authority to carry out the functions of his office" at the time of the challenged action). Simply put, even if severing some of an officer's statutory authority makes him an employee *going forward* and remedies a *prospective* Appointments Clause violation, it cannot *retroactively* cure his powerlessness to act *prior to* that "remedy."

In all events, as the district court itself recognized, "officials cannot be 'an officer on Monday and an employee on Tuesday'; once significant authority is delegated, the official is a federal officer." Add.127. Yet its remedy does precisely that: It deems Members officers at the time the Council developed Framework Adjustment 65—and even the day *before* judgment issued—and employees on the day of the judgment.

By so doing, the district court's retroactive severance "remedy" denied NEFSA *any* remedy at all. The district court (correctly) held that NEFSA established both an Appointments Clause violation and harm to its members from the Final Rule. Add.108, 133. But it failed to redress that harm, instead upholding the Final Rule and its dramatic catch-limit reductions. The district court thus left NEFSA in exactly the same injured position it would have occupied without filing suit—and guaranteed a repeat of this constitutional violation by leaving the Council's rule-developing power in place.

Unsurprisingly, the district court failed to cite any persuasive, let alone controlling, authority to support its smoke-and-mirrors severance remedy. None exists.

*First*, the district court relied on *Seila Law*, where the Supreme Court remedied a *removal-restriction* violation by severing a discrete for-cause removal provision. *See* Add.135. *Seila Law*, however, does not suggest that a federal court can remedy an *Appointments Clause* violation by severing an officer's significant authority, much less overrule *Free Enterprise Fund*'s prohibition on such judicial blue-penciling. To the contrary, where it has deployed a severance remedy in removal-restriction cases, the Supreme Court has emphasized that the remedy makes no changes to the officer's authority, explaining that the "structure and duties" of these offices "remain[ed] fully operative without the offending tenure restriction." *Seila Law*, 591 U.S. at 235; *Free Enter. Fund*, 561 U.S. at 509-10, *Collins*, 594 U.S. at 258 n.23. The district court's severance remedy here does precisely the opposite because it *changes* the authorities, "structure and duties" of Council Members' offices. *Seila Law*, 591 U.S. at 235.

*Second*, the district court staked its approach on the Third Circuit's decision in *Lofstad*. There, the Third Circuit became, to Appellants' knowledge, the first federal court in history to wield severability doctrine to "remedy" an Appointments Clause violation by (purportedly)

transforming a principal officer into a mere employee.  *See Lofstad*, 117 F.4th at 501.  The Third Circuit majority thought it could save the Mid-Atlantic Council by transforming its members from constitutional officers into mere employees.  *See id.*

But the majority's cursory severability analysis did not recognize the novelty of this approach or its tensions with Supreme Court precedent.  *See id.*  The majority did not even mention, let alone distinguish, *Freytag*'s holding that officer status is categorical.  *See id.* And it did not acknowledge, much less seek to comply with, *Free Enterprise Fund*'s prohibition on judicial blue-penciling of officers' duties. *See id.*

Respectfully, the *Lofstad* court erred.  As Judge Rendell explained in dissent, the majority's approach "gut[s] the powers given the Councils by Congress."  117 F.4th at 502 (Rendell, J., dissenting).  While severing a standalone removal restriction may be appropriate, any so-called "cure" that "excises precisely what Congress gave the Councils authority to do" is not.  *Id.* at 502 n.3.  Indeed, the majority's reasoning contravenes *Free Enterprise Fund* and would permit the judiciary effectively to create

whole new offices Congress did not "establish by Law." U.S. Const, art. II, § 2, cl. 2.

*Third*, neither the district court nor the Third Circuit in *Lofstad* cited *United States v. Arthrex*, 594 U.S. 1, to justify this novel approach. And for good reason: *Arthrex* did not overrule *Free Enterprise Fund*'s prohibition on judicial blue-penciling of an officer's duties. In fact, *Arthrex* did not even involve an Article II defect in any officer's method of appointment. Instead, *Arthrex*—like a removal-restriction case— involved an Article II defect in a principal officer's authority to control an inferior officer.

The question in *Arthrex* was whether administrative patent judges (APJs)—whom Congress had created, and who had been properly appointed, as "inferior officers"—bore "responsibilities … consistent with their method of appointment." 594 U.S. at 13. Thus, because "[a]n inferior officer must be directed and supervised at some level by" a principal officer, that question boiled down to whether APJs were so directed and supervised. *Id.* at 13-14 (cleaned up). APJs generally are overseen by the Director of the Patent Trial and Appeal Board, who is a principal officer, *see id.* at 8, but Congress had excepted decisions by

42

panels of APJs from the Director's review, *id.* at 26. That "restraint on the review authority of the Director" was the sole source of the constitutional problem. *Id.* at 27. Thus, as in its removal-restriction cases, the Supreme Court severed the review restriction and restored the President's ultimate authority to control the inferior-officer APJs. *See id.* at 24-27.

Notably, the Supreme Court explained that this remedy would not have been appropriate if the Article II violation had been in the method of "the appointment of APJs." *Id.* at 27. In that scenario, the Supreme Court reiterated, the proper remedy would have been vacatur of the APJs' panel decision and "a hearing before a new panel of APJs" who had been constitutionally appointed. *Id.*

*Arthrex* thus underscores that the district court erred in ordering severance of the Act rather than vacatur of the Final Rule. *See id.* After all, the constitutional violation in this case is that Members lack *any* valid Article II appointment and thus cannot take any action, *see supra* Part I.A.2, not that they are inadequately supervised inferior officers, *see* 594 U.S. at 13-14, 27. Thus, even *Arthrex* confirms that vacatur is the appropriate remedy here. *See id.*

43

Indeed, *Arthrex* did not purport to bless—and could *not* have blessed—judicial blue-penciling to transform principal officers into mere employees by eliminating substantive powers granted by Congress. *See id.* But even if this Court detects some tension among *Arthrex, Freytag,* and *Free Enterprise Fund* on this issue, resolving any perceived conflict is a job for the Supreme Court itself. "The Supreme Court has repeatedly instructed lower courts that only it has the prerogative to overrule its own decisions." *United States v. Siciliano*, 578 F.3d 61, 69 n.5 (1st Cir. 2009). Until the Supreme Court acts, a lower court cannot be the first to claim the core Legislative power to "blue-pencil" enough of the Council's "responsibilities so that its members" transform into mere employees. *Free Enter. Fund*, 561 U.S. at 509-10. *Arthrex* did not do that, and this Court should not follow the Third Circuit's misguided lead, as *Free Enterprise Fund* makes clear.

*     *     *

The district court's remedial creativity may have been motivated by an understandable desire not to "invalidat[e] an entire statutory scheme that has effectively governed the United States for decades." Add.136. That concern is simply misplaced here. NEFSA has *never* sought (and

44

would never seek) wholesale invalidation of the Act. It seeks only targeted relief based on the specific challenged appointment and removal provisions. In addition, while recognizing the Council's unconstitutional structure compels relief *in this case*, it does not imperil fishery regulation writ large. NEFSA has not sought relief for *past* regulations. And *future* regulations can be developed without using the Act's Council-driven rulemaking process. The Secretary can regulate unilaterally if the Council fails to act—a power that might well be triggered by a judicial ruling that the Council is *powerless* to act *at all*. *See* 16 U.S.C. § 1854(c)(1)(A). In the meantime, or until Congress tweaks the Act's appointment and removal provisions, the Secretary can use his interim rulemaking power as appropriate. *See id.* § 1855(c)(1). In short, the sky will not fall—and NEFSA has no interest in seeing that it does.

## B.    The District Court's Remedy Perpetuates, Rather Than Cures, The Appointments Clause Violation.

Even if a court *could* solve an Appointments Clause violation by blue-penciling Congress's statutes granting a federal official officer-level authority, the district court's remedy fails to do so here. The Council's rule-developing power the district court left in place is significant executive authority, so Council Members' lack of valid Article II

45

appointments voids their actions and the Final Rule even under the district court's remedy.  Thus, in all events, the district court's remedy perpetuates, rather than cures, the Appointments Clause violation and cannot stand.

### 1. *Council Members retain significant authority under the district court's remedy.*

Only lawfully appointed Article II "Officers" may wield "significant" federal authority.  *Freytag*, 501 U.S. at 881.  Any power that is "more than ministerial" qualifies as "significant."  *Id.*  Thus, the category of federal officials who qualify as officers is broad and encompasses even a "postmaster first class" and "the clerk of a district court."  *Buckley*, 424 U.S. at 126.

Council Members' rule-developing power preserved by the district court's remedy is likewise significant.  In particular, Congress empowered the Council to initiate the Act's process for making region-wide rules, *see, e.g.*, 16 U.S.C. §§ 1854(a)(1), (b)(1), to develop rules to amend the governing regulatory frameworks, *see, e.g.*, *id.* §§ 1852(h)(1), (h)(6); 1853(c)(1); 1854(a)(3)(C), and to assemble the administrative record that justifies each new action it proposes, *see id.* §§ 1852(h)(3), (g);

1853(a); *see, e.g.*, *Lucia*, 585 U.S. at 248 (power to "shape the administrative record" is significant).

These powers authorize Council Members to make policy judgments affecting fishermen region-wide and to instigate rulemaking by the Executive Branch. Moreover, they even empower Council Members to compel the Secretary—*a Cabinet official*—to act. Whenever the Council develops an implementing regulation, the Secretary "*shall* immediately initiate an evaluat[ion]" of it, but only for consistency with law. 16 U.S.C. § 1854(b)(1) (emphasis added). The Secretary's options upon completing that evaluation are likewise limited. For instance, if the Council-developed rule is consistent with law, "the Secretary *shall* publish" it for notice and comment. *Id.* § 1854(b)(1)(A) (emphasis added). If it is not, the Secretary "*shall*" explain the "inconsistencies," "recommend[]" curative "revisions," and remand to the council, *id.* § 1854(b)(1)(B) (emphasis added), or at minimum "consult with the Council before making any" even minor revisions to it, *id.* § 1854(b)(2), (3).

The district court's remedy preserves all of these significant powers. *See* Add.136. Thus, because Council Members purport to occupy a

47

"continuing office established by law," their lack of valid Article II appointments means their actions and the Final Rule remain invalid under the district court's remedy. *Lucia*, 585 U.S. at 246; *see supra* Part I.A.2.

In addressing this alternative argument, the Court need not decide whether the rule-developing power makes Council Members principal or inferior officers. Either way, they lack valid Article II appointments, *see* U.S. Const. art. II, § 2, cl.2; *supra* Part I.A.1, so the district court's remedy fails to cure the Appointments Clause violation.

## 2. *The district court's contrary reasoning fails.*

The district court concluded that its remedy solved the Appointments Clause problem by removing Council Members' officer status under Article II. It reached that conclusion only by misapplying controlling Supreme Court precedent and misinterpreting the Act.

a.    The district court thought the Council's rule-developing power is not significant because NMFS must "legally effectuate" Council-developed rules "through implementing regulations." Add.129; *see also* Add.130 (The Council's "policy proposals have no legal effect on private parties without NMFS going through the rulemaking process."). In

particular, the district court reasoned that because "only NMFS has the authority to issue binding rulemakings," only NMFS wields significant authority with respect to fishery management regulations.  Add.131.

This reasoning directly contradicts Supreme Court authority:  The Supreme Court has "explicitly reject[ed]" the "theory that final decisionmaking authority is a *sine qua non* of officer status."  *Lucia*, 585 U.S. at 247 n.4.  Instead, it has recognized that a federal official can be an Article II officer even where his "opinion counts for nothing unless" another, superior officer "adopts it as his own."  *Id.* at 249; *Freytag*, 501 U.S. at 881.

Indeed, whether an official wields final decisionmaking authority or only nonfinal authority is relevant to whether he is a *principal or inferior* officer under Article II—a question the Court need not resolve if it reaches this alternative argument—*not* whether he is an officer in the first instance.  *See, e.g.*, *Arthrex*, 594 U.S. at 23 ("Only an officer properly appointed to a *principal* office may issue a final decision binding the Executive Branch.") (emphasis added); *Edmond*, 520 U.S. at 663 (inferior officer is subject to "direct[ion] and supervis[ion]" from a superior officer); *see also Burgess v. Fed. Deposit Ins. Corp.*, 871 F.3d 297, 303 (5th Cir.

2017) (final decisionmaking authority is "relevant to the distinction between principal and inferior Officers," not "the distinction between Officers and employees").

For example, the military judges in *Edmond* were powerless to "render a final decision … unless permitted to do so by other Executive officers." 520 U.S. at 665. But that lack of final decisionmaking authority did not affect, much less alter, the conclusion that they qualified as (inferior) officers. *See id.* at 663-66; *see also Bandimere v. SEC*, 844 F.3d 1168, 1184 (10th Cir. 2016). Thus, that Council Members' rule-developing power does not accord them final decisionmaking authority neither renders that power insignificant nor excepts them from the Appointments Clause. *See, e.g.*, *Arthrex*, 594 U.S. at 23; *Edmond*, 520 U.S. at 663; *Burgess*, 871 F.3d at 303.

**b.** The district court next attempted a variation on this theme, suggesting that the rule-developing power is not significant because the Secretary may reject Council-developed rules for any legal or policy reason. Add.129. But the district court once again missed the point: Even as described by the district court, the scope of Secretary's review has no bearing on whether the Council's rule-developing power is

50

significant. Instead, once again, the existence and scope of any review by a superior officer bear on whether the official is a principal or inferior officer, not whether he is an officer *at all*. *See, e.g.*, *Arthrex*, 594 U.S. at 23; *Edmond*, 520 U.S. at 663; *Burgess*, 871 F.3d at 303. Principal officers make decisions free from a superior's review, while "[s]ince the founding," inferior officers' decisions have been subject to review "on matters of law *as well as policy*." *Arthrex*, 594 U.S. at 18 (emphasis added).

Thus, as the Supreme Court has made clear, whether an office confers officer status does not hinge on "standard-of-review distinction[s]" or the degree of "deference" a superior affords to the official's decisions. *Lucia*, 585 U.S. at 250. The ALJs in *Lucia* were constitutional officers even though the SEC reviewed their decisions *de novo*. *Id.* at 241-42; *accord Burgess*, 871 F.3d at 303 (FDIC's "de novo" review of "ALJ recommendations" did not defeat ALJs' officer status). So, too, did the Oversight Board in *Free Enterprise Fund* wield "significant executive power," 561 U.S. at 514, even though the SEC enjoyed plenary discretion to "abrogat[e], delet[e,] or ad[d] to" any Board rule, 15 U.S.C. § 7217(b)(5). Thus, even under the district court's characterization of the scope of the Secretary's review, Council Members' rule-developing power

remains significant and, thus, their lack of valid appointments voids their actions and the Final Rule.

If more were somehow needed, the district court misinterpreted the scope of the Secretary's review under the Act. To the extent the Act authorizes the Secretary to conduct *any* independent review of Council-developed rules (although NMFS review is performed by a *Council Member*, *see supra*, at 13), such review is restricted to ensuring consistency with "the national standards, the other provisions of th[e] Act, and any other applicable law." 16 U.S.C. § 1854(a)(1)(A); *see also id.* § 1854(b)(1). Thus, "the Secretary is not to substitute his judgment for that of the Councils regarding how to manage a fishery"; he can reject a Council-developed rule only if it is "in clear violation of the national standards or a clear violation of law." H.R. Rep. No. 97-549, 97th Cong., 2d Sess., at 28 (1982). Moreover, even when he conducts the legal review authorized by the Act, the Secretary must identify the particular legal "inconsistenc[y]," so that the Council can resubmit after "conform[ing]" its rule to the law's "requirements." 16 U.S.C. § 1854(a)(3), (b)(1)(B).

Congress knows how to draft a plenary, *de novo* review scheme. *See, e.g.*, 5 U.S.C. § 557(b)-(c) (plenary SEC review of ALJ rulings).

52

Indeed, it did so elsewhere in the Act.  *See* 16 U.S.C. § 1854(c)(4)(A), (5) (when the Secretary develops his own plan, he need only "tak[e] into account" the Council's advisory "comment[s]").  It did not do so here. Instead, it limited the Secretary's review to ensuring "compliance with statutory mandates."  *Franklin*, 989 F.2d at 57.  It therefore left considerable unreviewable policy discretion in Council Members.

Contrary to the district court's reasoning, *see* Add.129, that the Secretary's review extends to "consisten[cy] with the national standards," 16 U.S.C. § 1854(a)(1)(A), does not empower the Secretary to reject a Council-developed rule merely because he disagrees with the Council's policy judgments.  In the first place, the national standards are legal restrictions, not invitations to open-ended policy balancing; that is why courts can (and do) police regulations for compliance with those standards. *See, e.g.*, *Hall v. Evans*, 165 F. Supp. 2d 114, 117 (D.R.I. 2001).

Moreover, in all events, Congress provided that the Secretary must approve any Council submission that is "*consistent*" with the standards. That textual choice preserves a zone of policy judgment.  Confronted with a substantially similar statute, the Fifth Circuit held that "consistency review" is *not* "independent oversight."  *Nat'l Horsemen's Benevolent &*

53

*Protective Ass'n v. Black*, 53 F.4th 869, 884-85 (5th Cir. 2022). Finding that "a rule is or is not 'consistent'" with "aspiration[al]" standards really "says next to nothing." *Id.* at 885. Such a scheme empowers the first mover to 'fill up the details'"—*i.e.*, "the very business of regulating." *Id.* So too here: Because the national standards "pull in opposite directions," a "range" of policies will "serve [their] objectives adequately." *Intercollegiate Broad. Sys.*, 684 F.3d at 1339 (cleaned up); *see* Add.129 (acknowledging that the standards "provide ten broad, and sometimes contradictory policy directives"). Within that range, the Council, not the Secretary, decides.

The district court's related reliance on 16 U.S.C. § 1855(d), *see* Add.128—which assigns the Secretary the "general responsibility to carry out any … plan or amendment approved or prepared by him, in accordance with … this chapter," 16 U.S.C. § 1855(d)—fails for the same reasons. Even if that provision authorized the Secretary to conduct plenary review of Council actions, it would have no bearing on the Appointments Clause violation perpetuated by the district court's remedy. *See, e.g.*, *Arthrex*, 594 U.S. at 23; *Edmond*, 520 U.S. at 663; *Burgess*, 871 F.3d at 303.

54

Furthermore, that provision does not grant the Secretary any plenary review power. Rather, it permits the Secretary only to *implement* the regulatory frameworks developed by the Council, not to unilaterally *replace* them with his own. In short, "the more specific terms of § 1854 serve as a limit on the Secretary's broad regulatory powers described in § 1855(d)." *Oceana, Inc. v. Evans*, 2005 WL 555416, at *26 (D.D.C. Mar. 9, 2005). Recognizing as much, NMFS issued Framework Adjustment 65's Council-developed rules under 16 U.S.C. § 1854(b) after finding them consistent with law. *See* JA.091, 116, 134, 148.

**c.** The district court eventually acknowledged that the Council's lack of final decisionmaking authority is not dispositive of the Appointments Clause analysis. Add.129. So it fell back and attempted to distinguish *Freytag* and *Lucia* on the basis that ALJs oversee adjudications of cases involving private litigants while the Council develops prospective rules. Add.129-30. Without much analysis, the Government seized on this same distinction. ECF No. 41 at 30-31.

There is, however, no basis in law or logic to limit the universe of constitutional officers to officials who participate in adjudication and to exclude officials who participate in rulemaking. In fact, the district

court's and the Government's proposed distinction between these two categories of officials *undermines* their position. After all, if anything, rulemaking is a *more* significant authority than adjudication. To be sure, an SEC ALJ's power to enforce discovery orders is unquestionably "significant" to the litigant before him. But the *product* of that adjudication is narrow and retrospective: an "initial decision" on whether the individual violated securities laws, 17 C.F.R. § 201.360(a)(1), subject to *de novo* review by the Commission, *id.* § 201.360(d)(2).

By contrast, unlike an ALJ, the Council need not wait for an agency prosecutor to submit a dispute—the Council itself can choose to initiate the Act's rulemaking process. The Council thus can kick off a sprawling, often months-long endeavor of gathering evidence from various industry and community stakeholders. *See, e.g.*, 16 U.S.C. §§ 1852(g), (h)(3), 1853(a). In this role, the Council "critically shape[s] the administrative record" in a way analogous to an ALJ, except that the Council's "record" exists to justify a decision with far broader implications. *Lucia*, 585 U.S. at 248. After collecting the facts, the Council exercises its collective policy judgment to select and develop a preferred course of action (unlike a judge, who must apply the law without regard to his policy views). The

end product is a prospective regulation which, if found lawful by the Secretary, will govern the conduct of an entire private industry across a five-state region.

The authority to conduct this process is *at least* as "significant" as the power to issue a nonbinding "initial decision" against a single defendant in an adjudication. *Id.* at 242. Indeed, if the reviewable power of an ALJ to initially adjudicate a single enforcement action involving a single private party subject to *de novo* review constitutes "significant authority," then the Council's reviewable power to develop prospective, region-wide fishery regulations subject only to the Secretary's deferential review must qualify, too.

**d.** Nor does any distinction between the Act's mechanism for converting a Council policy into a final regulation and the analogous processes for converting an ALJ's initial decision into a final decision in *Freytag* and *Lucia* help the Government here. *Contra* Add.131. The tax judge in *Freytag* "prepare[d] proposed findings and an opinion," but the "actual decision" was "rendered by a regular judge of the Tax Court." 501 U.S. at 873. Similarly, the ALJ in *Lucia* rendered an "initial decision" that became final only if the SEC affirmed it or issued an order expressly

57

adopting it.  585 U.S. at 249.  And here, the Council's plan, amendment, or implementing regulation is reviewed by the Secretary's delegee (himself a Council Member).  *See supra* at 13.  If approved, the Secretary takes action to issue it as a binding rule of law, just like the Tax Court in *Freytag* and the SEC in *Lucia*.

In fact, the Secretary enjoys far *less* authority to countermand a Council policy than did those officials:  While Tax Court judges and SEC Commissioners could issue final decisions *reversing* their subordinates' initial rulings, the Secretary can merely *remand* a defective policy with "recommendations … that could be taken by the Council to conform" it to applicable law.    16 U.S.C. § 1854(a)(3)(C) (plans and amendments); *accord id.* § 1854(b)(1)(B) (implementing regulations).

In short, the "Act is clear that when the Secretary is presented with [Council] regulations, he does not have the independent authority to, *sua sponte*, add a regulation that is inconsistent with the proposal from the Council."  *Conn. v. Daley*, 53 F. Supp. 2d 147, 160-61 (D. Conn. 1999).  The district court thus erred when it hypothesized some distinction between NMFS "accepting [a Council] proposal" and "choosing to issue a final version of the rule with implementing regulations."  Add.130.  The

Secretary *must* approve a Council-developed policy or implementing regulation if he finds it consistent with applicable law. And after making such a finding, the Secretary *must* proceed with the process of promulgating that policy or implementing regulation. *See* 16 U.S.C. § 1854(a)(1), (a)(3), (b)(1)(A). Put differently, the Secretary's only options are (1) approval and issuance or (2) disapproval and remand. Provided the Council remains engaged in the rulemaking dialogue, *see id.* § 1854(c)(1)(A)-(B), the Secretary never gains the power to simply re-write the Council-developed rule. The Act's text provides no such step, which would nullify its entire structure.

Moreover, unlike in *Freytag* and *Lucia*, crucial policy decisions by the Council can take effect without *any* review. In particular, if NMFS fails to "notify a Council within 30 days" of its approval decision, the Council's "plan or amendment shall take effect as if approved." 16 U.S.C. § 1854(a)(3)(C). While the Act contains no such provision for implementing regulations, Add.131, that hardly matters: An unreviewed-but-approved fishery plan or amendment still "bind[s] the Executive Branch," *Arthrex*, 594 U.S. at 23, because *every* implementing

59

regulation must be "consistent" with the underlying plan or amendment, 16 U.S.C. § 1854(b)(1).

*    *    *

Because the Appointments Clause rates "among the significant structural safeguards of [our] constitutional scheme," *Edmond*, 520 U.S. at 659, "Appointments Clause remedies are designed … to create incentives to raise [such] challenges," *Lucia*, 585 U.S. at 251 & n.5 (cleaned up).  NEFSA thus is "entitled to relief" on its Appointments Clause claim.  *Lucia*, 585 U.S. at 251 n.5.  Even on its own terms, however, the district court's remedy provided NEFSA no relief—and, in fact, *perpetuates* the very constitutional violation that harms NEFSA's members.  On this basis alone, the Court should at minimum vacate the district court's order and remand for entry of appropriate relief.

## II.    COUNCIL MEMBERS ARE UNCONSTITUTIONALLY INSULATED FROM REMOVAL.

The Court also should acknowledge that NEFSA has also prevailed, and is entitled to relief, on its removal-restriction claim.

On the merits, this is a simple case.  "Under our Constitution, the 'executive Power'—all of it—is 'vested in a President,' who must 'take Care that the Laws be faithfully executed.'"  *Seila Law*, 591 U.S. at 203

60

(quoting U.S. Const. Art. II, § 1, cl. 1, and § 3). The President must therefore retain "the ability to remove executive officials, for it is only the authority that can remove such officials that they must fear and, in the performance of their functions, obey." *Id.* at 213-14 (cleaned up). The at-will removal rule has two narrow exceptions for (1) multimember agencies that lack "executive power" and (2) certain inferior officers. *Id.* at 215. Even within those categories, however, Congress cannot abrogate all presidential control. Under limited circumstances, Article II may tolerate traditional for-cause provisions. *See Humphrey's Executor v. United States*, 295 U.S. 602, 619 (1935). But if Congress imposes an *additional* layer of such protection, it impermissibly interferes with presidential control over the Executive Branch. *See Free Enter. Fund.*, 561 U.S. at 495-96.

The Government did not attempt to defend the Council's array of removal protections under that framework—and it is easy to see why. Even if a *Seila Law* exception applied—and neither does—the Act would *still* impermissibly impede the President's removal power.

The President is utterly powerless to remove five Council Members: the state bureaucrats who serve "so long as" they occupy predicate state

jobs.  16 U.S.C. § 1852(b)(1)(A).  In fact, *no federal official* can remove such a Member; their tenures in federal office are restrained only by the vagaries of state law and (potentially) their state superiors.  It is difficult to imagine a more "inappropriate" form of insulation "for officers wielding the executive power of the United States," *Free Enter. Fund*, 561 U.S. at 503, than one that vests all removal power in a *separate sovereign*.

The 12 governor-nominated Members fare no better.  The Secretary can remove these Members only "for cause."  16 U.S.C. § 1852(b)(6).  But even that overstates things, because the Act provides just *one* scenario in which the Secretary can remove a Member unilaterally: after a formal hearing finds the Member violated a conflict-of-interest provision.  *Id.* § 1852(b)(6)(B) (citing *id.* § 1857(1)(O)).  Thus, the Secretary cannot dismiss a Member for inefficiency, neglect, criminality, embarrassing conduct, undermining the President's policies, or anything else.  *But see Collins*, 594 U.S. at 256 (the President "must be able to remove" officers for these reasons).

Moreover, if the Secretary wishes to remove a Member for something *other* than violating the conflict-of-interest provision, the Member's *own Council colleagues* must "first recommend[]" that removal

62

by a two-thirds vote.  16 U.S.C. § 1852(b)(6)(A).  Of course, that discretionary power over whether to *permit* the President to remove Members is plainly unconstitutional.  *Free Enterprise Fund* rejected two layers of traditional for-cause requirements.  561 U.S. at 495-96.  That pales in comparison to the Act's scheme, under which a shifting coalition of just a few Members can thwart their colleague's removal indefinitely and with impunity.

Finally, there is Regional Administrator Pentony, who enjoys the panoply of tenure protections that accompany a career SES appointment.  By definition, SES officials "exercise significant responsibility—including directing organizational units, supervising work, and determining policy." *Esparraguera v. Dep't of the Army*, 981 F.3d 1328, 1330 (Fed. Cir. 2020); 5 U.S.C. § 3132(a)(2)(E).  Nonetheless, they are largely immune from termination following a one-year probation period and enjoy substantial protections against reassignment.  *See* 5 U.S.C. § 3995.  Moreover, Pentony can be removed from the civil service or suspended for more than 14 days "only for misconduct, neglect of duty, malfeasance, or failure to accept a directed reassignment or to accompany a position in a transfer of function"—and only with robust protections and appellate

63

rights. *See id.* §§ 7542-43, 7512-13; 5 C.F.R. §§ 752.604, 752.605. And he can be stripped of his SES status only "under another set of procedures for 'unsatisfactory' or 'less than fully successful' performance," after which he would remain entitled to (non-SES) federal employment at the same pay rate. *Esparraguera*, 981 F.3d at 1330-31 (citing 5 U.S.C. §§ 3592(a), 3594, 4314(a)(3)).

Each of the removal protections enjoyed by Council Members is "incompatible with the Constitution's separation of powers." *Free Enter. Fund*, 561 U.S. at 498. Indeed, as the district court expressly found, the Government waived any argument to the contrary by staking its entire defense of the Act on the question of "Officer" status. *See* App.134 (citing *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990)). Nor can the Government develop new remedial defenses on remand, having passed up the opportunity to brief those issues below. *See, e.g.*, *id.* (Government "did not substantially engage with [the severability] issue"). Thus, NEFSA is entitled to final judgment—and meaningful relief—on its successful removal-power claim.

**CONCLUSION**

The Court should vacate the judgment below and remand for the entry of appropriate relief on NEFSA's successful claims.

Dated:  June 4, 2025                    Respectfully submitted,

                                        */s/ John M. Gore*
                                        Donald F. McGahn, II
                                        John M. Gore
                                        John Henry Thompson
                                        Louis J. Capozzi, III
                                        JONES DAY
                                        51 Louisiana Avenue, NW
                                        Washington, D.C. 20001
                                        (202) 879-3939
                                        jmgore@jonesday.com

*Counsel for Plaintiff-Appellant New England Fishermen's Stewardship Association*

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the length limitations of Fed. R. App. P. 32(a)(7). The brief contains 12,332 words, excluding the items exempted by Fed. R. App. P. 32(f).

2.     This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6). It was prepared using Microsoft Office Word 2016 in 14-point, proportionally spaced Century Schoolbook Std. font.

Dated:  June 4, 2025                          */s/ John M. Gore*
                                                                    John M. Gore
                                                                    *Counsel for Plaintiff-Appellant*
                                                                    *New England Fishermen's*
                                                                    *Stewardship Association*

**CERTIFICATE OF SERVICE**

I certify that on June 4, 2025, I electronically filed this brief with the Clerk of the Court for the United States Court of Appeals for the First Circuit using the CM/ECF system. Counsel for Defendants-Appellees are registered CM/ECF users and will be served by the CM/ECF system.


Dated:  June 4, 2025                          */s/ John M. Gore*
                                              John M. Gore
                                              *Counsel for Plaintiff-Appellant*
                                              *New England Fishermen's*
                                              *Stewardship Association*

**ADDENDUM**

## TABLE OF CONTENTS

**ITEM**                                                          **PAGE**

Final Judgment ........................................................Add.001

Opinion and Order....................................................Add.003

The Appointments Clause
    U.S. Const. Art. II, § 2, cl. 2 ...............................Add.146

The Magnuson-Stevens Act
    16 U.S.C. § 1801................................................Add.147

    16 U.S.C. § 1851................................................Add.153

    16 U.S.C. § 1852................................................Add.155

    16 U.S.C. § 1853................................................Add.168

    16 U.S.C. § 1854................................................Add.173

    16 U.S.C. § 1855................................................Add.184

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| NEW ENGLAND FISHERMEN'S STEWARDSHIP ASSOCIATION, | ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:23-cv-00339-JAW |
| | ) | |
| GINA RAIMONDO, et al., | ) | |
| | ) | |
| Defendants, | ) | |

JUDGMENT

In accordance with the Order on Motions for Summary Judgment entered by Judge John A. Woodcock, Jr. on December 30, 2024,

JUDGMENT is hereby entered for plaintiff New England Fishermen's Stewardship Association and against the defendants Gina Raimondo, National Marine Fisheries Service, Janet Coit and Samuel D. Rauch, III on Counts 1 and 2 of the Amended Complaint; Defendants are ENJOINED from applying 16 U.S.C. §§ 1854(c)(3), (h), the provisions prohibiting the National Marine Fisheries Service from repealing Fisheries Management Plans or imposing a limited access system without prior approval by the Council and these provisions are SEVERED as unconstitutional from the Magnuson-Stevens Fishery Conservation and Management Act;

JUDGMENT if further entered for the defendants Gina Raimondo, National Marine Fisheries Service, Janet Coit and Samuel D. Rauch, III and against the plaintiff New England Fishermen's Stewardship Association on Counts 3 and 4 of the Amended Complaint.

CHRISTA K. BERRY
CLERK


By:     /s/ Julie W. Rodrigue
        Deputy Clerk

Dated: December 31, 2024

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

NEW ENGLAND FISHERMEN'S )
STEWARDSHIP ASSOCIATION, )
)
        Plaintiff, )
)
        v. )      2:23-cv-00339-JAW
)
GINA RAIMONDO, et al., )
)
        Defendants. )

**ORDER ON MOTIONS FOR SUMMARY JUDGMENT**

A trade group files a lawsuit on behalf of commercial fishermen against the federal agency and officials responsible for implementing federal fishery policy in New England, asserting that a federal statute violates various provisions of the federal Constitution, including the Appointments Clause and the non-delegation doctrine. The trade group moves for summary judgment on its claims, while the defendants, in turn, jointly move for summary judgment for lack of standing and on the merits as a matter of law. The court concludes the plaintiff has standing to bring its claims against the agency and that statutory provisions allowing fishery councils made up of state bureaucrat and governor-nominated members to block certain types of actions by the federal agency constitute actions of federal officers in violation of the Appointments Clause and other constitutional doctrines. The court concludes these provisions are severable without interfering with the function of the statute or will of Congress, and grants the plaintiff's motion in part, denies it in part, and severs the unconstitutional provisions of the statute.

## I.  STATEMENT OF FACTS

### A.  Procedural Background

On September 8, 2023, New England Fishermen's Stewardship Association (NEFSA) and Jerry Leeman, commercial fisherman and CEO of NEFSA, filed a complaint against Gina Raimondo, in her official capacity as U.S. Secretary of Commerce; the National Marine Fisheries Service (NMFS); Janet Coit, in her official capacity as Assistant Administrator for Fisheries at NMFS; and Samuel D. Rauch III, in his official capacity as Deputy Assistant Administrator for Regulatory Programs at NMFS.  *Compl.* (ECF No. 1).  In their complaint, Plaintiffs sought declaratory and injunctive relief to remedy alleged violations of the Appointments Clause and the president's removal power, and, in the alternative, alleged violations of the non-delegation doctrine.  *Id.* at 1, 47-58.  On September 22, 2023, NEFSA filed an amended complaint terminating Jerry Leeman as a party.  *Am. Petition for Review and Compl.* (ECF No. 13) (*First Am. Compl.*).  On November 2, 2023, Defendants answered the amended complaint.  *Answer* (ECF No. 38).

On September 20, 2023, Plaintiffs filed a motion to expedite proceedings.  *Mot. to Expedite Proc.* (ECF No. 12).  Defendants responded on October 10, 2023, stating that they did not oppose expedited resolution but requesting, to the extent necessary, a hearing pursuant to 16 U.S.C. § 1855(f)(4) following the conclusion of briefing on the merits.  *Defs.' Resp. to Mot. to Expedite Proc.* at 1 (ECF No. 24).  On October 16, 2023, parties filed a joint motion for approval of Local Rule 56(h) to propose a briefing schedule and process for filing of the administrative record.  *Joint Mot. to Set Briefing*

Add.004

*Schedule and for Other Relief* (ECF No. 26) (*Joint Mot. for Approval of Local Rule*

*56(h) Sch.*).  After the Court sought clarifying details, on October 23, 2023, the parties

supplemented their joint motion:

> [T]he parties respectfully submit that the Court may dispense with the
> Statements of Fact typically filed with summary-judgment motions
> pursuant to Federal Rule of Civil Procedure 56 and District of Maine
> Local Rule 56. The factual record before the Court will be limited to (1)
> the administrative record compiled by Defendants and (2) the standing
> declaration(s) submitted by Plaintiff with its motion.

*Supp. to the Parties' Joint Mot. to Set a Briefing Schedule and for Other Relief* at 3

(ECF No. 34) (*Supp. to Joint Mot. for Approval of Local Rule 56(h) Sch.*); *see also*

*Order re Joint Mot. for Approval of Local Rule 56(h)* (ECF No. 33) (*Local Rule 56(h)*

*Clarifying Order*).  The Court granted the joint motion for approval of Local Rule

56(h) schedule on October 23, 2023.  *Order Granting Mot. for Approval of Local Rule*

*56(h) Schedule* (ECF No. 35) (*Local Rule 56(h) Final Order*).  On October 24, 2023,

the Court granted the motion to expedite proceedings.  *Order Granting Mot. to*

*Expedite Proc.* (ECF No. 36).

 On November 8, 2023, NEFSA filed a motion for summary judgment, which

included as attachments sworn declarations submitted by NEFSA members David

Osier and Devyn Campbell in support of NEFSA's organizational standing.  *Pl.'s Mot.*

*for Summ. J.* (ECF No. 39) (*Pl.'s Mot.*); *Pl.'s Mot.*, Attach. 1, *Decl. of David Osier* (*Osier*

*Decl.*); *Pl.'s Mot.*, Attach. 2, *Decl. of Devyn Campbell* (*Campbell Decl.*).  Defendants

filed a cross-motion for summary judgment and response to the Plaintiff's motion for

summary judgment on December 1, 2023.  *Defs.' Cross-Mot. for Summ. J. and Resp.*

*to Pl.'s Mot. for Summ. J.* (ECF No. 41) (*Defs.' Mot.*).  NEFSA responded to

Defendants' cross-motion on December 19, 2023, which also served as a reply in support of its own motion for summary judgment. *Pl.'s Resp. to Defs.' Cross-Mot. for Summ. J. and Reply in Support of Pl.'s Mot. for Summ. J.* (ECF No. 43) (*Pl.'s Resp.*). Defendants replied to the plaintiff's motion for summary judgment on January 10, 2024, which also included a reply to the plaintiff's response in opposition to their cross-motion for summary judgment. *Defs.' Reply in Support of Cross-Mot. for Summ. J.* (ECF No. 45) (*Defs.' Reply*).

In the subsequent months, Defendants filed two notices referring the Court to recent decisions made by other courts in analogous cases: *Arnesen v. Raimondo*, No. 1:23-cv-160-TBM-RPM, 2024 U.S. Dist. LEXIS 16775 (S.D. Miss. Jan. 31, 2024), and *Lofstad, et al. v. Raimondo, et al.*, Case No. 3:22-cv-07360-RK-TJB, 2024 U.S. Dist. LEXIS 34112 (D.N.J. Feb. 28, 2024). *Notice of Suppl. Auth.* (ECF No. 49); *Notice of Recent Dev.* (ECF No. 50). More recently, on October 2, 2024, the Defendants filed an additional notice of supplemental authority, informing the Court of the decision of the Third Circuit in *Lofstad v. Raimondo*, Case No. 24-1420, 2024 U.S. App. LEXIS 24317 (3d Cir. Sep. 25, 2024).[1]

On October 29, 2024, the Court held an oral argument on the cross motions for summary judgment. *Min. Entry* (ECF No. 58).

---

[1]    The Third Circuit vacated its original order in *Lofstad* on September 26, 2024, and ordered the court clerk to file an amended opinion. *Lofstad v. Raimondo*, No. 24-1420, 2024 U.S. App. LEXIS 24434 (3d Cir. Sep. 26, 2024). The amended opinion, filed on September 26, 2024, did not affect the judgment of the original order. *Lofstad v. Raimondo*, Case No. 24-1420, slip op. (3d Cir. Sep. 26, 2024).

## II.    FACTUAL BACKGROUND[2]

### A.    The Magnuson-Stevens Fishery Conservation and Management Act: Regional Fishery Management Councils, Fishery Management Plans, and Implementing Regulations

In 1976, Congress passed the Magnuson-Stevens Fishery Conservation and Management Act (MSA or "the Act"), 16 U.S.C. § 1801 *et seq.*, to regulate the nation's territorial waters between three miles offshore, where the states' domain ends, and 200 miles offshore. *Pl.'s Mot.* at 2. The Act was Congress' first comprehensive regulation of fishing in federal territorial waters. *First Am. Compl.* ¶ 3. Adopted in response to "foreign fleets [] entering federal waters" and "fear[s] that new technologies could trigger unsustainable overfishing," *id.*, Congress designed the MSA to impose "conservation and management measures" through the creation of Fishery Management Plans (FMPs). *Id.* ¶ 6 (citing 16 U.S.C. § 1853). As additional guidance, Congress "set[] forth required provisions for FMPs, including that FMPs must contain measures 'necessary and appropriate for the conservation and management of the fishery, to prevent overfishing and rebuild overfished stocks, and to protect, restore, and promote the long-term health and stability of the fishery." *Defs.' Mot.* at 3 (citing 16 U.S.C. § 1853(a)(1)(A)). Congress further required that FMPs contain measures "consistent with the national standards, the other provisions of this Act, . . . and any other applicable law." 16 U.S.C. § 1853(a)(1)(C). As

---

[2]    In the parties' joint motion for approval of Local Rule 56(h) schedule, parties requested to "dispense with the Statements of Fact typically filed with summary-judgment motions," asking the Court to limit the factual record to "(1) the administrative record compiled by Defendants and (2) the standing declaration(s) submitted by Plaintiff with its motion." *Supp. to Jt. Mot. for Approval of Local Rule 56(h) Sch.* at 3. The Court granted this motion. *Local Rule 56(h) Final Order.* For purposes of the cross motions for summary judgment, the Court considered the facts in the administrative record and standing declarations.

referenced in this section, the MSA sets forth ten national standards for fishery management:

(1) Conservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry.

(2) Conservation and management measures shall be based upon the best scientific information available.

(3) To the extent practicable, an individual stock of fish shall be managed as a unit throughout its range, and interrelated stocks of fish shall be managed as a unit or in close coordination.

(4) Conservation and management measures shall not discriminate between residents of different States. If it becomes necessary to allocate or assign fishing privileges among various United States fishermen, such allocation shall be (A) fair and equitable to all such fishermen; (B) reasonably calculated to promote conservation; and (C) carried out in such manner that no particular individual, corporation, or other entity acquires an excessive share of such privileges.

(5) Conservation and management measures shall, where practicable, consider efficiency in the utilization of fishery resources; except that no such measure shall have economic allocation as its sole purpose.

(6) Conservation and management measures shall take into account and allow for variations among, and contingencies in, fisheries, fishery resources, and catches.

(7) Conservation and management measures shall, where practicable, minimize costs and avoid unnecessary duplication.

(8) Conservation and management measures shall, consistent with the conservation requirements of this Act (including the prevention of overfishing and rebuilding of overfished stocks), take into account the importance of fishery resources to fishing communities by utilizing economic and social data that meet the requirements of paragraph (2), in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities.

(9) Conservation and management measures shall, to the extent practicable, (A) minimize bycatch and (B) to the extent bycatch cannot be avoided, minimize the mortality of such bycatch.

6

(10) Conservation and management measures shall, to the extent practicable, promote the safety of human life at sea.

16 U.S.C. § 1851(a) (capitalization altered). The statute compels the Secretary to establish advisory guidelines, based on the national standards, to assist in the development of FMPs. 16 U.S.C. § 1851(b).

As part of its statutory scheme, "the [MSA] established eight regional fishery management councils (Councils), 16 U.S.C. § 1852(a), that 'enable the State, the fishing industry, consumer and environmental organizations, and other interested persons to participate in, and advise on, the establishment and administration of [FMPs].'" *Defs.' Mot.* at 3 (quoting 16 U.S.C. § 1801(b)(5)(A)); *accord Pl.'s Mot.* at 2. Congress charged the Councils with "exercis[ing] sound judgment in the stewardship of fishery resources through the preparation, monitoring, and revision of" FMPs. 16 U.S.C. § 1801(b)(5)). Typically, the Councils hold the primary responsibility for drafting FMPs and amendments, which are subsequently submitted to the Secretary of Commerce (Secretary). 16 U.S.C. § 1852(h).

The Secretary must, within five days of receipt, "commence a review of the plan or amendment to determine whether it is consistent with the national standards . . . and any other applicable law," "publish in the Federal Register a notice stating that the plan or amendment is available," and solicit public comment of interested persons for a sixty-day period. 16 U.S.C. § 1854(a)(1). The Secretary is statutorily required to "approve, disapprove, or partially approve a plan or amendment," and notify the Council of its decision in writing, within thirty days of the end of the public comment period. 16 U.S.C. § 1854(a)(3). If the Secretary responds to a submission with

7

disapproval or partial approval, the notice to the Council must include: "(A) the applicable law with which the plan or amendment is inconsistent; (B) the nature of such inconsistencies; and (C) recommendations concerning the actions that could be taken by the Council to conform such plan or amendment to the requirements of applicable law." *Id.* Upon such a notice, "the Council may submit a revised plan or amendment to the Secretary for review." 16 U.S.C. § 1854(a)(4). If, however, the Secretary takes no action within thirty days, "then such plan or amendment shall take effect as if approved." 16 U.S.C. § 1854(a)(3). Once promulgated, "[t]he Secretary may repeal or revoke a fishery management plan for a fishery under the authority of a Council only if the Council approves the repeal or revocation by a three-quarters majority of the voting members of the Council." 16 U.S.C. § 1854(h).

While the Councils develop most FMPs, the MSA also contains mechanisms for the Secretary to draft and publish FMPs directly in certain circumstances. *See* 16 U.S.C. § 1854(c). The statute contemplates three scenarios where the Secretary would assume this primary role:

> (A) the appropriate Council fails to develop and submit to the Secretary, after a reasonable period of time, a [FMP] for such fishery, or any necessary amendment to such a plan, if such fishery requires conservation and management;
>
> (B) the Secretary disapproves or partially disapproves any such plan or amendment, or disapproves a revised plan or amendment, and the

Council involved fails to submit a revised or further revised plan or amendment; or

(C) the Secretary is given authority to prepare such plan or amendment under this section.

16 U.S.C. § 1854(c)(2).  However, in such circumstances, the Secretary remains subject to additional restrictions. First, the Secretary may not prepare a FMP containing "a provision establishing a limited access system, including any limited access privilege program, unless such system is first approved by a majority of the voting members, present and voting, of each appropriate Council."  16 U.S.C. § 1854(c)(3).  Second, the Secretary must "submit such plan or amendment to the appropriate Council for consideration and comment," publish the plan or amendment in the Federal Register, and solicit public comment for a sixty-day period.  16 U.S.C. § 1854(c)(4).  If the Secretary has prepared a FMP or amendment pursuant to 16 U.S.C. § 1854(c)(4)(A), the appropriate Council must submit any comments and recommendations within the sixty-day comment period.  16 U.S.C. § 1854(c)(5).

The process for promulgating regulations implementing a particular FMP or amendment follows the same process for the initial preparation of a FMP in many respects.  "Proposed regulations which the Council deems necessary or appropriate" to implement an FMP must be "submitted to the Secretary simultaneously with the plan or amendment."  16 U.S.C. § 1853(c)(1).  After submission, the Secretary is compelled by statute to "initiate an evaluation of the proposed regulations to determine whether they are consistent with the [FMP], plan amendment, this Act

and other applicable law" within five days, and to make a determination within fifteen days of initiating its evaluation. 16 U.S.C. § 1854(b)(1).

If the Secretary disapproves of the Council's proposed regulations, the Secretary must "notify the Council in writing of the inconsistencies and provide recommendations on revisions that would make the proposed regulations consistent with the [FMP], plan amendment, this Act, and other applicable law." 16 U.S.C. § 1854(b)(1)(B). "Upon receiving a notification under paragraph (1)(B), the Council may revise the proposed regulations and submit them to the Secretary for reevaluation." 16 U.S.C. § 1854(b)(2). Should the Secretary reach an affirmative determination with regard to the Council's proposed regulations, the MSA mandates publication in the Federal Register for a public comment period between fifteen and sixty days, after which the Secretary "shall promulgate final regulations within 30 days after the end of the comment period." 16 U.S.C. § 1854(b)(1)(A), (b)(3). However, "[t]he Secretary shall consult with the Council before making any revisions to the proposed regulations, and must publish in the Federal Register an explanation of any differences between the proposed and final regulations." 16 U.S.C. § 1854(b)(3).

As with FMPs, the MSA again provides a mechanism for the Secretary, via NMFS, to assume the drafting role for regulations in certain situations. Specifically, "[t]he Secretary may propose regulations in the Federal Register to implement any plan or amendment prepared by the Secretary" by submitting them to the Council along with the plan or amendment, as well as providing a public comment period of sixty days. 16 U.S.C. § 1854(c)(6). The Secretary must promulgate final regulations

within thirty days of the end of the public comment period and include in the Federal Register "an explanation of any substantive differences between the proposed and final rules." 16 U.S.C. § 1854(c)(7).

Finally, the respective roles of the Secretary and Councils change in emergency situations. "If the Secretary finds that an emergency exists or that interim measures are needed to reduce overfishing for any fishery, he may promulgate emergency regulations or interim measures necessary to address the emergency or overfishing, without regard to whether a fishery management plan exists for such fishery." 16 U.S.C. § 1855(c)(1). If, however, "a Council finds that an emergency exists or that interim measures are needed to reduce overfishing for any fishery within its jurisdiction," the Secretary is compelled to promulgate emergency regulations or interim measures if the Council requests such an action "by unanimous vote of the members who are voting members." 16 U.S.C. § 1855(c)(2)(A). If the Council's emergency designation vote is not unanimous, then the Council may only request the Secretary issue such emergency regulations. 16 U.S.C. § 1855(c)(2)(B).

## B.  New England Fishery Management Council Membership

As noted earlier, the MSA established eight Councils, dividing the nation's federal fisheries into zones for management by regional authorities. 16 U.S.C. § 1852(a). As relevant here:

> The New England Fishery Management Council shall consist of the States of Maine, New Hampshire, Massachusetts, Rhode Island, and Connecticut and shall have authority over the fisheries in the Atlantic Ocean seaward of such States (except [for any highly migratory species fishery]). The New England Council shall have 18 voting members,

11

including 12 appointed by the Secretary in accordance with subsection
(b)(2) (at least one of whom shall be appointed from each such State).

16 U.S.C. § 1852(a)(1)(A). The statute instructs who will constitute the eighteen

voting members in subpart (b), stating the voting members must be:

(A) The principal State official with marine fishery management
responsibility and expertise in each constituent State, who is designated
as such by the Governor of the State, so long as the official continues to
hold such position, or the designee of such official.

(B) The regional director of the National Marine Fisheries Service for
the geographic area concerned, or his designee, except that if two such
directors are within such geographical area, the Secretary shall
designate which of such directors shall be the voting member.

(C) The members required to be appointed by the Secretary in
accordance with paragraphs (2) and (5).

16 U.S.C. § 1852(b)(1).

The New England Council's eighteen-person membership can be divided into

three categories. First, one member is "[t]he regional director of the National Marine

Fisheries Service for the geographic area concerned." 16 U.S.C. § 1852(b)(1)(2). In

this instance, Michael W. Pentony fills this position in his capacity as Regional

Administrator for the Greater Atlantic Region. *See* Administrative Record ("A.R.")

6264. Mr. Pentony is a career Senior Executive Service (SES) official, *id.* at 6265, a

position that comes with protections against removal unless the relevant agency

identifies "misconduct, neglect of duty, malfeasance, or failure to accept a direct

reassignment." *See* 5 U.S.C. §§ 3592, 7541-43.

Second, each of the five states that make up the New England Fishery sends

one member: "[t]he principal State official with marine fishery management

responsibility and expertise in each constituent State, who is designated as such by

12

Add.014

the Governor of the State . . ., or the designee of such official." 16 U.S.C. §
1852(b)(1)(A). Because these officials serve on the New England Council by virtue of
their state-held office, their membership lasts "so long as the official continues to hold
such position." *Id.*

Finally, the third category of Council members consists of "members required
to be appointed by the Secretary in accordance with paragraphs (2)."[3] 16 U.S.C. §
1852(b)(1)(C). In the New England Council, twelve members constitute this category
of membership, and "at least one of whom shall be appointed from each such State."
16 U.S.C. § 1852(a)(1)(A). Paragraph (2) provides robust specifications and processes
for the twelve members nominated and appointed under this subsection. Regarding
their qualifications, the statute provides:

> The members of each Council required to be appointed by the Secretary
> must be individuals who, by reason of their occupational or other
> experience, scientific expertise, or training, are knowledgeable
> regarding the conservation and management, or the commercial or
> recreational harvest, of the fishery resources of the geographical
> area concerned. Within nine months after the date of enactment of the
> Fishery Conservation Amendments of 1990 [enacted Nov. 28, 1990], the
> Secretary shall, by regulation, prescribe criteria for determining
> whether an individual satisfies the requirements of this subparagraph.

16 U.S.C. § 1852(b)(2)(A). The statute explains the nomination and appointment
process as:

> The Secretary shall appoint the members of each Council from a list of
> individuals submitted by the Governor of each applicable constituent
> State. A Governor may not submit the names of individuals to the
> Secretary for appointment unless the Governor has determined that
> each such individual is qualified under the requirements of

---

[3] The full phrase is "members required to be appointed by the Secretary in accordance with
paragraphs (2) and (5)." 16 U.S.C. § 1852(b)(1)(C). Paragraph (5) applies to the Pacific Council and is
not relevant to this case.

> subparagraph (A) and unless the Governor has, to the extent
> practicable, first consulted with representatives of the commercial and
> recreational fishing interests of the State regarding those individuals.
> Each such list shall include the names and pertinent biographical data
> of not less than three individuals for each applicable vacancy and shall
> be accompanied by a statement by the Governor explaining how each
> such individual meets the requirements of subparagraph (A). The
> Secretary shall review each list submitted by a Governor to ascertain if
> the individuals on the list are qualified for the vacancy on the basis of
> such requirements. If the Secretary determines that any individual is
> not qualified, the Secretary shall notify the appropriate Governor of that
> determination. The Governor shall then submit a revised list or
> resubmit the original list with an additional explanation of the
> qualifications of the individual in question.

16 U.S.C. § 1852(b)(2)(C). The statute makes clear that these members "are not employed by the Federal Government," and, unlike federal employees, "shall receive compensation at the daily rate . . . when engaged in the actual performance of duties for such Council." 16 U.S.C. § 1852(d). The MSA further provides two express scenarios in which "[t]he Secretary may remove for cause" a member of a Council within this third category: first, if the Secretary finds the member violated the Act's financial conflict of interest provision, or second, if "the Council concerned first recommends removal by not less than two-thirds of the members who are voting members and submits such removal recommendation to the Secretary in writing together with a statement of the basis for the recommendation." 16 U.S.C. § 1852(b)(6).

14

## C. The Northeast Multispecies Fishery Management Plan and Framework Adjustment 65[4]

The New England Council "promulgated the first Northeast Multispecies Fisheries Management Plan in 1985 in an effort to curb the decline of groundfish stock in the Gulf of Maine." *Gulf of Me. Fishermen's All. v. Daley*, 292 F.3d 84, 86 (1st Cir. 2002). "The [New England] Fishery is composed of thirteen bottom-dwelling fish species, inhabiting waters from Maine to the mid-Atlantic, which are divided for management purposes into twenty individual 'stocks.'" *Lovgren v. Locke*, 701 F.3d 5, 14 (1st Cir. 2012). However, the original New England FMP proved insufficient, and "[b]etween 1985 and 1996, the Plan underwent a series of amendments as the groundfish population in that region continued to suffer." *Gulf of Me. Fishermen's All.*, 292 F.3d at 86. As the First Circuit explained, continued failure to protect groundfish populations prompted the Department of Commerce to implement a strategic shift to its management procedure:

> Finally, in 1996, with the population of cod and other groundfish on the verge of collapse, the Commerce Department instituted a new "Framework" rulemaking procedure which allowed the regional regulatory authorities to amend inshore fishing regulations "at any time," thereby responding more quickly to fluctuations in the groundfish population. Under this new, abbreviated procedure, the regional councils are able to adjust their fishing restrictions over the span of two regular monthly meetings, but they must provide timely public notice of any proposed change in regulations and invite public comment prior to and at the second meeting.

---

[4]     The parties do not address in detail the underpinning of the New England Council; however, to complete the picture, the Court supplied some background from First Circuit opinions.

*Id.*  NEFSA brings its complaint against one of these so-called Framework Adjustments; specifically, Framework Adjustment 65.[5]

The New England Council submitted Framework Adjustment 65 to the NMFS for review on April 18, 2023, A.R. 5386 *et seq.*, after which the NMFS published the plan in the Federal Register as a Proposed Rule on May 31, 2023.  A.R. 6074; 88 Fed. Reg. 34810, 34818 (May 31, 2023).  Following a comment period by interested parties, which included submitted comment from, among others, NEFSA, A.R. 6086, NMFS issued the Framework Adjustment 65 Final Rule (Final Rule) on August 18, 2023.  A.R. 6214; 88 Fed. Reg. 56527 *et seq.* (Aug. 18, 2023).  Both the Final Rule published in the Federal Register and the Decision Memorandum certifying the Final Rule's consistency with national standards, the MSA, and other applicable laws are signed by Mr. Rauch, pursuant to his role as the NMFS Deputy Assistant Administrator for Regulatory Programs.  *Id.*

---

[5]     On June 17, 2024, Defendants filed a notice of recent development, informing the Court that NMFS had published a Final Rule to implement Framework Adjustment 66, 89 Fed. Reg. 35,755 (May 2, 2024), to the New England FMP.  *Not. of Recent Dev.* (ECF No. 50).  Defendants aver "Framework 66 sets new catch limits for fishing year 2024 for some of the stocks covered by the FMP while other stock limits remain the same, and it makes several additional management modifications," and asks the Court, should it determine Framework Adjustment 65 is flawed, to provide them with an opportunity to submit additional briefing on remedy in light of this development.  *Id.* at 2.  Plaintiff did not respond.

Though Defendants do not expressly raise mootness, the Court briefly addresses the potential effect of this development on the current dispute.  Here, NEFSA challenges the legality of Framework Adjustment 65 based on the statutorily directed membership of the New England Council and the authority of Defendant Rauch; Framework Adjustment 66 was prepared and promulgated by the same parties and under the same procedures.  As such, the Court proceeds to the merits of these legal arguments and considers its analysis and conclusions to apply equally to Framework Adjustment 66.  *See Conservation Law Found. v. Evans*, 360 F.3d 21 (1st Cir. 2004)) (discussing a mootness argument based on a subsequent Framework Adjustment and finding that "a more straightforward resolution of the issue is readily available on the facts of this case. NMFS has not shown, as it must, that the alleged procedural deficiency will not recur") (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 189 (2000)).

Framework Adjustment 65 imposed substantive limits on sixteen groundfish stocks; as particularly emphasized by the Plaintiff, it reduces the acceptable biological catch for Georges Bank haddock by 85% and Gulf of Maine haddock by 83% and lowers the white hake catch limit by approximately 13%. *Pl.'s Mot.* at 6 (citing A.R. 6216-17 (Table 2)). Further, Framework Adjustment 65 revises a rebuilding plan for Gulf of Maine cod, A.R. 6215, as statutorily compelled by U.S.C. § 1854(e) for stocks of fish determined to be overfished.[6] Finally, the Final Rule on Framework Adjustment 65 implemented regulatory changes to carry out the revisions to the FMP, pursuant to 16 U.S.C. § 1855(d), and enacted a short-term emergency rule, as requested by the New England Council in light of concerns over economic impact, to reduce the magnitude of its restriction of the Gulf of Maine haddock catch limit to 78% for a minimum of 180 days. A.R. 6214-31; *see also Pl.'s Mot.* at 6; *Defs.' Mot.* at 8.

### D. Parties

#### 1. New England Fishermen's Stewardship Association

NEFSA describes itself as "an alliance of commercial fishermen dedicated to educating the public about seafood resource management and protecting the future of local commercial fishing in New England." *First Am Compl.* ¶ 19; *Pl.'s Mot.* at 6-7. Its members include fishermen subject to "the catch limit reductions, cod rebuilding plan, and other regulations contained in Framework Adjustment 65," such

---

[6] The MSA defines "overfished" to mean "a rate or level of fishing mortality that jeopardizes the capacity of a fishery to produce the maximum sustainable yield on a continuing basis." 16 U.S.C. § 1802(34).

17

as David Osier and Devyn Campbell. *First Am. Compl.* ¶ 20; *Pl.'s Mot.* at 7 (citing *Osier Decl.* ¶¶ 6–17; *Campbell Decl.* ¶¶ 6–20). NEFSA maintains "the catch reductions and other regulations contained in Framework Adjustment 65 and implemented in the Final Rule" harm its members' "ability to profitably harvest haddock, hake, and other groundfish species." *Pl.'s Mot.* at 7 (citing *Osier Decl.* ¶¶ 6–17; *Campbell Decl.* ¶¶ 6–20).

## 2.    National Marine Fisheries Service

NMFS is an agency within the United States Department of Commerce, "acting under authority delegated from the Secretary of Commerce." *Defs.' Mot.* at 2; *Pl.'s Mot.* at 5. The NMFS "is responsible for managing fisheries under the [MSA]," which "is accomplished through [FMPs], amendments to those plans, framework adjustments, and implementing regulations." *Defs.' Mot.* at 3.

## 3.    Defendants Appearing in their Official Capacity

NEFSA names various federal government officials as additional defendants in this case; specifically, officials at various level of authority whom it alleges hold the responsibility for administering and implementing the MSA. As described by the Plaintiff: "[NMFS] is an agency within the Department of Commerce. The Secretary of Commerce has delegated to the National Oceanic and Atmospheric Administration (NOAA) the authority to administer the relevant portions of the Act; NOAA sub-delegated that authority to NMFS." *First Am. Compl.* ¶¶ 22, 61 (citing NOAA, *NOAA Organizational Handbook: Transmittal No. 61*, U.S. Department of Commerce, at 2–4 (Feb. 24, 2015) (NOAA Handbook). NEFSA continues, "the Assistant Administrator for Fisheries at NMFS . . . has been delegated the power to administer various

portions of the [MSA] by the Under Secretary for Oceans and Atmosphere," which
NEFSA describes as "the head of NOAA." *First Am. Compl.* ¶¶ 23, 60 (citing NOAA
Handbook). Further, NEFSA alleges, "[t]he Assistant Administrator for Fisheries
has, in turn, redelegated the authority to sign material generated under the Act for
publication in the Federal Register and Code of Federal Regulations to the Deputy
Assistant Administrator for Regulatory Programs." *Id.* ¶ 62 (citing NOAA Handbook
at 5).

Based on the foregoing, NEFSA brings its claims against three federal officials:
the Secretary of Commerce, currently Gina Raimondo; the Assistant Administrator
for Fisheries at NMFS, currently Janet Coit; and the Deputy Assistant Administrator
for Regulatory Programs at NMFS, currently Samuel D. Rauch III. *First. Am. Compl.*
¶¶ 21, 23, 24; *Defs.' Answer* ¶¶ 21, 23, 24. NEFSA sues these officials in their official
capacity. *First. Am. Compl.* ¶¶ 21, 23, 24.

## III. THE PARTIES' POSITIONS

### A. Plaintiff's Motion for Summary Judgment

#### 1. Standing

NEFSA claims standing to sue on behalf of its members and requests the Court
to apply the standard for associational standing articulated by the First Circuit in
*United States v. AVX Corp.*, 962 F.2d 108 (1st Cir. 1992), in which the court granted
standing to an organization based on three factors:

> (1) at least one of the members possesses standing to sue in his or her
> own right; (2) the interests that the suit seeks to vindicate are pertinent
> to the objectives for which the organization was formed; and (3) neither

the claim asserted nor the relief demanded necessitates the personal participation of affected individuals.

*Pl.'s Mot.* at 35-36 (citing *AVX Corp.*, 962 F.2d at 116). NEFSA argues it satisfies all three of these elements and, thus, the Court should grant standing.

NEFSA begins by addressing the second and third elements described above, contending it "was formed in part to protect the interests of local commercial fishermen who face onerous regulations like Framework Adjustment 65," *Pl.'s Mot.* at 36 (citing *Osier Decl.* ¶ 4), and "neither NEFSA's claims nor its requested relief requires the participation of individual members." *Id.* (citing *Warth v. Seldin*, 422 U.S. 490, 515 (1975) (where an "association seeks … prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of [injured] members"). The second and third elements, NEFSA opines, are satisfied. Thus, NEFSA says, "if any of its members would possess standing in his own right," the association should be granted standing. *Id.*

In its discussion of this first element, NEFSA directs this Court to the Supreme Court's test for Article III standing: "an individual has standing if he (1) suffers a concrete 'injury in fact' that was (2) 'likely caused by the defendant' and (3) 'would likely be redressed by judicial relief.'" *Id.* (citing *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021)). NEFSA urges the Court to "'assume, for purposes of the standing analysis,' that a plaintiff is 'correct on the merits of [his] claims[s].'" *Id.* (citing *Texas v. EEOC*, 933 F.3d 433, 447 (5th Cir. 2019) and *Cutler v. U.S. Dep't of Health & Hum. Servs.*, 797 F.3d 1173, 1179 (D.C. Cir. 2015). NEFSA then turns to the elements of individual standing.

### a. Injury

NEFSA argues "[t]he injuries here are concrete." *Pl.'s Mot.* at 36.  NEFSA alleges that "[b]y cutting multiple commercial quotas—including a more[]than 80% cut for haddock and about 13% for white hake—Framework Adjustment 65 reduces harvest opportunities across the board," and in so doing, "denies NEFSA members earnings, profits, and business opportunities derived from groundfishing." *Id.* at 36-37 (citing *Osier Decl.* ¶¶ 6–17; *Campbell Decl.* ¶¶ 6–20).  NEFSA characterizes these "unrecoverable losses" as "the inevitable consequence of compliance with the Final Rule" and asserts that they are "concrete, irreparable injuries." *Id.* at 37 (citing *Reddy v. Foster*, 845 F.3d 493, 500 (1st Cir. 2017); *Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 426 (8th Cir. 1996)).  NEFSA argues, "the mere 'subjection to' rules developed and issued by unconstitutionally appointed and insulated officers imposes an independently cognizable 'here-and-now injury.'" *Id.* (citing *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 191-92 (2023)).

### b. Causation

NEFSA next submits that "NEFSA members' injuries are 'fairly traceable' to Defendants." *Id.* (citing *Collins v. Yellen*, 594 U.S. 220, 224 (2021)).  First, NEFSA cautions that the causation element in the standing analysis "does *not* require evidence that 'the Government's … conduct would have been different in a counterfactual world in which [it] had acted with constitutional authority.'" *Id.* (quoting *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 211 (2020)) (emphasis added by Plaintiff).  Rather, Plaintiff posits, "the relevant inquiry is

whether the plaintiffs' injury can be traced to allegedly unlawful conduct of the defendant, not to the provision of law that is challenged." *Id.* (citing *Collins*, 594 U.S. at 242 (internal quotation marks omitted)). NEFSA concedes that another district court recently denied plaintiffs had standing in an analogous case but calls that court's decision "plainly wrong and "an obvious legal error" for "faulting plaintiffs for failing to 'allege that a differently structured Council would have voted against' the challenged policy." *Id.* (citing *United Cook Inlet Drift Ass'n v. NMFS* (*UCIDA*), 2022 U.S. Dist. LEXIS 109879, at *50–62 (D. Alaska June 21, 2022)).

Here, NEFSA claims, the promulgation of Framework Adjustment 65 constituted unlawful rulemaking for several distinct reasons. First, "Defendant NMFS (through Defendants Rauch and Coit) issued the Final Rule pursuant to the Secretary's statutory authority to approve and publish *Council* policies as regulations." *Id.* (citing 16 U.S.C. § 1854(a)–(b); A.R. 6228) (emphasis added by Plaintiff). NEFSA argues, "[t]he Council purported to wield its power to 'develop annual catch limits' when it 'prepare[d] and submit[ted]' Framework Adjustment 65." *Id.* (citing 16 U.S.C. § 1852(h)(1), (6)). However, "because the Council lacked *any* lawful authority . . . its members were *powerless* to develop and submit Framework Adjustment 65," and, thus, "NMFS never actually received a valid proposal to review." *Id.* at 37-38 (emphasis added by Plaintiff). NEFSA insists receipt of a lawful proposal is "a legal and factual predicate to issuing any regulation under § 1854(b)," such that "the Act's constitutional defects short-circuited the regulatory process and denied NMFS any authority to promulgate the Final Rule." *Id.* at 38. NEFSA claims

the process followed by NMFS in this case constitutes "an unlawful act that is currently subjecting NEFSA members to concrete injuries." *Id.*

Second, NEFSA asserts NMFS has an "inflexible statutory *duty*" to reject any proposal from an unconstitutionally appointed Council. *Id.* (citing 16 U.S.C. § 1854(a)(1)(A)) (emphasis added by Plaintiff). By "[n]eglecting that duty," NEFSA says, "NMFS issued Framework Adjustment 65 as a federal regulation—and NEFSA members are now suffering." *Id.* NEFSA again contests *UCIDA* on this point, claiming the court found "that plaintiffs can *never* raise Appointments Clause or removal challenges to the Act because Council rules have 'no legal effect' until 'the agency first promulgat[es] implementing regulations,'" and arguing "[t]hat is wrong—agency action is *not* a prerequisite to Council policy 'tak[ing] effect.'" *Id.* (first citing *UCIDA*, 2022 U.S. Dist. LEXIS 109879, at *53-54; then citing 16 U.S.C. § 1854(a)(3)) (emphasis added by Plaintiff). NEFSA claims the *UCIDA* court further erred by "assum[ing] that the precise scope of the *Council's* authority controls a plaintiff's standing to sue the *agency*." *Id.* (emphasis added by Plaintiff). Rather, NEFSA insists, "[a]t the standing stage, the Court must presume that NEFSA's central merits contention is *correct*—namely, that the Council lacks lawful executive authority, and thus NMFS could not issue the Final Rule." *Id.* at 38-39 (emphasis added by Plaintiff). "If the Council was powerless to act *at all*, NMFS was powerless to issue the Council's policies through a binding federal regulation." *Id.* at 39 (emphasis added by Plaintiff).

Anticipating Defendants' argument that NEFSA cannot sue the federal Defendants as a means of challenging the makeup of the Council, NEFSA asserts "[a] plaintiff can challenge an unconstitutional statute that undergirds a regulatory process in a suit attacking the *product* of that unlawful process." *Id*. (citing *FEC v. Cruz*, 596 U.S. 289, 301–02 (2022)) (emphasis added by Plaintiff). NEFSA suggests that, per *Cruz*, "a plaintiff may contest the *statute's* constitutionality even if the *rule* triggered his injury," and that "[r]ules implementing an 'invalid and unenforceable' statute are void, and a plaintiff harmed by such a rule may 'raise constitutional claims against' the underlying 'statutory provision.'" *Id*. (quoting *Cruz*, 596 U.S. at 301-302) (emphasis added by Plaintiff). "Here, NEFSA's members' injuries are directly 'traceable to the operation of' the Act itself—which is ripe for this challenge." *Id*. (citing *Cruz*, 596 U.S. at 301).

Third and finally, NEFSA claims it satisfies the causation element of the standing analysis by arguing "under the Act's terms, the Council *did* take actions that harmed NEFSA's members." *Id*. (citing *Collins*, 594 U.S. at 258 n. 24) (emphasis added by Plaintiff). Asserting "NMFS approved Framework Adjustment 65, but its substance was developed by the Council," NEFSA takes the position that "Article III is satisfied even under the (false) premise that standing requires subjection to the *Council's* lawless actions, not merely the *agency's*." *Id*. (citing *Dep't of Com. v. New York*, 588 U.S. 752, (2019)) ("Article III requires no more than *de facto* causality") (emphasis added by Plaintiff). NEFSA concludes that it satisfies the causation element of standing because "Defendants engaged in 'conduct' that NEFSA 'allege[s]'

is 'unlawful'—and that conduct has caused 'injury' to NEFSA's members." *Id.* (quoting *Collins*, 594 U.S. at 242).

### c. Redressability

Regarding the element of redressability, NEFSA maintains that "[w]hen a party 'challenging the legality of government action … is himself an object of the action[,] there is ordinarily little question' that a 'judgment preventing' that action will redress his injuries." *Id.* at 40 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561-62 (1992)).

Here, NEFSA argues the relief requested "would redress its members' injuries by enabling them to fish as if the Framework Adjustment 65 process had not occurred—and thus to catch and sell more groundfish." *Id.* NEFSA again contests the ruling of the *UCIDA* court; while the court in that case "opined that even if it vacated the agency's rule, 'the constitutional issues [plaintiffs] raise regarding the makeup of the Council would not be redressed,'" NEFSA argues "courts redress *injuries*, not 'issues.'" *Id.* (quoting *UCIDA*, 2022 U.S. Dist. LEXIS 109879, at *59-61) (emphasis added by Plaintiff). At bottom, NEFSA insists, "Defendants imposed burdensome regulations pursuant to the Act's unconstitutional terms, and the resulting harm to NEFSA's members is entirely redressable." *Id.* Thus, NEFSA concludes, the redressability requirement of the standing analysis is satisfied.

### 2. Merits

#### a. Appointments Clause

NEFSA brings a claim pursuant to the Appointments Clause of the United States Constitution, which provides that the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint . . . all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law." U.S. CONST. art. II, § 2 (Appointments Clause). The Appointments Clause itself contains the only exception to its general rule: "Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." *Id.* Plaintiff asserts the Appointments Clause functions to preserve the principle of separation of powers and the executive's accountability to the American public. *Pl.'s Mot.* at 8. As such, it is not "mere ... etiquette or protocol," but a "structural safeguard[] of the constitutional scheme." *Id.* (first citing *Buckley v. Valeo*, 424 U.S. 1, 125 (1976); then citing *Edmond v. United States*, 520 U.S. 651, 659 (1997)).

NEFSA first seeks to establish that members of the New England Council meet the constitutional definition of "officers," and then argues that, as such, they were appointed to this position in violation of Constitutional requirements. *Id.*

#### i. Council Members as Officers of the United States

"The Appointments Clause envisions three categories of federal officials: principal officers, inferior officers, and 'lesser functionaries.'" *Id.* (citing *Buckley*, 424 U.S. at 126 n. 162). NEFSA articulates a two-part test for identifying federal

"officers:" first, they "hold continuing office[s] established by law," *id.* at 9 (quoting *Lucia v. SEC*, 595 U.S. 237, 247 (2018)), and second, they "exercis[e] significant authority pursuant to the laws of the United States." *Id.* (quoting *Buckley*, 424 U.S. at 126; citing *Aurelius Inv., LLC v. Puerto Rico*, 915 F.3d 838, 856 (1st Cir. 2019)) (outlining officer test). NEFSA addresses each prong of this test in turn.

### 1. Holding Continuing Offices Established by Law

NEFSA argues "to qualify as an office, the position must not depend on the identity of the person occupying it, and the duties should continue, though the person be changed." *Id.* (quoting *United States v. Donziger*, 38 F.4th 290, 297 (2d Cir. 2022)) (internal quotation marks omitted). The positions must be "established by law" and "continuing and permanent," *id. (*first quoting *Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 881 (1991)); then quoting *Lucia*, 595 U.S. at 245), as opposed to "occasional and intermittent." *Id.* (quoting *United States v. Germaine*, 99 U.S. 508, 511–12 (1879)).

NEFSA argues that Council Members hold "continuing office[s] established by law" and are entrusted with "continuing and permanent duties." *Id.* (quoting *Lucia*, 595 U.S. at 245). It first asserts that "Congress 'created' Council seats 'by statute'— 'down to [their] duties, salary, and means of appointment," *id.* (quoting *Lucia*, 595 U.S. at 248). In support, it directs the Court to 16 U.S.C. § 1852(a)(1) for the statutory creation of Councils, and to 16 U.S.C. § 1852(d), (h), and § 1853(a) for statutory directives regarding Council Members' responsibilities and pay structure. *Id.* Second, NEFSA says, "unlike the surgeons in *Germaine*, who worked only 'when

27

called on … in some special case,' … Council Members' duties are ongoing." *Id.* (citing *Germaine*, 99 U.S. at 512). Council Members, NEFSA continues, review stock assessments "on a *continuing* basis," "develop *annual* catch limits," and oversee "*multi-year* research." *Id.* (citing 16 U.S.C. § 1852(h)(5)–(7)) (emphases added by Plaintiff). Further, no Member serves on an "occasional or temporary basis": most "serve three-year terms (which can be extended to nine years), and the state-bureaucracy Members and Regional Director hold their Council seats indefinitely." *Id.* (citing 16 U.S.C. § 1852(b)(1), (3) and *Aurelius*, 915 F.3d at 856 (renewable three-year term and restrictions on removal made position an "office")). Third, NEFSA says, Council seats are permanent positions that exist independent of the individuals who fill them. *Id.* (citing *Donziger*, 38 F.4th at 297).

NEFSA seeks to anticipate Defendant's potential argument "that Members drawn from state governments and the private sector are not part of the federal government or subject to Article II at all," by claiming this position would "doom the [MSA] under the private nondelegation doctrine." *Id.* at 10. More to the point, Plaintiff says, "the argument is wrong" because "federal employment is not necessary for the Appointments Clause to apply." *Id.* (citing *Officers of the United States within the Meaning of the Appointments Clause*, 31 Op. O.L.C. 73, 78 (2007)). Instead, it says, "a position, however labeled, is in fact a federal office if (1) it is invested by legal authority with a portion of the sovereign powers of the federal Government, and (2) it is 'continuing.'" *Id.* (quoting the same at 73–74). Plaintiff asserts Council Members

meet these criteria, "regardless of a Member's independent status as a state or private employee." *Id.*

## 2. Exercising Significant Authority

NEFSA next asserts that Council Members exert "significant authority within the meaning of *Buckley* and its progeny. *Id.* (citing *Buckley*, 424 U.S. at 126). Before addressing the Council specifically, NEFSA defines "significant authority" as persons who "perform more than ministerial tasks" and "exercise significant discretion," *id.* (citing *Freytag*, 501 U.S. at 881–82), before offering examples of executive functions such as "rulemaking, [issuing] advisory opinions, and [making] determinations of [benefit] eligibility." *Id* (citing *Buckley*, 424 U.S. at 140-41). Plaintiff further emphasizes that this determination does not consider the duties of the position as a whole, but rather, "if an official wields officer-level authority in exercising *any* of his duties, he qualifies as an 'officer' under the Appointments Clause." *Id.* (citing *Freytag*, 501 U.S. at 822; *Lucia*, 595 U.S. at 247 n. 4) (emphasis added by Plaintiff).

Applying this standard to the Councils, NEFSA argues the "[MSA] vests Members with 'authority over the[ir] fisheries' and charges them to 'exercise sound judgment in the stewardship of fishery resources.'" *Id.* (citing 16 U.S.C. §§ 1801(b)(5), 1852(a)(1)). Turning to the statute itself, Plaintiff focuses on the Councils' role in "adopt[ing] and amend[ing] FMPs for its fisheries," arguing that "the [MSA] leaves these policy decisions to Councils; the Secretary contributes only nonbinding guidance and can repeal an existing Council policy only if three-quarters of the Council agrees." *Id.* at 11 (citing 16 U.S.C. §§ 1851(b), 1854(h)). NEFSA extends this argument to the Councils' authority to "draft[] implementing regulations as it 'deems

29

necessary or appropriate.'" *Id.* (citing 16 U.S.C. § 1853(c)). NEFSA characterizes the Councils as making "crucial determinations regarding the health of its fisheries and 'develop[ing]' its own 'multi-year research priorities.'" *Id.* (citing 16 U.S.C. § 1852(h)(5), (7)). However, the MSA goes further, NEFSA claims, by granting Councils "the power to *compel* the Secretary's imposition of emergency or interim regulations, . . . and an unqualified right to *veto* the creation of any 'limited access system' governing their fisheries." *Id.* (citing 16 U.S.C. § 1855(c)(2)(A), (c)(3)). Finally, NEFSA claims the statute grants broad residual power to the Councils to "conduct any other activities. . . which are necessary and appropriate to the foregoing functions." *Id.* (citing 16 U.S.C. § 1852(h)(9)).

Turning from the statutory directives to the specific actions of the New England Council in the case at bar, NEFSA argues the Council "'develop[ed] annual catch limits' for groundfish species." *Id.* (citing 16 U.S.C. § 1852(h)(6)). More specifically, NEFSA alleges "the Council slashed commercial catch limits for haddock by around 80% and imposed other restrictive regulations," based on "fact-finding, internal deliberations, and policy decisionmaking [t]hat take up thousands of pages of the Administrative Record." *Id.* (citing A.R. 1–5370). This process constitutes the exercise of significant authority, NEFSA says, because "now that Framework Adjustment 65 has taken effect, the Council must consent to any lifting of its restrictions." *Id.* (citing 16 U.S.C. § 1854(h)).

NEFSA preemptively rebuts Defendants' argument that NFMS holds the ultimate authority by approving Council policies, arguing "that does not strip Council

Members of officer status, for several reasons." *Id.* at 12. First, NEFSA posits "Councils unilaterally set the policy agenda through the Act's two-step rulemaking process," such that, for Council-managed fisheries, NMFS "can act unilaterally *only* when a Council chooses not to." *Id.* (citing 16 U.S.C. § 1854(c)(1)(A), (6) (emphasis added by Plaintiff)). "Councils decide when to *begin* the rulemaking process," and "when a Council *does* choose to act, the agency's back-end review is limited to 'consisten[cy] with . . . applicable law." *Id.* (citing 16 U.S.C. § 1854(a)(1), (b)(1) (emphasis added by Plaintiff)). NEFSA avers "if a Council's course of action is lawful, NMFS 'shall' promulgate it as a final rule," and, even in the event NMFS deems the proposal unlawful, the agency "merely explains that error and 'recommend[s]' revisions." *Id.* (quoting 16 U.S.C. 1854(a)(3)-(4), (b)(1), (3)). While it concedes NMFS reviews Council proposals, NEFSA argues this "does not render Council Members non-officer employees," and claims "the Final Rule's legal compliance was certified by Regional Administrator Pentony—a Council Member." *Id.* (citing A.R. 6201–05).

NEFSA takes the position that the Supreme Court has "'explicitly reject[ed]' the 'theory that final decisionmaking authority is a *sine qua non* of officer status.'" *Id.* at 12-13 (quoting *Lucia*, 595 U.S. at 245 n. 4). Rather, NEFSA says, "[a]n official's duties can make him an officer even if his 'opinion counts for nothing unless' another official 'adopts it as his own.'" *Id.* at 13 (quoting *Lucia*, 595 U.S. at 249, and citing *Freytag*, 501 U.S. at 881 (an official who "lack[s] authority to enter a final decision" may still be an officer)). NEFSA claims the question of "whether or not [an] act may be subject to direction or review" defines the line between primary and inferior

officers, but "does not *also* define the line between officers and 'lesser functionaries.'" *Id.* (citing *Edmond*, 520 U.S. at 663; *Buckley*, 424 U.S. at 126 n. 162) (emphasis added by Plaintiff). In support, it draws a comparison to the Private Company Accounting and Oversight Board (PCAOB), which similarly develops policies that cannot "become effective without prior approval of the [Securities and Exchange] Commission [(SEC)]." *Id.* (quoting 15 U.S.C. § 7217(b)(2)). Further, PCOAB policies are reviewed by the SEC, which *"shall* approve a proposed rule, if it finds that the rule is consistent with the requirements of this Act,*"* and has "broad authority to 'abrogat[e], delet[e], or add[]' to PCOAB rules." *Id.* (quoting 15 U.S.C. § 7217(b)(3), (5)) (emphasis added by Plaintiff). The Supreme Court, NEFSA says, found PCOAB to "exercise significant executive power" in *Free Enterprise Fund v. PCAOB*, 561 U.S. 477, 477 (2010). *Id.*

NEFSA argues the Supreme Court's holding in *Free Enterprise Fund* applies with even greater force to the MSA's Councils, as their policies "may 'take effect' *without* NMFS approval." *Id.* (emphasis added by Plaintiff). NEFSA points to *Lucia*, where the Supreme Court concluded that SEC administrative law judges (ALJs) were federal officers because "the SEC could 'decline[] [to] review' a judge's ruling, thereby making it 'final.'" *Id.* (citing Lucia, 595 U.S. at 249). NEFSA compares this holding to the MSA, which provides, if the Secretary does not "notify a Council within 30 days … of the approval, disapproval, or partial approval of a plan or amendment, then such plan or amendment *shall take effect as if approved*." *Id.* (quoting 16 U.S.C. § 1854(a)(3)(C) (emphasis added by Plaintiff). NEFSA claims this "gives Councils even *more* authority than the adjudicators in *Lucia*, where the SEC had to affirmatively

'issue an opinion' declining to review a particular decision before that decision would take effect." *Id. a*t 14 (citing *Lucia*, 595 U.S. at 249) (emphasis added by Plaintiff).

Moving to their second piece of evidence for a Council's significant authority, NEFSA argues the MSA "plainly *does* empower Council Members to make various final decisions affecting the rights and obligations of fishermen." *Id.* (emphasis added by Plaintiff). It lists four statutory examples it claims constitute significant authority:

> [A] Council can: **(1)** make any policy choices that are "consistent" with the Act and other relevant statutes, 16 U.S.C. § 1854(a)(1); **(2)** unilaterally and indefinitely veto, on any grounds, an attempt by the agency to "repeal or revoke" a FMP, *id*. § 1854(h); **(3)** exercise its policy judgment to "find[] that an emergency exists or that interim measures are needed to reduce overfishing," and thereby *order* the Secretary to issue regulations, *id*. § 1855(c)(2)(A); and **(4)** make an unreviewable decision on whether to implement a "limited access system" to govern any of its fisheries—*even* where NMFS would otherwise have leeway to impose its own rule, *id*. § 1854(c)(3).

*Id.* (emphasis added by Plaintiff).

NEFSA's third point evidencing the Council's significant authority is their "prepar[ing] proposed findings," and "'shap[ing] the administrative record' upon which their policy determinations and NMFS review are based." *Id.* (first citing *Freytag*, 501 U.S. at 874; then citing *Lucia*, 595 U.S. at 247-48). NEFSA argues that, "even if . . . NMFS *could* review Council policies *de novo*," the Councils possess "officer-level authority" because the MSA authorizes them to "detail[] the factual basis for a FMP or amendment, collect[] public comments, and incorporat[e] input from its advisory committees." *Id.* (citing 16 U.S.C. §§ 1852(g), (h)(3); 1853(a)) (internal citations omitted) (emphasis added by Plaintiff).

NEFSA contests the characterization of the Councils as mere "advisory bodies," arguing that "Congress knows how to create advisory bodies . . . [and] it did so elsewhere in the Act," but "never describes the Councils or their policies in such terms." *Id.* at 14-15 (citing 16 U.S.C. 1852(g)(1)–(3), (5)). Rather, Plaintiff says, the MSA "repeatedly directs the *Secretary* to offer advisory recommendations to the *Councils*—not the other way around." *Id.* (citing 16 U.S.C. §§ 1851(b)(1)(B); 1854(a)(3)(C), (b)(1)(B), (e); 1855(b)(1)) (emphasis added by Plaintiff). NEFSA urges the Court to ignore a recent ruling on this point from the District of New Hampshire, arguing that court's determination that "Councils do not exercise 'significant' authority" was mere dicta and, further, a "conclusory observation" in which "[t]he court did not assess the full range of Council authority under the Act or the nature of NMFS review, and it did not have the benefit of *Lucia*, decided in 2018." *Id.* at 15-16 (citing *Goethel v. Pritzker*, No. 15-cv-497-JL, 2016 U.S. Dist. LEXIS 99515, at *27-29 (July 29, 2016)). Deeming its arguments to have sufficiently established Council Members as constituting federal officers, NEFSA turns to explaining why their appointment violated the federal Constitution.

### ii.    Council Members as Principal Officers

NEFSA first avers that Council Members constitute "principal officers" who have been appointed to their positions in violation of the express constitutional requirements. *Id.* at 16. To distinguish between principal and inferior officers, the Plaintiff directs the court to consider "how much power an officer exercised free from control by a superior" by applying three factors: "*First*, does a principal officer exercise sufficient 'administrative oversight' of the officer in question? *Second*, may a principal

officer freely remove him from office? *Third*, can a principal officer 'review the [relevant officer's] decisions'?" *Id.* (quoting *United States v. Arthrex, Inc.,* 594 U.S. 1, 13 (2021) (emphasis added by Plaintiff)). NEFSA claims Council Members satisfy all three *Arthrex* factors.

First, NEFSA claims, "no principal officer oversees the Councils." *Id.* It informs the Court "this factor is met where a superior can 'prescribe uniform rules of procedure' for, or 'formulate policies and procedure in regard to,' the subordinate officer's duties," or where "a principal officer 'fixes the [officer's] rate of pay,' 'controls the decision whether to' initiate his work, or can 'select[]' the subordinate officer to perform particular tasks." *Id.* (first quoting *Edmond*, 520 U.S. at 663, 664–65; then quoting *Arthrex*, 594 U.S. at 13). Applying these standards to the present case, NEFSA argues "the Councils are subject to only minimal NMFS oversight," because "[t]hey control their own procedures, policy priorities, research agendas, and staffing decisions," "[n]o superior controls their pay," and nobody "other than a Council itself decide[s] whether to initiate the Act's policymaking process." *Id.* at 16-17 (citing 16 U.S.C. §§ 1852(d), (e)–(i); 1854(a)(1). NEFSA states these parameters are "insulate[d]" by the statute. *Id.* at 17 (citing 16 U.S.C. § 1851(b)).

Second, NEFSA avers, "no principal officer—nor even the President—may remove Council Members at will," and argues these "nearly impenetrable removal protections [] violate the Constitution in their own right" or, at least, "clearly deny any principal officer the power to freely remove Members." *Id.* Third, NEFSA posits "no principal officer can veto a Council's policy decisions," citing *Arthrex* to support

its argument that principal officers direct decisions on matters of both law and policy. *Id.* (citing 594 U.S. at 18). NEFSA argues the MSA limits NMFS' review authority to legal defects only, and further that its review is not compulsory because "Council policies 'shall take effect as if approved' if the agency fails to act. *Id.* (quoting 16 U.S.C. § 1854(a)(3)(C). NEFSA concludes its principal officer argument by directing the Court to other examples of the Council's unreviewable authority, such as the ability to deny the President's request to revoke an existing plan by a vote of five Members, the decision to "force the Secretary to impose emergency regulations," and a "Council's unilateral judgment that its fishery shall not be governed by a 'limited access system.'" *Id.* (citing 16 U.S.C. §§ 1854(a)(3)(C), (c)(3); 1855(c)(2)(A)).

### iii.      Council Members as Inferior Officers

Should the Court determine Council Members are not principal officers, NEFSA argues the Court should alternatively find them to be inferior officers appointed in violation of the process described by the federal Constitution. *Id.* While Plaintiff notes Article II of the Constitution "authorizes Congress to 'vest the Appointment' of 'inferior officers' in 'the President alone, in the Courts of Law, or in the Heads of Departments,'" *id.* (quoting U.S. CONST. art. II, § 2, cl. 2), it claims "[n]either the President nor any court selects Council Members," and "17 of 18 Members are not appointed by [Heads of Departments]." *Id.* NEFSA addresses the two categories of Council Members it alleges are unconstitutionally appointed in turn.

### 1.      State Bureaucracy Members

Reminding the Court that the MSA "reserves Council seats for '[t]he principal State official with marine fishery management responsibility and expertise in each

constituent State, who is designated as such by the Governor of the State,' or his 'designee,'" *id.* at 18 (quoting 16 U.S.C. § 1852(b)(1)(A)), NEFSA argues the Appointments Clause nowhere permits Congress "to delegate the *federal* appointment power to *state* officials." *Id.* NEFSA posits this process contravenes the purpose of the Appointments Clause "to provide clear 'lines of accountability,'" *id.* (citing *Arthrex*, 594 U.S. at 16), because "*state* officials are accountable, if at all, only to *state* electorates" and "[s]uch officials cannot wield the *federal* power to appoint officers whose authority transcends state borders." *Id.* (emphasis added by Plaintiff). By "empower[ing] state officials to appoint federal officers," NEFSA says, the MSA diffuses Executive accountability and leaves state fishermen "*zero* political recourse against a significant portion of its members," a "plainly unconstitutional" result. *Id.* (citing *Free Enter. Fund*, 561 U.S. at 497) (emphasis added by Plaintiff).

### 2. Governor-nominated Members

Turning to the twelve members of the New England Council that "are nominated by governors and selected from curated lists by the Commerce Secretary," NEFSA argues "this procedure does not allow the Secretary to choose whomever she (or the President) prefers," as instructed by the Constitution. *Id.* By compelling the Secretary to "pick from a closed set of candidates nominated by a state official," without any time restraints or mechanism to bypass the Governors' selections, Plaintiff says the statute puts state governors in control of the process. *Id.* at 18-19. NEFSA argues this process "'limit[s] selection' and 'trench[es] upon executive choice'" in violation of the Constitution, which contravenes the Executive Branch's right to "exclude officials with 'different views of policy.'" *Id.* at 19 (first quoting *Myers v.*

37

*United States,* 272 U.S. 52, 128 (1926); then quoting *Collins*, 594 U.S. at 256). NEFSA takes issue with the "[MSA] assign[ing] an essential role in officer selection to *separate sovereigns*," which it deems to be "a wanton 'diffusion of the appointment power' that assaults 'the Constitution's structural integrity.'" *Id.* (citing *Freytag*, 501 U.S. at 878 (emphasis added by Plaintiff)). NEFSA bases its position "that the appointment power is not shared, divided into phases, or otherwise diluted" on the text of the Constitution, which instructs, "[f]or inferior officers, Congress must '*vest*' the power in one of a short list of decisionmakers—meaning the President, court, or department head 'alone' must wield the authority." *Id.* (for the latter, citing U.S. CONST. art. II, § 2, cl. 2 (emphasis added by Plaintiff)).

### iv. Effect of Appointments Clause Violation on Final Rule

Whether principal or inferior officers, NEFSA concludes that "[b]ecause the Council's Members were appointed in violation of the Appointments Clause, the Council lacked authority to develop Framework Adjustment 65." *Id.* The Council's dearth of authority, NEFSA says, means "Framework Adjustment 65 is thus 'void *ab initio*,' as are NMFS rules implementing it." *Id.* (citing *Collins*, 594 U.S. at 257). Because Framework Adjustment 65 was void, NEFSA continues, NMFS "should have rejected it as illegal under 16 U.S.C. § 1854(a)(1)(A). *Id.* at 19-20. Instead, NMFS adopted the Council's policies, making them binding regulation. *Id.* at 20. For these reasons, NEFSA avers, "the Final Rule must be vacated and its enforcement enjoined." *Id.* (citing 16 U.S.C. § 1855(f)(1)(B); *Lucia*, 595 U.S. at 251; *Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 684 F.3d 1332, 1342 (D.C. Cir. 2012)).

### b.    Council Members' Insulation from Removal

As a supplement to its Appointment Clause claim, NEFSA similarly argues that, as federal officers, the Council Members' and Defendant Rauch's protections against removal by the President violate the "Vesting" and "Take Care" Clauses of the United States Constitution. *See* U.S. CONST. art. II, § 1, cl. 1, and § 3). NEFSA asserts "the 'executive Power'—all of it—is 'vested in a President,' who must 'take Care that the Laws be faithfully executed.'" *Id.* at 20 (citing *Seila Law*, 591 U.S. 203 (quoting U.S. CONST. art. II, § 1, cl. 1, and § 3)). Pursuant to these clauses, Plaintiff asserts "[t]he President must retain "the ability to remove executive officials," because "otherwise, the President 'could not be held fully accountable for discharging his own responsibilities.'" *Id.* (first quoting *Seila Law*, 591 U.S. at 203; then quoting *Free Enter. Fund*, 561 U.S. at 514). Following the Supreme Court's holding in *Seila Law*, Plaintiff characterizes "the Constitution's default rule" as "the President must be able to remove executive officials at will." *Id.* (citing 591 U.S. at 203).

NEFSA notes that *Seila Law* recognized that its general rule does not apply to "(1) multimember agencies that lack "executive power" and (2) certain inferior officers,"; however, NEFSA argues that even for these two exceptions, "Congress cannot abrogate all presidential control." *Id.* at 20-21 (citing *Seila Law*, 591 U.S. at 216-18). For example, NEFSA observes, for-cause provisions may be tolerated in some cases, but they impermissibly interfere with the Executive's constitutional authority "when Congress imposes an *additional* layer of such protection," such as tenure protections. *Id.* at 21 (first citing *Humphrey's Executor v. United States*, 295

U.S. 602, 619 (1935); then citing *Free Enter. Fund.*, 561 U.S. at 495–96, 503) (emphasis added by Plaintiff).

### i. Recognized Exceptions to the Constitutional Removal Doctrine

Applying the constitutional removal doctrine to the Councils, NEFSA argues their Members fail to qualify for either exception to *Seila Law*'s general rule requiring such officials to be subject to the President's removal power. The first exception, which the Supreme Court articulated in *Humphrey's Executor* and subsequently recognized in *Seila Law*, applies to "for-cause removal protections [given] to a multimember body of experts, balanced along partisan lines, that performed legislative and judicial functions and was said not to exercise any executive power." *Id.* (quoting *Seila Law*, 591 U.S. at 216-17). NEFSA says the Councils do not qualify for the *Humphrey's Executor* exception because "the [MSA] lacks partisan-balance requirements, and Council Members exercise the *executive* function of rulemaking— not the legislative function of advising Congress nor any adjudicatory role [as in *Humphrey's Executor*]." *Id.* (emphasis added by Plaintiff).

The second exception, created by the Supreme Court in *Morrison v. Olson*, 487 U.S. 654, 672 (1988), and later respected in *Seila Law*, permits removal protections for "certain *inferior* officers with narrowly defined duties." *Id.* (quoting *Seila Law*, 591 U.S. at 204). In *Morrison*, the official in question was an "independent counsel— a prosecutor 'appointed … to accomplish a single' criminal investigation." *Id.* (quoting *Morrison*, 487 U.S. at 672). In that case, the Supreme Court permitted removal protections because the independent counsel "lacked policymaking or administrative

authority" based on the narrow grant of investigative authority to "actors identified by others, and was confined to a specified matter." *Id.* (quoting *Seila Law*, 591 U.S. at 219). Applying the *Morrison* exception to Councils, NEFSA argues their Members do not fit because "they are *principal* officers," "bear no resemblance to the time-limited, narrow-in-scope independent counsel," and "their extensive 'duties' under the Act 'are far from limited.'" *Id.* at 22 (quoting *Seila Law*, 591 U.S. at 199). Plaintiff concludes neither exception to the constitutional removal doctrine applies, such that "the President must be free to remove Members *at will*." *Id.* (emphasis added by Plaintiff).

Finally, NEFSA argues that, even if the Court determines Council Members fit within one of the two exceptions, "the Act's extraordinary and unprecedented removal protections would still be unconstitutional," because "[t]he President is utterly powerless to remove five Council Members: the state bureaucrats appointed by other state officials . . . [who] serve 'so long as' they occupy their predicate state positions." *Id.* (citing 16 U.S.C. § 1852(b)(1)(A)). Because "*[n]o federal official* can remove such a Member," NEFSA argues that the vesting of removal power "for officers wielding the executive power of the United States" in a "*separate sovereign*" violates the Constitution. *Id.* (citing *Free Enter. Fund*, 561 U.S. at 503) (emphasis added by Plaintiff).

Addressing the "12 governor-nominated Members," NEFSA points out that while "[t]he Secretary may remove these Members only 'for cause,'" the "Act provides just one scenario in which the Secretary can remove a Member unilaterally: after a

41

formal hearing finds the Member violated a specific conflict-of-interest provision" governing disclosures and recusals based on financial interests. *Id*. (citing 16 U.S.C. §§ 1852(b)(6); 1857(1)(O)). NEFSA argues the President must be permitted to remove a Member for other failures, including "inefficiency, neglect, criminality, nepotism, embarrassing conduct, undermining the President's policies, or anything else," but the statute limits the President from doing so unless the Council's membership "'first recommends removal' by a two-third vote." *Id* at 23. (citing 16 U.S.C. § 1852(b)(6)(A)). Plaintiff describes this statutory process as constituting "two layers" of removal protection, as was rejected in *Free Enterprise Fund*, and in so doing, "imped[ing] the President's ability to perform his constitutional duty." *Id*. (first citing *Free Enterprise Fund*, 561 U.S. at 495-96; then quoting *Seila Law*, 591 U.S. at 217).

### ii. Entitlement to Relief

Plaintiff specifically addresses the propriety of its requested relief based on its insulation from removal claim, arguing it is entitled to relief for two reasons: "*First*, because the Act's rulemaking system cannot be severed from the Councils' unconstitutional removal protections, the Final Rule must be vacated and enjoined. *Second*, NEFSA is entitled to vacatur and declaratory relief even if this Court could somehow re-write the Act to create a constitutionally compliant Council." *Id*. (emphasis added by Plaintiff).

Beginning with its assertion that the unconstitutional protection from removal "cannot be severed from Congress's grant of authority," NEFSA distinguishes the present case from *Free Enterprise Fund*, in which the Court's "ability to sever the

relevant statute's for-cause removal provision enabled the Board to keep running." *Id.* at 23-24 (quoting *Axon Enter.*, 598 U.S. at 189). Here, though, Plaintiff says the Court cannot sever the unconstitutional provision because "the statute created in its absence is legislation that Congress would not have enacted." *Id.* at 24 (quoting *Seila Law*, 591 U.S. at 234). It directs the Court to the two-step inquiry the Supreme Court applied in *Seila Law*: first, "consider[] whether the law's 'surviving provisions [are] capable of "functioning independently."'" *Id.* (quoting *Seila Law*, 591 U.S. at 234) (quoting *Free Enter. Fund*, 561 U.S. at 509). Second, if the law survives the first step, the Court "examines [the law's] 'text [and] historical context' to determine whether Congress would have passed it without its 'invalid' components." *Id.* (quoting *Free Enter. Fund*, 561 U.S. at 509). Plaintiff argues the Council's structure fails at both steps of this inquiry.

Regarding step one, NEFSA argues Council Members' tenure protections are fundamentally intertwined with the Council system set up in the MSA, which "contains *no* removal provisions for Members appointed from state bureaucracies, who 'shall be' Members by virtue of their state employment." *Id.* (citing 16 U.S.C. § 1852(b)(1)(A) (emphasis added by Plaintiff)). NEFSA makes the same argument for the Regional Administrator, who "serves on the Council due to his appointment to a career NMFS position; his tenure protections arise from statutes *outside* the Act," and, therefore, there is "no provision in the Act this Court could excise to cure the defect." *Id.* (emphasis added by Plaintiff). Without the ability to sever a removal-specific provision, Plaintiff says, "the only remedy would be to erase these six Council

Members from the Act *entirely,*" which would contravene Congress's intention for the "Act's Council-based policymaking system." *Id.* at 24-25 (for the latter, citing *Alaska Airlines, Inc.*, 480 U.S. at 685) (emphasis added by Plaintiff).

NEFSA argues the complicated structure of the removal protections of the twelve governor-nominated Members similarly resists straightforward judicial severance, as it remains unclear if the Court should excise "[its] restriction to conflict-of-interest violations, the formal hearing rule, the supermajority requirement, the Council's prerogative to 'recommend removal,' or all of the above." *Id.* at 25 (citing 16 U.S.C. § 1852(b)(6)). It compares this structure to the "discrete for-cause provisions" severed by the courts in *Free Enterprise Fund* and *Seila Law*, arguing that doing so here would "usurp[] 'editorial freedom' that 'belongs to the Legislature.'" *Id.* (citing *Seila Law*, 591 U.S. at 238)). Plaintiff posits "[t]here is simply too much guesswork to ensure the revised Act will 'remain[] fully operative' in the manner Congress intended." *Id.* (citing *Free Enter. Fund.*, 561 U.S. at 509; *Alaska Airlines, Inc.*, 480 U.S. at 685).

Turning to the second step of the severability analysis, NEFSA argues that, even if the Court could rewrite the MSA to make Council Members removable by the President, the statute's text and history bely Congress's intent to leave fishery policy development to the states. *Id.* It was the opposition of state governments and the fishing industry that prompted Congress to put states in charge of the Council system, Plaintiff says, referencing earlier drafts of the statute that called for, in the Senate's version, "Members to be appointed by the President in consultation with

44

Governors, then confirmed by the Senate," or, in the House's version, for "three federal officials, a gubernatorial appointee from each state, and at-large seats filled by the Commerce Secretary from lists prepared by the other Members." *Id.* (first citing S. Rep. No. 961, 94th Cong., 1st Sess. (1975); then citing H.R. Rep. No. 94-445, 94th Cong., 1st Sess. (1975)).  In addition to these earlier drafts, NEFSA quotes from hearings before the Senate Committee on Commerce raising concerns regarding federal control of fishery policy.  *Id.* (citing *Hearings Before the Senate Committee on Commerce on S. 961*, 94th Cong., 1st Sess., 468 (1975) (Sen. Stevens)).  NEFSA credits these concerns and "political pressures" with the changes made to the final version of the Act, which granted greater authority to state entities over developing fishery policy, such that "Congress would never have enacted a federally controlled regulatory regime." *Id.* at 26-27.  Because Congress did not seek or intend to create fully federal Councils, Plaintiff concludes, neither should the Court through severing governor-nominated Members.  *Id.* at 27.

Finally, NEFSA argues that prospective relief is warranted even if removal protections were severable, because Framework Adjustment 65 and the Final Rule "represent an exercise of federal power free from presidential control . . . [a]nd a successful plaintiff is generally entitled to relief from the imposition of such power." *Id.*  Plaintiff tells the Court "its members are subject to the Council's ongoing authority. . . [which] is 'illegitimate,' 'cannot be undone' and requires 'meaningful judicial relief,'" and claims the "obvious remedy . . . would be to dismiss the agency's

action—*i.e.*, to vacate it." *Id.* (first citing *Axon Enter.*, 598 U.S. at 191-92; then citing *Seila Law*, 591 U.S. at 232).

Alternatively, NEFSA seeks a declaration from the Court "that the Act's removal restrictions are unconstitutional and the Final Rule is unlawful," which it asserts is "'appropriate' to 'declare the rights' of a party" in the event of an "actual controversy." *Id.* at 27-28 (citing 28 U.S.C. § 2201(a)). NEFSA concludes by citing *Collins* to support its argument that declaratory relief is appropriate if a plaintiff "is impacted by the *conduct* of an illegally insulated official—'not [by] the provision of law that is challenged.'" *Id.* at 28 (citing *Collins*, 594 U.S. at 258-59 n.24).

### c. Private Non-Delegation Doctrine

In the event the Court finds Council Members do not constitute federal officers, NEFSA brings an alternative claim for a violation of the private non-delegation doctrine by arguing this constitutional doctrine "permits only the federal government to exercise federal power." *Id.* at 28-29 (citing *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869, 880 (5th Cir. 2022)). Any role delegated to private entities "must be an 'advisor[]'—nothing more." *Id.* (citing *Oklahoma v. United States*, 62 F.4th 221, 229 (6th Cir. 2023)).

NEFSA draws an extensive comparison to another statutory scheme the Fifth Circuit declared invalid pursuant to the non-delegation doctrine. First, Plaintiff describes the structure of the Horseracing Integrity and Safety Act (HISA), which created the Horseracing Integrity Safety Authority as a "private, independent, self-regulatory, nonprofit corporation" to "develop[] regulatory program[s]" and submit

them to the Federal Trade Commission (FTC). *Id.* (citing 15 U.S.C. §§ 3052(a), 3053(a)). Pursuant to the HISA, the proposed regulations do not take effect until approved and published in the Federal Register by the FTC; however, the statute instructs the FTC to approve any proposed rule "consistent" with HISA. *Id.* (citing 15 U.S.C. § 3053(b)(1)-(2), (c)(2)). When challenged, the Fifth Circuit identified three constitutional flaws in HISA: "*First*, HISA gave the Authority 'sweeping' policymaking power over 'myriad' aspects of the industry," *"[s]econd*, the court emphasized the FTC's 'limited review' for 'consistency' with HISA,*"* and "*[t]hird*, the court stressed the FTC's inability to 'abrogate' or 'modify' Authority rules." *Id.* at 30 (citing *Black*, 53 F.4th at 882-88) (emphasis added by Plaintiff).

After Congress amended the HISA to give the FTC "sweeping power to . . . create rules that 'abrogate, add to, and modify the rules of the Authority,'" *id.* (citing *Oklahoma*, 62 F.4th at 227) (quoting 15 U.S.C. § 3053(e)), the Sixth Circuit upheld the constitutionality of HISA in a subsequent challenge based on two key reasons: "*[f]irst*, it allowed the FTC to unconditionally and unilaterally 'abrogate' or 'modify' the Authority's proposed and enacted rules," and *"[s]econd*, it 'grant[ed] the FTC a comprehensive oversight role,' ensuring that its newfound 'power to write and rewrite the rules' would "'span[] the [Authority's] whole jurisdiction.'" *Id.* (quoting *Oklahoma*, 62 F.4th at 227-31) (emphasis added by Plaintiff).

NEFSA likens the MSA to the original version of HISA declared unconstitutional by the Fifth Circuit, arguing the Councils enjoy similar "sweeping" authority, "exercise their policy judgment to 'develop' and 'prepare' fishery rules"

before submitting them to a federal agency for review and promulgation, and are compelled to approve policies if "consistent" with the statute. *Id.* (citing 16 U.S.C. §§ 1852(h)(1), (6); 1854(a)(1)(A), (a)(3)). Further, as with the HISA, "identifying an inconsistency does not empower the reviewing agency to take unilateral action, but triggers a remand accompanied by 'recommendations.'" *Id.* (citing 16 U.S.C.§ 1854(a)(3)(C)). NEFSA points out that the Act also "expressly *bars* NMFS from 'repeal[ing] or revok[ing]' a Council's plan without its consent," which it argues distinguishes it from the amended HISA found constitutional by the Sixth Circuit. *Id.* (citing 15 U.S.C. § 3053(e); *Oklahoma*, 62 F.4th at 230) (emphasis added by Plaintiff).

Plaintiff argues the MSA goes even further than the HISA by providing that "Council rules 'shall take effect' if NMFS *fails* to act," and leaves crucial decisions, such as enacting a limited access system or issuing emergency regulations, "to the Councils *alone*." *Id* at 31-32 (citing 16 U.S.C. §§ 1854(a)(3)(C), (c)(3); 1855(c)(2)(A)) (emphasis added by Plaintiff). Finally, Plaintiff claims NMFS "lacks the 'comprehensive oversight' —across the Councils' 'whole jurisdiction'—that the Sixth Circuit found dispositive" in its ruling on the amended HISA. *Id.* at 32 (citing *Oklahoma*, 62 F.4th at 230). Based on the foregoing, NEFSA concludes that, if the Councils are deemed private actors, this statutory structure violates the private non-delegation doctrine by granting executive power to a private actor. *Id.*

### d. Defendant Rauch's Insulation from Removal

NEFSA brings a separate constitutional claim against Defendant Rauch as being unconstitutionally insulated from removal. *Id.* at 32. Reiterating the need for executive accountability, Plaintiff notes Congress "created an insulated cadre of 'Senior Executive Service' [SES] officers who *by definition* 'exercise[] important policy-making, policy-determining, or other executive functions.'" *Id.* (citing 5 U.S.C. § 3132(a)(2)(E)) (emphasis added by Plaintiff). These SES officials "can be suspended or terminated only for 'misconduct, neglect of duty, malfeasance, or failure to accept a directed reassignment or to accompany a position in a transfer of function'—and only with robust procedural protections and appellate rights." *Id.* (citing 5 U.S.C. §§ 7542–43, 7512–13). Plaintiff contests SES removal protections as "wholly 'incompatible with the Constitution's separation of powers.'" *Id.* (quoting *Free Enter. Fund*, 561 U.S. at 498). This insulation, it says, "impede[s] the President's prerogative to remove those 'who disobey his commands, [or for other reasons]'" *id.* (citing *Collins,* 594 U.S. at 256), regardless of if some in the SES are "relatively low on agency organizational charts." *Id.* (citing *Arthrex*, 594 U.S. at 18).

Applying its criticisms to Defendant Rauch, an SES official, NEFSA argues he "wields substantial executive power" by overseeing NMFS regulatory programs and actions, while "enjoy[ing] powerful removal protections that follow SES status." *Id.* at 34. First, regarding "Mr. Rauch's authority to issue rules," NEFSA argues "[t]he Supreme Court has held that, under the Constitution, only 'Officers' . . . have [that] power." *Id.* (quoting *Alfa Int'l Seafood v. Ross*, 264 F. Supp. 3d 23, 41 (D.D.C. 2017)).

In this case, Plaintiff says, Defendant Rauch "issues rules by executing and publishing Council FMPs, amendments, and regulations in the Federal Register and CFR as final rules," and "signed the official internal 'decision memorandum' certifying the rules legality," and he does so "across *all* federally managed fisheries—those under Councils and those under NMFS." *Id.* (citing A.R. 6205) (emphasis added by Plaintiff).

NEFSA also clarifies that Defendant Rauch does not fit either of the exceptions to the Constitution's removal rules under *Humphrey's Executor* or *Morrison*, as he is a "purely executive official[]" who exercises policymaking or administrative authority. *Id.* at 35 (citing *Seila Law*, 591 U.S. at 218). As such, his insulation from removal is unconstitutional, making his exercise of authority "illegitimate" and the rules he signed void, unless the unconstitutional protections are severable. *Id.* (citing *Axon Enter.*, 598 U.S. at 191). However, on this point, NEFSA argues that severance is impossible because insulation from removal is "the *whole point* of the SES regime," *id.* (citing *Seila Law*, 591 U.S. at 233-34) (emphasis added by Plaintiff), and thus, the Court should declare Defendant Rauch's issuance of the Final Rule unlawful, vacate it, and enjoin its enforcement. *Id.* In the alternative, should the Court find Defendant Rauch's removal protections severable, Plaintiff asks the Court to, at minimum, declare his insulation from removal unconstitutional. *Id.* (citing *Seila Law*, 591 U.S. at 233-34).

### B. Defendants' Cross-Motion for Summary Judgment

#### 1. Standing

Defendants begin by reminding the Court that federal court jurisdiction is limited to "actual 'cases' and 'controversies'" under Article III of the United States Constitution. *Defs.' Mot.* at 9 (citing U.S. CONST. art. III, § 2). Defendants then summarize the three elements of standing articulated by the Supreme Court in *Lujan v. Defenders of Wildlife*, writing "[f]irst, the plaintiff must have suffered an 'injury in fact,' meaning an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id.* (citing *Lujan*, 504 U.S. at 560; *Spokeo, Inc. v. Robins*, 578 U.S. at 339 (2016)). The second required element, Defendants assert, is "a causal connection between the injury and the conduct complained of," continuing that "the injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Id. at* 9-10 (citing *Lujan*, 504 U.S. at 560). Third, "it must be 'likely,' not merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Id.* at 10 (citing *Lujan*, 504 U.S. at 561.

The Defendants place on NEFSA "the burden of alleging facts that 'affirmatively' demonstrate standing," and assert this burden must be met "for each claim it brings." *Id.* (first quoting *FW/PBS v. City of Dall.*, 493 U.S. 215, 231 (1990); then quoting *DaimlerChrysler Corp. v. Cun*o, 547 U.S. 332, 352 (2006) (internal quotation marks omitted)). Recognizing the different standard for determining the standing of an associational plaintiff, Defendants inform the Court that an association "may have standing if at least one of its members has standing in his or her own right, the interests served by the suit are pertinent to the mission of the

organization, and relief does not require the presence of the members in the suit." *Id.* (quoting *Town of Norwood v. FERC*, 202 F.3d 392, 405-06 (1st Cir. 2000)).

Having established the standard they deem applicable to NEFSA, Defendants argue it lacks associational standing "because none of its members has standing in his or her own right;" more specifically, NEFSA fails to satisfy causation "because Plaintiff's members allege injury from the Final Rule promulgated by NMFS, yet nearly all Plaintiff's merits arguments center on the alleged unconstitutionality of the New England Council, whose actions have 'no legal effect whatsoever.'" *Id.* (quoting *UCIDA*, 2022 U.S. Dist. LEXIS 109879, at *53-54).

### a. Standing for Claims Relating to the Structure of the New England Council

Beginning by addressing NEFSA's assertion of standing to challenge the New England Council, Defendants characterize NEFSA's case as "a two-pronged argument," writing "[f]irst, Plaintiff asserts that the New England Council violates the Constitution's Appointments Clause for multiple reasons. Second, Plaintiff contends that it has suffered injuries from NMFS's Final Rule, namely financial losses and 'subjection to' a rule issued by 'unconstitutionally appointed and insulated officers.'" *Id.* at 11 (citing *Pl.'s Mot.* at 37) (quoting *Axon Enter.*, 598 U.S. at 190-91). Accepting, for the sake of argument, "that Plaintiff has provided sufficient allegations to show injury-in-fact from the second prong," Defendants aver the purported injuries "are not traceable to any constitutional infirmities articulated in the first prong." *Id.* Defendants restate "Plaintiff has not 'sustain[ed]' an injury 'from an [act by the

Council] that allegedly exceeds the [Council's] authority.'" *Id.* (citing *Seila Law*, 591 U.S. at 202, 210-11 (2020) (internal quotation marks and citations omitted)).

### i. Causation

Defendants cite cases from other circuits to support their claim that "a plaintiff lacks standing where, as here, a plaintiff fails to connect the injury allegedly caused by NMFS's duly-issued regulation to the Council." *Id.* (citing *Northwest Envt'l Def. Ctr. v. Brennen*, 958 F.2d 930, 937 (9th Cir. 1992) (finding the Pacific Council's regulations setting harvest limits for Oregon coastal coho salmon did not cause plaintiffs' injury because the Secretary implemented the regulations in question, such that "[w]hatever constitutional infirmity may inhere in the Council's structure has not caused the injury of which [plaintiff] complains"); *UCIDA*, 2022 U.S. Dist. LEXIS 109879, at *56 (finding "a Council's proposal has no legal effect whatsoever without the agency first promulgating implementing regulations"). Defendants collect additional caselaw in which courts found, in the context of the MSA, that "only the Secretary (acting through NMFS) has the authority to approve and implement an FMP, FMP amendment, framework adjustment, or specifications through regulations or other actions that have the effect of law." *Id.* at 11-13 (citing *J.H. Miles & Co. v. Brown*, 910 F. Supp. 1138, 1157-59 (E.D. Va. 1995); *Conservation Law Found. of New England v. Franklin*, 989 F.2d 54, 60 (1st Cir. 1993); *Gulf Restoration Network v. NMFS*, 730 F. Supp. 2d 157, 174 (D.D.C. 2010); *Anglers Conservation Network v. Pritzker*, 70 F. Supp. 3d 427, 436 (D.D.C. 2014). This is because "the Council is not

an 'agency' under the APA." *Id.* at 13. (citing *Flaherty v. Ross*, 373 F. Supp. 3d 97, 104-10 (D.D.C. 2019).

After this recitation of caselaw, Defendants address NEFSA's arguments distinguishing the present case from *Brennen* and *UCIDA*. *Id.* at 14. Specifically, Defendants' assert NEFSA's reliance on these cases is "misplaced" because their standing fails, not for the "'counterfactual world' in which a differently structured Council would have reached a different decision, . . . but because any proposal by the Council is only that—a proposal." *Id.* (citing *Seila Law*, 591 U.S. at 210-11). Thus, Defendants take the position that "there is no world in which the Council's proposals cause injury to Plaintiff." *Id.* Defendants also distinguish *Collins* and *Seila Law* from the present case by arguing that, "in both[,] the injury was traceable to the action taken by the allegedly unconstitutional agency." *Id.* (citing *Collins*, 594 U.S. at 242 (challenging the Federal Housing Finance Agency's "adoption and implementation" of an action); *Seila Law*, 591 U.S. at 210-11 (challenging "an executive act that allegedly exceed[ed] the official's authority")). Defendants aver these actions can be distinguished from the present case because "Councils under the [MSA] are simply advisory bodies and have no legal authority." *Id.* (citing *UCIDA*, 2022 U.S. Dist. LEXIS 109879, at *59). Defendants argue the injury here fails to satisfy the causation element of standing, which "demands more than incidental effects; the injury must be fairly traceable to the challenged action." *Id.*

Defendants next respond to NEFSA's "assertion that the [MSA's] 'constitutional defects short-circuited the regulatory process and denied NMFS any

authority to promulgate the Final Rule,'" which they argue "rests on the flawed premise that the Council's proposal had a legal effect." *Id.* at 15 (quoting *Pl.'s Mot.* at 38). Defendants note that NEFSA cites 16 U.S.C. § 1854(a)(1)(A)) to support its contention that "NMFS could have rejected Framework 65—and indeed was required to reject it." *Id.* Defendants argue that while "the Framework was not proposed under § 1854(a), the provision "undercuts the Plaintiff's own position" by requiring the Secretary to "independently review whether the Council's recommendation is 'consistent with the national standards, the other provisions of this chapter, and any other applicable law.'" *Id.* (citing 16 U.S.C. § 1854(a)). As such, Defendants say, the Secretary possesses "wide discretion" under the statute to determine "whether and how to move forward with any action proposed by the councils." *Id.*

Defendants next respond to NEFSA's argument that "NMFS's action is not necessarily a prerequisite to Council recommendations taking effect." *Id.* at 16 (citing *Pl.'s Mot.* at 38). Calling this argument "a red herring," Defendants posit "whether the Secretary affirmatively acts on an FMP amendment is of no moment from a legal perspective, as these have no legal effect without implementing regulations, which the Secretary—not the Council—issues." *Id.* at 15-16 (citing 16 U.S.C. § 1854(b)). Further, Defendants characterize "the Secretary's choice to take no action on a proposed amendment under § 1854(a)(3)" as "itself a deliberate decision." *Id.* However, Defendants argue that "the Court need not reach this issue" because "Framework 65 was not submitted under § 1854(a)," and "the Secretary, through AA Coit as the head of NMFS, did determine that the Council's Framework 65

regulations are consistent with the FMP, the statute, and other applicable laws pursuant to § 1854(b)(1)(A)." *Id.* at 16. As such, Defendants say, "Plaintiff has suffered no injury because of the Council's Framework 65 'tak[ing] effect *as if approved*.'" *Id.* (citing 16 U.S.C. § 1854(a)(3) (emphasis added by Defendants).

Defendants further contest NEFSA's reliance on *Cruz*, arguing the Supreme Court's holding in that case is inapposite because of differences in the underlying statute. *Id.* (citing *Cruz*, 596 U.S. at 301). Defendants emphasize the *Cruz* Court's finding that "a litigant cannot, 'by virtue of his standing to challenge one government action, challenge other governmental actions that did not injure him.'" *Id.* (quoting *Cruz,* 596 U.S. at 301). "Whereas in *FEC* the Court determined the appellees were challenging 'one Government action that cause[d] their harm[,]' Plaintiff here seeks to challenge an action that did not injure it—the Council's proposal of Framework Adjustment 65—via a claim to have been injured by NMFS's Final Rule implementing that Framework." *Id.* at 17. Defendants reiterate that "[c]ourts have refused to recognize challenges to the Council's recommendations because they have no legal effect and are not final agency actions." *Id.* (citing *Gulf Restoration Network*, 730 F. Supp. at 174).

Addressing NEFSA's argument that "the Council's proposals did cause harm to its members because, while NMFS approved Framework 65, 'its substance was developed by the Council,'" Defendants posit that "the Secretary, through AA Coit, had the ultimate discretion to approve or disapprove of Framework Adjustment 65, after considering the National Standards and applicable law, among other factors."

*Id.* Defendants argue Defendant Coit affirmatively chose to approve Framework 65 and implement it through final regulations following her consideration of public comments. *Id.* "This independent decision by the Secretary—and not the Council's proposal—is the cause of any injuries allegedly incurred by Plaintiff." *Id.* Defendants dispute NEFSA's analogy to *Department of Commerce v. New York*, arguing this case "did not disturb the Court's 'steady refusal' to find standing where the chain of causation is broken by 'independent decisionmakers' exercising their judgment." *Id.* (citing *Dep't of Com. v. New York*, 588 U.S. at 768 (2019)).

### ii. Redressability

Turning to redressability, Defendants aver the causation analysis colors this element. *Id.* at 17-18 (citing *West v. Lynch*, 845 F.3d 1228, 1235-36 (D.C. Cir. 2017) (noting that redressability and causation are "'closely related' like 'two sides of a . . . coin.'" (citation omitted)). Defendants say declaratory or injunctive relief provide no relief in the present case "[b]ecause the Council has no authority to issue regulations." *Id.* (citing *UCIDA*, 2022 U.S. Dist. LEXIS 109879, at \*59-61). While "Plaintiff asserts that vacatur of the Final Rule would redress its alleged injury," Defendants argue "Plaintiff has not mounted a challenge to the substance of the Final Rule . . . , and thus would not redress the claimed injuries." *Id.* (citing *Alaska Factory Trawler Ass'n v. Baldrige*, 831 F.2d 1456, 1464 (9th Cir. 1987).

Finally, with respect to its claims against actions by the Council, Defendants argue NEFSA also lacks standing for its alternative claim that the Council violates the private non-delegation doctrine because "the Council's proposals have no legal

effect without an implementing regulation or an action published in the Federal Register [and] [t]hus, any injury to Plaintiff flows from actions taken by NMFS, and not from any proposal by the Council." *Id.*

### b. Standing for Claim Relating to the Actions of Defendant Rauch

Defendants next argue NEFSA lacks standing for its claim involving Defendant Rauch, observing that the association bases its standing in this regard on two "incorrect assumptions," those being: "(1) DAARP Rauch has the 'authority to issue rules'; and (2) [Defendant Rauch] used that authority to issue the Final Rule in this case." *Id.* at 19 (citing *Pl.'s Mot.* at 34-35). In doing so, Defendants say, "Plaintiff misunderstands the nature of NMFS's rulemaking process and DAARP Rauch's role in that process." *Id.* Defendants assert Defendant Rauch "has no authority to issue regulations and, consistent with this lack of legal authority, did not issue the Final Rule . . . [i]nstead, [Assistant Administrator] Coit, a properly appointed inferior officer, issued the Final Rule." *Id.* To support this contention, Defendants cite the Administrative Record, which shows, on May 17, 2023, Defendant Coit "received correspondence asking for her review of the proposed rule to implement Framework 65," to which she "responded that she 'approve[d]' the proposed rule." *Id.* (citing A.R. 6072-73). Defendant Coit further "received correspondence with the Final Rule for her review," on August 2, 2023, and approved the Final Rule the following day. *Id.* at 20 (citing A.R. 6212-13).

Defendants support the propriety of Defendant Coit's actions because she "is an 'inferior officer' properly appointed under the Appointments Clause. . . [with] the

58

authority to issue this rule." *Id.* (first citing Reorganization Plan No. 4 of 1970, 84 Stat. 2090 (1970) (providing that the Assistant Administrator "shall be appointed by the Secretary, subject to approval of the President"); then citing *Massachusetts v. Pritzker*, 10 F. Supp. 3d 208, 212 n.4 (recognizing that NMFS, as the Secretary's designee, has authority to promulgate certain regulations under the MSA)). Defendants point out that NEFSA does not argue "that [Assistant Administrator] Coit's appointment is unconstitutional or that she lacked legal authority to issue the Final Rule," instead focusing its argument on delegation of such authority to the Deputy Administrative Assistant for Regulatory Programs, Defendant Rauch, pursuant to the NOAA Organizational Handbook. *Id.* (citing *Pl.'s Mot.* at 5).

Defendants insist NEFSA misrepresents the contents of the NOAA Organizational Handbook in its claim that "the [AA] has subdelegated the power to issue rules for publication in the Federal Register and Code of Federal Regulations to [DAARP Rauch]." *Id.* (citing *Pl.'s Mot.* at 5) (citing A.R. 6248). Defendants argue the only authority delegated to Defendant Rauch is for the "*signature* of material for publication in the Federal Register and the Code of Federal Regulations." *Id.* (citing A.R. 6245) (emphasis added by Defendants). Defendants distinguishes the power of signature from the power to issue rules, describing the former as a "ministerial task" and "not a significant exercise of authority" that can be lawfully performed by a non-officer. *Id.* (citing *Freytag,* 501 U.S. at 881). According to the Defendants, NEFSA's "alleged injury does not stem from DAARP Rauch issuing the Final Rule, and is instead traceable to Assistant Administrator Coit," such that NEFSA "has not

'sustain[ed]' an injury 'from an [act by Defendant Rauch] that allegedly exceed [his] authority.'" *Id.* at 21 (for the latter, quoting *Seila Law*, 591 U.S. at 211.

Defendants claim their argument regarding NEFSA's failure to prove the actions of Defendant Rauch caused their alleged injury similarly applies to the element of redressability, because "any favorable judgment directed at DAARP Rauch as the allegedly unconstitutional employee would not redress their injuries." *Id.*

Finally, Defendants also dispute NEFSA's asserted standard for the judicial inquiry at the summary judgment stage, arguing NEFSA "must set forth by affidavit or other evidence specific facts" in support of standing and cannot "premise its standing on an erroneous legal conclusion." *Id.* at 19 (first citing *Lujan*, 504 U.S. at 561; then citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

### 2. Merits

Turning from standing to the merits of NEFSA's claims, Defendants argue that, on the merits, "the Court should grant Defendants summary judgment in full," because Council Members are not federal officers, the statutory structure of the MSA does not violate the non-delegation doctrine, and Defendant Rauch did not issue the Final Rule. *Id.* at 21.

#### a. Appointments Clause

##### i. Council Members as Officers of the United States

Defendants contest NEFSA's characterization of the Council Members as federal officers. *Pl.'s Mot.* at 21-34. Describing the same two types of officers and their respective appointment processes articulated by the Plaintiff, Defendants assert

"[p]rincipal officers must be appointed by the President with the advice and consent of the Senate, while inferior officers may be, if authorized by Congress, appointed by the President alone, the head of the department, or a court." *Id.* at 21 (citing *Arthrex*, 594 U.S. at 10) (citing U.S. CONST. art. II, § 2, cl. 2). However, Defendants argue the Court need not determine which type of officer a Council Member would be, because they do not constitute federal officers at all based on their lack of a "continuing" position or "significant authority." *Id.* at 22 (citing *Lucia*, 595 U.S. at 237). Rather, they conclude the Councils serve as advisory committees to NMFS. *Id.* at 33.

### 1. Holding Continuing Offices Established by Law

Beginning with the first factor, "continuing office," Defendants describe the Council Member duties as "episodic and temporary," arguing that the Council meets "five to six times a year," for periods of approximately three days. *Id.* at 22 (citing A. R. 2561-65; 5030-42; 5333-36). As such, Council Members work "only when called upon at discrete moments during the year." *Id.* (citing 16 U.S.C. § 1852(e)(3)). Defendants distinguish these "temporary assignments" from the "career appointments" of SEC ALJs that NEFSA points to in *Lucia*. *Id.* Council Members' compensation is similarly limited, Defendants say, as the twelve governor-nominated New England Council Members are expressly "not employed by the Federal Government," and receive daily compensation only for the times when they "engaged in the actual performances of duties for such Council. *Id.* at 22-23 (citing 16 U.S.C. § 1852(a)(1)(A), (b)(1), (b)(2)(B), (d)). The five Council Members who derive their

positions through their state government positions are also not federal employees and "receive no compensation at all from the Federal Government." *Id.* at 23.

Defendants argue that the "limited terms," "episodic nature," and "limited 'daily rate' compensation" all distinguish Council Members from the types of officials that courts have deemed federal officers, such as the SEC ALJs in *Lucia* or the FTC special trial judges in *Freytag*. *Id.* (citing *Lucia*, 595 U.S. at 247-48; *Freytag*, 501 U.S. at 880-82). Rather, Defendants insist the Council Members have more in common with the civil surgeon appointed in *Germaine*, which that court deemed to not be an officer because "the tenure, duration, emolument, and duties of the job were merely occasional and temporary." *Id.* (citing *Germaine*, 99 U.S. at 512). Defendants further direct the Court to a decision by the D.C. Circuit Court, which found that ""[t]he Appointments Clause governs the selection of public officers—it says nothing about the exercise of public power by private persons." *Id.* at 23-24. (citing *Melcher v. Fed. Open Mkt. Comm.*, 644 F. Supp. 510, 521 (D.D.C. 1986)).

Responding to NEFSA's argument that "federal employment is not necessary," *Pl.'s Mot.* at 10, Defendants assert that, while employment is certainly not required to a federal officer, this "is a factor that weighs in favor of finding the Council Members to be officers," and is not present in this case. *Id.* at 24.

### 2.   Exercising Significant Authority

Defendants next dispute Plaintiff's characterization of the Councils' authority, arguing that its members "cannot exercise 'significant authority'" because "no action taken by the Council is self-executing" and "the Secretary—acting through the AA— has the sole authority to promulgate binding regulations." *Id.* at 24-25. Claiming

"Plaintiff has advanced not only an as applied challenge to the Final Rule, but also a general challenge to Councils," Defendants direct the Court to two statutory provisions as "clear evidence of the Secretary's ultimate responsibility for fisheries management:"

> First, in 16 U.S.C. § 1854, Congress described a wide array of authorities, including reviewing FMPs (§ 1854(a)), reviewing regulations (§ 1854(b)), preparing FMPs for highly migratory species and for other species when a Council fails to develop an FMP (§ 1854(c), (g)), and determining when a species is overfished and requires rebuilding (§ 1854(e)). Second, in 16 U.S.C. § 1855, Congress articulated in capacious language NMFS's "general responsibility to carry out any [FMP] or amendment" and to promulgate regulations "as may be necessary to discharge such responsibility or to carry out any other provision of this chapter." That section also vests NMFS with authority to implement emergency or interim measures. *Id.* § 1855(c).

*Id.* at 25. Describing the review pursuant to 16 U.S.C. § 1854(a) as "no rubber stamp," Defendants insist "[t]he Secretary must independently review whether the Council's recommendation is 'consistent with the national standards, the other provisions of this chapter, and any other applicable law.'" *Id.* at 26 (for the latter, quoting 16 U.S.C. § 1854(a)(1)(A)).

Defendants first point to the National Standards, which they argue "require the Secretary to exercise discretion and judgment in balancing' several competing factors." *Id.* (quoting *All. Against IFQs v. Brown*, 84 F.3d 343, 350 (9th Cir. 1996)). Defendants assert "the Secretary may not promulgate an implementing regulation that, in her judgment, is inconsistent with the ten National Standards," and "retains ultimate discretion" in determining an FMP's consistency. *Id.* at 26-27 (citing *Conservation Law Found. v. Mineta*, 131 F. Supp. 2d 19, 27 (D.D.C. 2001)). Further, Defendants say, the Secretary serves a front-end role in FMP development "through

63

the National Standard advisory guidelines, which the statute required the Secretary to publish." *Id.* at 27 (16 U.S.C. § 1851(b)).

Defendants next focus on the Secretary's determination of "whether a Council proposal is consistent with 'other applicable law.'" *Id.* (citing 16 U.S.C. § 1854(a)(1)(A), (b)(1)). Defendants assert this "independent evaluation" reviews for consistency with numerous other federal environmental laws and executive orders and was completed with regard to the Final Rule at issue here according to A.R. 6201-11. *Id.* Defendants claim "the Secretary's statutory authority to disapprove the Council's plan or amendments shows that the Council does not wield 'significant authority.'" *Id.* (citing *Estes v. U.S. Dep't of the Treasury*, 219 F. Supp. 3d 17, 38 (D.D.C. 2016)). Further, Defendants say, only the Secretary holds "[t]he power to alter a proposed regulation before it becomes final," a supposedly significant discretionary authority subject only to the requirements that she "consult with the Council" and include an explanation of the revision in the rule's publication to the Federal Register. *Id.* at 28. Finally, Defendants point the Court to the Secretary's ability to "promulgate 'emergency regulations or interim measures necessary to address [an] emergency or overfishing'" based on her determination that such measures are necessary to reduce overfishing, *id.* (citing 16 U.S.C. § 1855(c)(1)), which they argue is "legally and historically distinct from [the Secretary's] power to issue rules to implement FMPs and amendments." *Id.* (citing *Assoc. Fisheries of Me. v. Evans*, 350 F. Supp. 2d 247, 255 (D. Me. 2004)).

Seeking to differentiate the statutory scheme of the MSA from the roles found by courts to exercise significant authority in cases cited by NEFSA, Defendants first argue the FEC members found to be unconstitutional in *Buckley* had "'primary and substantial responsibility for administering and enforcing the [Federal Election Campaign] Act,' record-keeping, disclosure, and investigative functions, as well as extensive rule making and adjudicative powers." *Id.* at 28-29 (citing *Buckley*, 424 U.S. at 109). Defendants juxtapose this role with that of the Councils, which they contend is "solely advisory." *Id.* at 29 (citing signing statements accompanying amendments and reauthorizations of the MSA by Presidents Trump, Bush, and Clinton, respectively). Defendants bolster this position by citing numerous cases in which other courts determined Council proposals have no legal authority without implementing regulations promulgated by NMFS. *Id.* at 29-30 (citing, e.g., *J.H. Miles & Co.*, 910 F. Supp. at 1157-59; *Goethel*, 2016 U.S. Dist. LEXIS 99515; *Flaherty*, 373 F. Supp. 3d at 104-10; *Yakutat, Inc. v. Evans*, No. C02-1052R, 2003 WL 1906336, at *3 (W.D. Wash. Apr. 10, 2003); *Nw. Env't. Def. Ctr. v. Evans*, No. Civ. 87-229-FR, 1988 U.S. Dist. LEXIS 8977, at *20 (D. Or. Aug. 12, 1988); *Fishing Co. of Alaska v. Gutierrez*, 510 F.3d 328, 333 (D.C. Cir. 2007)).

Defendants argue NEFSA ignores this robust jurisprudence and, instead, "leans heavily on *Lucia* and *Freytag*," which Defendants posit are inaccurate comparisons. *Id.* Regarding the SEC ALJs at issue in *Lucia*, Defendants argue these officials "'exercise[d] significant discretion' in the course of 'tak[ing] testimony, conduct[ing] trials, rul[ing] on the admissibility of evidence, and . . . enforc[ing]

65

compliance with discovery orders,'" id. (citing *Lucia*, 595 U.S. at 246-47), such that the Supreme Court determined these officials "exercised 'nearly all the tools of federal trial judges'" and, further, "issued opinions that could be 'deemed the action of the [SEC]' without further review." *Id* at 30-31 (citing *Lucia*, 595 U.S. at 249). Similarly, Defendants say, "the Tax Court special trial judges in *Freytag* had 'the power to enforce compliance with discovery orders' and to 'punish contempts by fine or imprisonment.'" *Id.* at 31 (citing *Freytag*, 501 U.S. at 882, 891). Defendants note that, in *Freytag*, "the government *conceded* that they acted as inferior officers in cases in which they could enter final decisions," which led to the Supreme Court's ruling that "[s]pecial trial judges are not inferior officers for purposes of some of their duties under [the statute] but mere employees with respect to other responsibilities." *Id.* (citing 501 U.S. at 891) (emphasis added by Defendants). Comparing the officials in *Lucia* and *Freytag* to the Councils, Defendants assert the Council "possesses no power to enter final decisions" based on the Secretary's authority to review their proposals and lack of legal force until "*after* the Secretary chooses to promulgate a regulation," such that the Councils do not wield significant authority. *Id.* (emphasis added by Defendants).

Defendants continue by responding to NEFSA's invocation of 16 U.S.C. § 1854(h), under which NEFSA argues "now that Framework Adjustment 65 has taken effect, the Council must consent to any lifting of its restrictions." *Id.* (quoting *Pl.s' Mot.* at 11). Defendants note "Framework 65 has no independent legal effect without the implementing regulations that only the Secretary can promulgate," and argue

NEFSA mischaracterizes this statutory provision as a restriction on the Secretary; rather, Defendants say, the section "limits the ability of the *Council* to repeal or revoke its own FMP by a three-quarters majority," but "does not speak to the Secretary's significant authority to, for example, prepare her own Secretarial plan and implementing regulations, independent of the Council." *Id.* at 32 (first citing 16 U.S.C. §§ 1854(h) ("The Secretary may repeal or revoke a fishery management plan for a fishery *under the authority of a Council* only if the Council approves.") (emphasis added by Defendants); then citing 16 U.S.C. §1854(c), (g)).

Defendants also respond to NEFSA's argument that Council Members "are 'vested with the *general* rulemaking authority,'" *id.* (quoting *Pl.'s Mot.* at 12), by arguing the statute instead grants NMFS with the "'general responsibility to carry out any [FMP] or amendment' and to promulgate regulations 'as may be necessary to discharge such responsibility or to carry out any other provision of this chapter.'" *Id.* (quoting 16 U.S.C. § 1855(d)). Similarly, Defendants contest Plaintiff's assertions that "Council Members 'make various final decisions affecting the rights and obligations of fishermen,'" *id.* (citing *Pl.'s Mot.* at 14), by arguing each of the four examples leveraged by Plaintiff actually "contemplate a subsidiary role for the Council," writing:

> (1) proposals that are consistent with the Act and other laws only become final through action by NMFS; (2) the repeal or revocation of an FMP only occurs after NMFS has implemented an FMP and only after NMFS has decided that repeal or revocation is appropriate; (3) Councils do not "order" NMFS to issue emergency regulations; rather, they can request that such an action be taken by NMFS; and (4) the Council must "first approve" and submit any proposed limited access system to NMFS,

Add.069

but such discretionary systems are part of an FMP, and an FMP is only implemented by NMFS.

*Id.* at 32-33.

Defendants also reject Plaintiff's argument "that the Councils cannot be advisory because Congress 'never describes the Councils or their policies in such terms,'" *id.* at 33 (quoting *Pl.'s Mot.* at 15), alleging NEFSA "ignores the purposes section of the statute, which indicates that Councils will 'advise on' the establishment of FMPs," "places form over substance," and that Congress explicitly "exempted the Councils from the Federal Advisory Committees Act," which implies the Councils fit the definition of an advisory committee. *Id.* (citing 16 U.S.C. §§ 1801(a)(3); 1824(b)(5)-(6); 1852(i)(1)). Finally, Defendants urge the Court to consider *Goethel*, which they argue "properly determined that the Appointments Clause challenge to an FMP amendment failed '[b]ecause the Councils do not exercise 'significant authority.'" *Id.* (quoting *Goethel*, 2016 U.S. Dist. LEXIS 99515, at *27-29).

Defendants conclude Council Members should not be deemed federal officers because "[t]hey do not occupy continuing positions," "they do not wield significant authority," and "the Council has no power to execute law." *Id.* at 34. They argue this "doom[s] Plaintiff's Appointments Clause claims," *id.*, such that "the Court need not reach Plaintiff's second claim that they are unlawfully insulated from removal." *Id.* at 34 n.8.

### b.  Private Non-Delegation Doctrine

Turning to NEFSA's assertion that the MSA violates the private non-delegation doctrine, Defendants argue this constitutional canon applies "if a private

entity were to have the final word over how delegated authority is used over other private entities." *Id* (citing *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936)). Defendants raise several reasons why the instant case does not violate the private non-delegation doctrine.

First, Defendants dispute the characterization of Councils as "private," arguing "the Council is made up of both private individuals and individuals working in the public sector, specifically for state and federal agencies," such that the private non-delegation doctrine facially does not apply. *Id.* at 34-35 (citing *Kerpen v. Metro. Wash. Airports Auth.*, 907 F.3d 152, 162 (4th Cir. 2018) ("There has been no unlawful delegation of 'government power' to a private entity in this case for the simple reason that [the entity in question] is not a private entity"). Further, Defendants urge the Court to focus on "subordination," arguing the private non-delegation doctrine is not violated when the entity "operate[s] as an aid to the [agency]," "is subject to [the agency's] pervasive surveillance and authority," or the supervising agency "retains the discretion to 'approve[], disapprove[], or modif[y] [proposals].'" *Id.* at 35 (citing *Oklahoma*, 63 F.4th at 230; *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 399 (1940); *Black*, 53 F.4th at 880; *Am. R.R.s v. U.S. Dep't of Transp.*, 721 F.3d 666, 671 n.5 (D.C. Cir. 2013)).

Applying the doctrine to this case, Defendants argue "the Council functions subordinately to NMFS," and as such, "Plaintiff's claim here fails as a matter of law." *Id.* Responding to NEFSA's comparison of the MSA to the HISA, Defendants argue the oversight by FTC provided by the amended statute and upheld by the Sixth

Circuit "is like the role of the Secretary in the [MSA]: it is NMFS that has the 'final say' over decisions." *Id.* (citing *Oklahoma*, 63 F.4th at 225; *Black*, 53 F.4th at 880). Defendants compare the HISA to the MSA, positing statutory similarities include: the ability of the Horseracing Authority and Councils to submit proposals that do not take effect until the supervising agency (the FTC and Secretary, respectively) determine the proposal's consistency with the statutory directives; the process of the supervising agency issuing the proposed rule for public comment and publishing a final rule in the Federal Register with any changes explained, or else returning an inconsistent proposal to the Authority or Council, respectively, with recommendations for its improvement; and the ability of the FTC or Secretary, respectively, to abrogate, add, or modify rules in certain scenarios. *Id.* at 36-37.

Defendants also look elsewhere for analogous support—in the securities context, the SEC's private self-regulatory organizations (SROs) were upheld against a private non-delegation doctrine claim by the Second Circuit. *Id.* at 37-38 (citing *R.H. Johnson & Co. v. SEC*, 198 F.2d 690, 695 (2d Cir. 1952)); *see also id.* (citing *Adkins*, 310 U.S. at 388 (permitting private industry's regulatory involvement based on supervision by the Coal Commission); *Currin v. Wallace*, 306 U.S. 1, 15-16 (1939) (upholding delegation of power to tobacco growers as lawfully "prescrib[ing] the conditions of [the law's] application"); *Sierra Club v. Lynn*, 502 F.2d 43, 59 (5th Cir. 1974) (permitting delegation of statutory responsibilities under the National Environmental Policy Act to a developer)). Defendants take the position that NEFSA "misunderstands the relationship between NMFS and the Councils," in its contention

that NFMS review is limited to consistent with the MSA alone, and further "disregards the basic precept that statutes should be interpreted to avoid constitutional problems, not to create them." *Id.* at 38 (for the latter, citing *Zadvydas v. Davis*, 533 U.S. 678, 689 (2001)).

At bottom, Defendants insist "the Council functions subordinately to NMFS, which is the rule-maker," and, accordingly, the Act complies with the non-delegation doctrine. *Id.*

### c. Claim Against Defendant Rauch

Defendants dispute NEFSA's claim that the Final Rule was "improperly 'issued'" by Defendant Rauch, arguing "[a]s a threshold matter, any Appointments Clause challenge to DAARP Rauch has been forfeited because it was not raised during the rulemaking proceedings." *Id.* Defendants acknowledge comments received during the public comment period raised alleged Appointments Clause violations against Council Members," *id.* at 38-39 (citing 88 Fed. Reg. at 56540), but claim no such comment was made against Defendant Rauch despite his signing of the Proposed Rule. *Id.* at 39 (citing 88 Fed. Reg. at 34819). As such, Defendants contend "NMFS was deprived of the opportunity to contemporaneously address any error." *Id.* (citing *Pepperell Assocs. v. EPA*, 246 F.3d 15, 27 (1st Cir. 2001); *In re DBC*, 545 F.3d 1373, 1377 (Fed. Cir. 2008); *Lucia*, 595 U.S. at 251).

Should the Court determine NEFSA did not forfeit this claim, Defendants argue NEFSA's description of Defendant Rauch as a federal officer unconstitutionally insulated from removal claim misapprehends his role by erroneously assuming that

he has "authority to issue rules" and "issues regulations. . . as he did here." *Id.* (citing *Pl.'s Mot.* at 34). Defendants argue "AA Coit is a properly appointed inferior officer who serves as the head of NMFS and issued the Final Rule." *Id.* at 39-40.

### d.    Entitlement to Relief

Defendants argue no remedy is warranted for Plaintiff's claims, but asks the Court, should it identify a flaw in the Final Rule, for "the opportunity to offer supplemental briefing on remedy, including severability." *Id.* at 40 (citing *Ayotte v. Planned Parenthood of N. New Engl.*, 546 U.S. 320, 328-329 (2006) and *Arthrex*, 594 U.S. at 23-24). Defendants contend "the appropriate remedy will turn on the contours of any ruling on the merits," such that it cannot yet determine how to best provide a properly tailored remedy. *Id.* However, should the Court find Defendant Rauch's removal protections to be unconstitutional, it posits the "appropriate remedy is ratification of the Final Rule by a duly appointed officer whose appointments and authority are undisputed." *Id.* (citing *Guedes v. ATF*, 920 F.3d 1, 13 (D.C. Cir. 2019); *Alfa Int'l Seafood*, 264 F. Supp. 3d at 30-32).

### C.    Plaintiff's Response to Defendant's Cross-Motion for Summary Judgment and Reply in Support of Plaintiff's Motion for Summary Judgment

#### 1.    Standing

##### a.    Standing for Claims Relating to the Structure of the New England Council

NEFSA asserts Defendants "mischaracterize[] Plaintiff's claims and its theory of standing," by "complaining that Plaintiff has not proven its standing to sue *the Council* in this suit against NMFS and the Secretary." *Pl.'s Resp.* at 3 (emphasis

added by Plaintiff). NEFSA argues that, in proceeding in this manner, Defendants "effectively concede[] that Plaintiff *does* have standing to challenge the Final Rule," because "Defendants' allegedly unlawful act—*i.e.* promulgating the Final Rule— caused concrete harm to Plaintiff's members." *Id.* (emphasis added by Plaintiff).

On the element of causation, Plaintiff reiterates that "Defendants issued the Final Rule pursuant to the Secretary's statutory authority to approve and publish *Council* policies as regulations," which they claim Defendants do not dispute. *Id.* (citing A.R. 6228 (issuing Rule under 16 U.S.C. § 1854(b)(1)(A)); *Pl.'s Mot.* at 37–38 (citing § 1854(b)). NEFSA depicts the statutory mechanism as "a lock that requires a sequence of keys," such that "[t]he Council turns the first key by exercising its prerogative to develop and submit a regulation. NMFS then determines whether applicable law compels it to turn its own key by promulgating that submission as a rule." *Id.* (citing 16 U.S.C. §§ 1853(c), 1854(b)(1)). NEFSA argues that NMFS's issuance of the Final Rule "purported to turn that second key." *Id.* NEFSA considers the Defendants to have thus "concede[d] two of the three elements of Article III traceability: 'conduct of the defendant' that causes a concrete 'injury,'" *id.* at 4 (quoting *Collins*, 594 U.S. at 242), through its purported admission that "Plaintiff's members are suffering injuries as a *result* of that Final Rule." *Id.* (citing *Defs.' Mot.* at 11, 17) (emphasis added by Plaintiff). NEFSA argues that "the Council never turned its 'key' in the rulemaking 'lock' because . . . it lacked constitutional authority to do so. Thus, NMFS never received a valid Council submission. And without that prerequisite to rulemaking, the agency could not legally turn its *own* key." *Id.* (citing

73

16 U.S.C. § 1854(b)(1) (NMFS acts only "[u]pon transmittal" of Council's submission)) (emphasis added by Plaintiff).

NEFSA asserts the Final Rule was unlawful because "Congress expressly *required* NMFS to reject unlawful Council policies," which NEFSA argues includes "a rule developed and submitted by unconstitutional interlopers," such as the New England Council. *Id.* (emphasis added by Plaintiff). Responding to the Defendants' claim that NMFS exercised its discretion in reviewing the Council's Framework Adjustment 65 proposal and adopting the Final Rule, NEFSA dismisses this claim as "irrelevant to standing," asserting that its "merits position (accepted at this stage) is that the Council lacked *any* constitutional authority to submit Framework Adjustment 65, and thus that Defendants *never* received a submission to promulgate." *Id.* at 5 (emphasis added by Plaintiff).

NEFSA also addresses the third element of traceability, "whether that 'conduct' is 'allegedly unlawful'," *id.* at 4 (citing *Yellen*, 594 U.S. at 242-43), by reiterating that it "*has* alleged that Defendants' promulgation of the Final Rule was unlawful and seeks relief on that basis." *Id.* (citing *Am. Compl.* ¶¶ 18, 129–33, 144, 157; *Pl.'s Mot.* At 19–20, 23–28, 35, 37–39) (emphasis added by Plaintiff). It informs the Court that, at the standing stage, it "must be careful not to decide the questions on the merits for or against the plaintiff, and must therefore assume that on the merits the plaintiff[] would be successful." *Id.* (quoting *City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003) (per curiam) (citing *Warth v. Seldin*, 422 U.S. 490, 502 (1975)). NEFSA characterizes the question of whether the Final Rule is

74

constitutionally invalid as "a classic *merits* question," which the Court "cannot decide

. . . at the standing stage." *Id.* (emphasis added by Plaintiff).

NEFSA rejects Defendants' remaining arguments describing the Council as a

"powerless advisory body whose policies have no practical or legal effect" as "patently

false." *Id.* at 5. Plaintiff argues the Final Rule "is law today *because of* the Council's

development of Framework Adjustment 65." *Id.* (emphasis added by Plaintiff).

Further, NEFSA says, the Court need not address the question of the Council's

authority because "Plaintiff did not sue the Council," thus, "[t]he relevant question is

whether Plaintiff's members' "injur[ies] can be traced to allegedly unlawful conduct

of the defendant[s]." *Id.* (citing *Collins*, 594 U.S. at 242). NEFSA offers its

affirmative answer to this question: "[t]hey can—namely, to Defendants' unlawful

promulgation of the Final Rule." *Id.* Finally, NEFSA concludes its causation

arguments by again rejecting Defendants' usage of *Brennen* and *UCIDA. Id. a*t 6

(citing *Collins*, 594 U.S. at 242).

Regarding the element of redressability, NEFSA says that, because

Defendants "*agree*[] that those injuries are the results of the Defendants' issuance of

the Final Rule," they thus "cannot credibly dispute that a judicial order vacating the

Final Rule or enjoining its enforcement would remedy those uncontested harms." *Id.*

(for latter, citing *Lujan*, 504 U.S. at 561-62) (emphasis added by Plaintiff). It

distinguishes the cases cited by Defendants to support their contention that courts

decline to invalidate NMFS rules based on procedural issues at the Council level as

"fundamentally different," arguing that these minor "irregularities" like "closed

mealtime gatherings" do not compare to the "lack of statutory prerequisite to rulemaking" that Plaintiff asserts here, likening the procedural issue in this case to "an agency that failed to issue a notice of proposed rulemaking." *Id.* at 6-7 (citing *Baldrige*, 831 F.2d at 1466.

### b. Standing for Claim Relating to the Actions of Defendant Rauch

NEFSA separately argues Defendants have "improperly blend[ed]" the standing and merits inquiries with regard to Defendant Rauch, asserting that "[a]t the standing stage, the sole question is whether Plaintiff's members were 'harmed by [Mr. Rauch's] action." *Id.* at 15 (citing *Collins*, 594 U.S. at 258-59 n.24). NEFSA argues "Mr. Rauch's signature on the Final Rule gave it effect," *id.* (citing A.R. 6229), so that even if "Defendant Coit also played some role in approving Framework Adjustment 65 . . . the Final Rule took effect *only* with Mr. Rauch's formal execution." *Id.* (emphasis added by Plaintiff).

### 2. Merits

### a. Appointments Clause

NEFSA submits Defendants "stake[] [their] case on the threshold question of officer status," *id.* at 7, asserting that by doing so they have waived their right to contest the unconstitutional insulation from removal claims by "ignor[ing] Plaintiff's argument that Congress cannot vest state officials with the exclusive power to remove federal officers," and failing to "explain why Congress can allow the Council itself to veto removal in all but the narrowest of circumstances." *Id* at 7 n.5.

### i. Council Members as Officers of the United States

NEFSA reiterates that the Court should deem Council Members federal officers based on the two factors provided by *Lucia*, 595 U.S. at 246-47.

### 1. Holding Continuing Offices Established by Law

Addressing the first factor, "continuing positions established by law," NEFSA raises four discrete points. First, it argues "Congress 'created' permanent Council seats 'by statute, down to [their] duties, salary, and means of appointment,'" *id.* (quoting *Lucia*, 595 U.S. at 247-48), and "bestow[ed] continuing responsibilities" on Council Members. *Id.* (citing 16 U.S.C. § 1852(a)(1)). Responding to Defendants' assertion that the Councils meet only episodically, *Defs.' Mot.* at 22, NEFSA claims "the number of times the Council chooses to meet has no bearing on officer status," and, further, the MSA "empowers the Council to set its own meeting schedule," such that the Councils could meet more often should they so choose. *Id.* (citing 16 U.S.C. § 1852(e)(3)). NEFSA contests Defendants' assertion that the periodic nature of meetings makes the Councils analogous to the civil surgeons in *Germaine*, arguing that those officials served "when called on by [another official] in some special case," *id.* at 7-8 (citing *Germaine*, 99 U.S. at 512), as compared to the Councils who were "assigned permanent, ongoing duties" by Congress. *Id.* at 8.

Second, regarding employment and compensation, NEFSA asserts "the relevant question is whether Members' compensation is *set by statute*, not how *much* they receive." *Id.* (citing Lucia, 595 U.S. at 248; 16 U.S.C. § 1852(d)) (emphasis added by Plaintiff). Further, Plaintiff insists "federal employment [is not] a prerequisite to

77

Add.079

officer status." *Id.* (citing *Free Enter. Fund*, 561 U.S. at 484-85; *Braidwood Mgmt. Inc. v. Becerra*, 627 F. Supp. 3d 624, 643 (N.D. Tex. 2022); *Buckley*, 424 U.S. 126).

Third, NEFSA maintains that the state-bureaucrat and governor-appointed Council Members should be deemed federal officers because the Councils "[are] part of the *federal* government, comprised of *federal* offices, that develop[] *federal* policies." *Id.* (emphasis added by Plaintiff). NEFSA further refutes Defendants' argument that the Appointments Clause should not apply to these categories because "the Appointments Clause governs the selection of public officers—it says nothing about the exercise of public power by private persons." *Id.* (quoting *Defs.' Mot.* at 23-24).

Fourth, NEFSA responds to Defendants' claim that "[m]embers' statutory tenures are simply too short to confer officer status," *id.* (citing *Defs.' Mot.* at 23), submitting the appropriate inquiry "is whether their '*positions* are fixed by statute and will continue indefinitely.'" *Id.* at 9-10 (quoting *Braidwood Mgmt.*, 627 F. Supp. 3d at 643; *Donziger*, 38 F.4th 290 at 97) (emphasis added by Plaintiff). Here, NEFSA says, the "Council *seats* are statutorily created and last forever, and "some Council Members serve *indefinitely* (as far as federal law is concerned), while other serve renewable three-year terms." *Id.* at 10 (emphasis added by Plaintiff). Plaintiff juxtaposes these "statutory tenures within continuing offices" to the "*qui tam* relators, who serve only as long as their civil cases last," which the Fifth Circuit upheld as constitutional in *Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 755 (5th Cir. 2001) (en banc). *Id.*

### 2. Exercising Significant Authority

NEFSA reasserts that the MSA "vests Council Members with 'authority over the[ir] fisheries' and charges them to 'exercise sound judgment in the stewardship of fishery resources,'" *id.* (citing 16 U.S.C. §§ 1801(b)(5), 1852(a)(1)), and accuses Defendants of emphasizing the Secretary's role "[i]nstead of grappling with the *Council's* full range of authority." *Id.* (emphasis added by Plaintiff). NEFSA reiterates that "the Act's plain text confines NMFS review to errors of law, and thus preserves for the Council an exclusive zone of legal policy judgments." *Id.* at 10.

NEFSA claims the Secretary's authority pursuant to 16 U.S.C. § 1854, including her authority over "highly migratory species," ability to act unilaterally when the Council fails to regulate a fishery, and authority to unilaterally develop rules and regulations in those circumstances, actually serve to "*support[]* Plaintiff's position," *id.* (emphasis added by Plaintiff), by highlighting the contrast to the other statutory circumstances in which "the Councils have presumptive control over the rulemaking process." *Id.* (citing 16 U.S.C. §§ 1852(a)(3); 1854(c)(4)–(5)). NEFSA extends this argument to the Secretary's powers under 16 U.S.C. § 1855, including to "carry out" existing FMPs and amendments and to promulgate temporary regulations in emergencies, *id.* at 11 (citing 16 U.S.C. § 1855(c)(1), (d)), claiming this "[does] not dilute or confine the *Council's* authority." *Id.* (emphasis added by Plaintiff). Rather, it informs the Court that "[t]his is not a zero-sum game: [m]ultiple actors under a statutory scheme can be 'Officers of the United States.'" *Id.* (citing U.S. CONST. art. II, § 2, cl. 2).

Posing "the only relevant question: whether the *Council* wields significant authority," NEFSA disputes Defendants' interpretation of 16 U.S.C. § 1854(h) as a limit on Council authority, arguing the statutory phrase "under the authority of a Council" merely means "within a Council's regulatory ambit," and asserts the dubious constitutionality of the Secretary's inability to repeal an FMP under this provision has been noted previously at the highest levels of the Executive branch. *Id.* (quoting 1996 U.S.C.C.A.N. 4120, 4120–21, 1996 WL 787969 (Oct. 11, 1996)) (President Clinton's signing statement with regard to the Sustainable Fisheries Act, in which he noted "[t]he prohibition … on the Secretary of Commerce's ability to repeal a [FMP] without [Council] approval … raises serious concerns under the Appointments Clause").

NEFSA contests the Defendants' description of the Council's emergency powers as "requests," *id.* (citing *Defs.' Mot.* at 33), submitting a "request" from a unanimous Council "amounts to an order" based on the mandatory meaning of the word "shall." *Id.* (first citing 16 U.S.C. § 1855(c)(2)(A) ("The Secretary *shall* promulgate emergency regulations or interim measures … to address the emergency or overfishing") (emphasis added by Plaintiff); then citing *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 172 (2016)). NEFSA suggests the same to be true with regard to adopting a "limited access system," but in the inverse: "the Secretary *may not include*" such a system "in any" FMP or amendment that she "prepare[s] . . . *unless* such system is first approved by" the Council." *Id.* at 12 (quoting 16 U.S.C.§ 1854(c)(3) (emphasis added by Plaintiff).

NEFSA continues by responding to Defendants' assertion that, even if the NMFS fails to review a Council proposal within 30 days, such proposals "have no legal effect without implementing regulations, which the Secretary—not the Council— issues." *Id.* (quoting *Defs.' Mot.* at 15-16). Plaintiff directs the Court to the statutory directive that, in such circumstances, the proposal "shall take effect as if approved," *id.* (citing 16 U.S.C. § 1854(a)(3)), and argues that, once in effect, the plans and amendments "control[] which 'implementing regulations' the Secretary can lawfully issue" pursuant to 16 U.S.C. § 1854(b)(1), thereby "dictat[ing] the content of federal fishery policy." *Id.* NEFSA avers the presidential signing statements cited by Defendants fail to demonstrate the advisory capacity of the Councils and argues the statute cannot be rewritten by either the President or the courts. *Id.* at 13 (citing *Jennings*, 583 U.S. 281, 298 (2018)).

Plaintiff concludes that Councils "*do* make various unreviewable decisions" and that, even if they do not, an official's "lack [of] authority to enter a final decision" does not deny him officer status. *Id.* (citing *Freytag*, 501 U.S. at 881; *Free Enter. Fund*, 561 U.S. at 514) (emphasis added by Plaintiff).

#### b. Private Non-Delegation Doctrine

NEFSA calls Defendants' position inconsistent, noting that they assert "the Council is obviously not a private entity," *id.* (quoting *Defs.' Mot.* at 34), while simultaneously claiming "its Members are private individuals exempt from the appointment and removal strictures of Article II." *Id.* (citing *Defs.' Mot.* at 23-24). Plaintiff next turns to the merits of its private non-delegation doctrine claim,

reasserting its comparison to the HISA and arguing that the statute in the present case remains analogous to the original HISA version rejected by the Fifth Circuit as unconstitutional. *Id.* (citing *Black*, 52 F.4th 869; *Oklahoma*, 62 F.4th at 227, 230).

While Defendants claim that "NMFS itself can promulgate rules without the Council's participation whenever doing so is necessary to serve the [Act's] purposes," *id.* (citing *Defs.' Mot.* at 37), NEFSA disputes the breadth of this assertion by arguing "Section 1855(d) simply empowers the Secretary to implement *existing* FMPs—not to unilaterally abrogate or alter them," *id.* (citing 16 U.S.C. § 1855(d) (emphasis added by Plaintiff)); noting "the Act expressly prohibits NMFS from 'repeal[ing] or revok[ing]' a Council's FMP without its consent," *id.* (citing 16 U.S.C. § 1854(h)); and asserting Section 1854(c)(6) is "wholly irrelevant" because it only permits NMFS "to propose regulations … [and] to implement any plan or amendment *prepared by the Secretary*." *Id.* (citing 16 U.S.C. § 1854(g) (emphasis added by Plaintiff).

### c.  Claim Against Defendant Rauch

NEFSA first responds to Defendants' assertion that it forfeited its constitutional claim against Defendant Rauch by failing to raise it during the public comment period on the Proposed Rule. *Id.* (citing *Defs.' Mot.* at 38). Plaintiff complains this "position requires plaintiffs to object to *future* unconstitutional acts," because its claim against Defendant Rauch derives from their belief that he "unlawfully exercised executive power *after* the comment period closed by signing and publishing the Final Rule in his own name. *Id.* (emphasis added by Plaintiff). Second, it insists "constitutional challenges to agency authority generally need not be

preserved before that same agency." *Id.* (citing *Carr v. Saul*, 593 U.S. 83, 91-92 (2021); *Weinberger v. Salfi*, 422 U.S. 749, 765 (1975); *Mobility Workx, LLC v. Unified Patents, LLC*, 15 F.4th 1146, 1151 (Fed. Cir. 2021)). Even if it had raised the issue at the Proposed Rule stage, NEFSA says, "Mr. Rauch could not have disavowed his tenure protections or declined to sign and publish the Rule." *Id.* (citing *Carr*, 593 U.S. at 93-94; A.R. 6248). In the event the Court determines Plaintiff should have raised its concerns at the Proposed Rule stage, NEFSA requests the Court "to exercise its discretion to consider the claim." *Id.* at 15 (citing *Freytag*, 501 U.S. at 878).

NEFSA next responds to Defendants' standing arguments with regard to its claim against Defendant Rauch, arguing Defendants have "improperly blended" merits and standing issues, and asking the Court to solely consider "whether Plaintiff's members were 'harmed by [Mr. Rauch's] action,'" *id.* (citing *Collins*, 594 U.S. at 258-59 n.24), to which it offers the answer "[t]hey clearly were, as Mr. Rauch's signature on the Final Rule gave it effect." *Id.* (citing A.R. 6229). It argues Defendant's position that Defendant Coit played a role in approving Framework Adjustment 65 to be inapposite, because "the Final Rule took effect *only* with Mr. Rauch's formal execution." *Id.* (emphasis added by Plaintiff).

Finally, Plaintiff reasserts the merits of its claim against Mr. Rauch, pointing out that Defendant Rauch "signed both the Final Rule and its internal 'Decision Memorandum,'" *id.* (citing A.R. 2605, 6229), and directing the Court to Defendant Rauch's ability to "exercise[] important policy-making, policy-determining, or other executive functions" by virtue of "oversee[ing]' all NMFS] 'regulatory actions and

programs.'" *Id.* (citing 5 U.S.C. § 3132(a)(2)(E)). Thus, Plaintiff concludes, Defendant

Rauch's insulation from removal violates Article II of the federal Constitution. *Id.*

### D. Defendants' Reply in Support of Cross-Motion for Summary Judgment

#### 1. Standing

##### a. Causation by the Structure of the New England Council

Defendants reiterate their prior arguments that the Court should apply the

standard for causation in the context of standing from *Lujan*, 504 U.S. at 560, and

join other courts that "have determined that a plaintiff alleging injury from a NMFS

rule but complaining about the composition of a Council does not have standing."

*Defs.' Reply* at 3 (citing *Brennen*, 958 F.2d at 937; *UCIDA,* 2022 U.S. Dist. LEXIS

109879, at *59-61). Defendants respond to NEFSA's arguments seeking to

distinguish *Brennen* and *UCIDA* from the present case, asserting that NEFSA's focus

the lack of a counterfactual Council proposal in *Brennen* "misses the crux of the case,

which turned on the key fact that '[a]lthough the Council proposed the challenged

fishery regulations, those regulations were implemented by the Secretary after

review.'" *Id.* (citing *Brennen,* 958 F.2d at 937).

Next, Defendants argue that NEFSA's assertion that the *UCIDA* court did not

address the unconstitutionality of any Council policy argument raised here "cannot

be squared with the court's opinion: the plaintiffs 'allege[d] that the Council is de

facto in charge of making policy decisions and implementing regulations,' which is

the same argument advanced in this case. *Id.* (quoting *UCIDA*, 2022 U.S. Dist.

LEXIS 109879, at *55-56). Defendants redirect the Court to cases where courts found

"Councils have "no 'authority' to do anything," *Id.* (citing *J.H. Miles & Co.*, 910 F. Supp. at 1157-59), arguing that this lack of authority "is critical because it breaks the causal chain between the complained-of conduct and the alleged harm." *Id.* at 4.

Defendants reject NEFSA's conception of the MSA as "a lock requiring two keys," pursuant to 16 U.S.C. § 1854(b)(1), because "Congress authorized NMFS to prepare a [FMP] or an amendment on its own if the Council fails to develop and submit a proposal to NMFS when conservation requires," and "NMFS retains the discretion to reject or revise proposals." *Id.* (citing 16 U.S.C. §§ 1854(c)(1)(A), 1854(b)(3)). Defendants also reemphasize the discretion granted to the Secretary by statute, directing the Court "in particular [to] § 1854(a) – (c), which authorize[] the Secretary to independently review council recommendations, and § 1855(d), which authorizes the Secretary to establish regulations that may be necessary to discharge her 'general responsibility' or to carry out Secretarial approved FMPs and 'any other provision' of the Act." *Id.* at 5 (citing 16 U.S.C. §§ 1854, 1855).

Defendants argue that their "standing arguments do not depend on disputing the merits of Plaintiff's claims," but, instead, "ask whether Plaintiff can show that it has 'sustain[ed]' an injury 'from an [act by the Council or DAARP Rauch] that allegedly exceeds [the Council's or DAARP Rauch's] authority.'" *Id.* (for the latter, quoting *Seila Law*, 591 U.S. at 210-11). Defendants assert NEFSA cannot show any such injury because "[e]ven if the Council and DAARP Rauch are unconstitutionally installed, any harm Plaintiff suffered is traceable only to the Final Rule—which they do not substantively challenge, and . . . which [was] issued by [Defendant] Coit." *Id.*

at 5-6.  Defendants note *Brennan* and *UCIDA* "dismissed essentially identical claims about a Council for lack of standing, even assuming the plaintiffs' constitutional concerns had merit."  *Id.* (citing *Brennen*, 958 F.2d at 937).

Defendants characterize NEFSA's allegations as based on the Council's unconstitutionality and yet alleging injury from the Final Rule, which they describe as "a fundamental disconnect."  *Id.*  They assert that, despite whatever role the Council had in developing Framework Adjustment 65, the rule "is the law because NMFS promulgated a regulation now codified in the Code of Federal Regulations, not because of anything the Council did."  *Id.* (citing *UCIDA*, 2022 U.S. Dist. LEXIS 109879, at *55-56 (noting the council's action have "no legal effect whatsoever") and *Gulf Restoration Network*, 730 F. Supp. 2d. at 174).  Defendants reject NEFSA's argument that it remedied this causation issue because "it did not sue the Council."  *Id.* (quoting *Pl.'s Resp.* at 5).

### b.    Causation by the Actions of Defendant Rauch

Defendants assert that "[e]ven if DAARP Rauch is improperly insulated from removal, he did not issue the Final Rule, and thus Plaintiff cannot show that any unconstitutional act by DAARP Rauch caused its alleged harms."  *Id.* at 6.  Rather, Defendants claim any injuries "are traceable to [Defendant] Coit, who approved the Final Rule and whose legal authority the Plaintiff does not challenge."  *Id.*  As such, Defendants say, NEFSA has failed to demonstrate any injury that derives from an action by Defendant Rauch in excess of his lawful authority.  *Id.* at 6-7 (citing *Seila Law*, 591 U.S. at 210-11).

Defendants reassert that "Plaintiffs cannot rely on 'mere allegations' concerning [Defendant] Rauch's role in causing its alleged harms—it 'must set forth by affidavit or other evidence specific facts' supporting standing." *Id.* at 7 (citing *Lujan*, 504 U.S. at 555). Defendants claim NEFSA has failed to produce any facts, based on the administrative record, which would contravene Defendants' evidence that Defendant Coit, not Rauch, approved and issued the Final Rule. *Id.* Instead, Defendants say, "Plaintiff claims that DAARP Rauch's ministerial act of signing the Final Rule for publication only 'gave it effect' and is therefore sufficient for standing." *Id.* (citing *Pl.'s Resp.* at 15). Defendants dispute this characterization of legal effect, arguing that "[Defendant] Coit's approval marked the culmination of the rulemaking process; DAARP Rauch's signature and the Federal Register's consequent publication merely marked the procedural steps to provide notice to the public." *Id.* (citing A.R. 6212).

### c.     Redressability

Jointly addressing Plaintiff's allegations of injury derived from the structure of the New England Council and the actions of Defendant Rauch, Defendants assert "Plaintiff raises two flawed arguments." *Id.* "First, Plaintiff's assertion that vacating the Final Rule would remedy the harm rests on a mismatch between the claims asserted and the relief sought." *Id.* (citing *Pl.'s Resp.* at 6). While Plaintiff brings its complaint with regard to the Council's lack of constitutional authority to propose Framework Adjustment 65, the requested remedies of vacatur of the Final Rule and declaratory relief would not address these purported issues in the Council's membership. *Id.* (citing *UCIDA*, 2022 U.S. Dist. LEXIS 109879, at *59-61; *Brennen*,

87

958 F.2d at 937). Defendants extend this argument to the Plaintiff's requests for injunctive relief, arguing that vacating the Final Rule or "enjoining its enforcement" would not fit the alleged harm here because it would fail to address either the unconstitutional membership of the Council or Defendant Rauch's purported lack of constitutional authority. *Id*. at 8 (citing *Salazar v. Buono*, 559 U.S. 700, 718 (2010); *Pl.'s Resp.* at 6).

Defendants again direct the Court to *Baldrige* as support that "[a] decision finding that Framework Adjustment 65 itself was invalid would not justify invalidating the Final Rule." *Id.* (citing *Baldrige*, 831 F.2d 1456). They seek to rebut Plaintiff's attempts to distinguish *Baldrige* from the case at bar, arguing that, at bottom, the Ninth Circuit's determined that any procedural flaws "did not result in any improper material being added to the administrative record," and "provided an opportunity for every interested person or group to present arguments to the Secretary." *Id.* (citing *Baldrige*, 831 F.2d at 1466). Defendants direct the Court to caselaw from other circuits in which courts declined to invalidate rules based on procedural deficiencies at the Council level so long as the errors "did not materially affect the Secretary's decisionmaking." *Id.* (quoting *Trawler Diane Marie, Inc. v. Brown*, 918 F. Supp. 921, 928 (E.D.N.C. 1995), *aff'd sub nom. Trawler Diane Marie, Inc. v. Kantor*, 91 F.3d 134 (4th Cir. 1996)).

Defendants argue NEFSA has failed to show how the purported "constitutional issues materially affected NMFS's decision to promulgate the Final Rule." *Id.* Defendants conclude the redressability section of their argument by positing that

88

Add.090

Plaintiff's argument that "NMFS did not receive a valid submission from a legitimate Council' is misplaced because the Council's proposals have no legal effect without implementing regulations issued by NMFS." *Id.* (quoting *Pl.'s Resp.* at 7) (internal citations omitted).

### 2.   Merits

#### a.   Appointments Clause

Turning to the merits of Plaintiff's claims, Defendants maintain that a grant of summary judgment is warranted because NEFSA misconstrues the contents of the MSA with regard to its Appointments Clause and non-delegation doctrine claims against Council Members, and has forfeited its claim against Defendant Rauch or else fails based on the Final Rule's promulgation by Assistant Administrator Coit, despite the signature by Defendant Rauch. *Id.* at 9.

##### i.   Council Members as Officers of the United States

###### 1.   Holding Continuing Offices Established by Law

First, Defendants describe a position's "continuing" nature as a spectrum from fleeting to permanent, asserting that Council Member positions "are far closer to the 'occasional and intermittent' end of the spectrum." *Id.* (citing *Germaine*, 99 U.S. at 512). Defendants rejoin NEFSA's argument that "nothing prevents [a Council] from meeting more often," *id.* (citing *Pl.'s Resp.* at 7), emphasizing this argument is "suppositional" and does not dispute the Council currently meets only episodically. *Id.* (citing A.R. 2561-65, 5030-42, 5333-36). Defendants reiterate the statute's daily compensation structure as evidence of "the intermittent nature of the position," and

points out NEFSA "fails to rebut the point that not all the members receive compensation." *Id*. They insist that, while Plaintiff focuses on Council Member terms being set by statute, "[the terms] are markedly less definite than a career appointment," and thus, are not "continuing." *Id*. at 10.

Defendants also take issue with NEFSA's contention that "actions taken by non-federal actors automatically run afoul of the private nondelegation doctrine," *id*. (citing *Pl.'s Resp.* at 8), arguing this presumption ignores the test developed by courts to determine "what counts as too much private participation in a federal regulatory scheme." *Id*.

### 2. Exercising Significant Authority

Defendants reiterate that "Congress created a system in which the Councils play an important *advisory* role by providing scientific and experience-based recommendations," arguing NEFSA "ignores that the Council's role is subordinate to the Secretary" as "the only one who can exercise rulemaking authority over Federal fisheries." *Id*. (emphasis added by Defendants). Defendants flag Plaintiff's failure to acknowledge the explicit exemption of the Councils in the Federal Advisory Committees Act, *id*. (citing 16 U.S.C. § 1852(i)(1)). Turning to the statutory text, Defendants first say NEFSA relies on 16 U.S.C. § 1852(a)(1), which they argue "does nothing more than distinguish the geographical scope of the New England Council's purview," without "demonstrat[ing] any decisionmaking or rulemaking authority." *Id* at 10-11 (citing 16 U.S.C. § 1852(a)(1)). NEFSA's second textual support, Defendants claim, relies on 16 U.S.C. § 1801(b)(5), which describes the Council's "judgment" in terms of "preparation, monitoring, and revision of [FMPs] under

circumstances [] which will enable the States, the fishing industry, consumer and environmental organizations, and other interested persons *to participate in*, and *advise on*, the establishment and administration of [FMPs]." *Id.* at 11 (quoting 16 U.S.C. § 1801(b)(5) (emphasis added by Defendants). Defendants insist Council roles described as "participatory and advisory" fail to constitute significant authority. *Id.*

Responding to Plaintiff's argument that the Act limits NMFS to reviewing for legality, Defendants claim the MSA does authorize the Secretary to make policy determinations, *id.* (citing 16 U.S.C. §§ 1855(d)) (granting the Secretary the "general responsibility to carry out any [FMP] or amendment" and issue regulations), and argue prior court rulings on the MSA and analogous statutes support this interpretation. *Id.* at 11-12 (citing *Babbitt v. Sweet Home Chapter of Cmty. for a Great Or.*, 515 U.S. 687, 708 (1995) (finding similar language in the Endangered Species Act conferred "broad administrative and interpretive power"); *Franklin*, 989 F.2d at 60 (finding the MSA "unequivocally vests the Secretary with the discretion to determine whether a Council's progress on conservation and management is reasonable"). Further, Defendants say, the authority to review Council proposals "extends beyond legal compliance" by including the National Standards. *Id.* at 12 (citing 16 U.S.C. § 1854). "Compliance with the national standards requires balancing by the agency and the exercise of discretion and judgment." *Id.* (quoting *Lovgren*, 701 F.3d at 32); *see also Mass. ex rel. Div. of Marine Fisheries v. Daley*, 170 F.3d 23, 30 (1st Cir. 1999) ("Given an internal conflict in the statute's mandates, the

job of the courts and the administrator is to implement the central aim of the statute").

Defendants reassert that various statutory scenarios—the regulation of highly migratory species, the authority to act unilaterally when a Council fails to act, and Council proposals taking effect when NMFS fail to review—reveal discretionary authority held by NMFS and reject Plaintiff's arguments that these provisions highlight such power being held by the Councils in other provisions. They emphasize "the Secretary through § 1854(c), is authorized to make rules. The inverse is not true because a Council cannot promulgate a rule." *Id.* at 12-13 (citing 16 U.S.C. § 1854(c), (g); *Goethel*, 2016 U.S. Dist. LEXIS 99515, at *27-29. Defendants concede Councils "can help shape policy," but argue their proposals fall short of "dictat[ing]" it. *Id.* at 13 (quoting *Pl.'s Resp.* at 12).

Defendants extend this argument to the statutory scenarios in which the Secretary is required to gain initial approval or a particular designation from the Council prior to taking action; to wit: needing a three-quarters majority of the relevant council to revoke an FMP, requiring initial approval by a Council to impose a limited access system, and requiring a predicate determination from a Council to implement temporary emergency regulations. *Id.* at 13 (citing 16 U.S.C. §§ 1854(h), (c)(3); 1855(c)(2)(A)). Defendants argue these provisions do not reveal significant authority on behalf of the Councils because, respectively, "§ 1854(h) only applies to FMPs, and not to implementing regulations" and "the Secretary is still the entity making the final decision;" for § 1854(c)(3), "initial approval by the Council does not

92

take away the Secretary's authority to decide whether to include the system;" and, for § 1855 (c)(2)(A), the Secretary "is not required to adopt whatever the Council proposes, thus preserving her discretionary authority." *Id.* Defendants conclude, for the above stated reasons, "Council members do not wield significant authority and thus are not officers." *Id.*

### b. Private Non-Delegation Doctrine Claim

Defendants maintain the proper judicial inquiry in evaluating a private non-delegation doctrine claim "is whether the entity in question in subordinate to a federal actor," *id.* at 14 (citing *Oklahoma*, 62 F.4th at 230), and posits that, here, "the Secretary acting through NMFS, is the rule-maker, and the Council functions in a subordinate role." *Id.* Defendants describe Plaintiff's assertion that "the Council must either be situated within the Federal government in violation of the Appointments Clause or be a private entity that violates the nondelegation doctrine" as a "false choice," because the Council lacks the ability to execute regulations. *Id.* (citing *Pl.'s Resp.* at 13). They also explain their previous claim that "the Council is not obviously a private entity," claiming the private non-delegation doctrine only applies when federal power is delegated to "true private entities," which it argues NEFSA has not proven. *Id.* at 14 n.5 (citing *Kerpen*, 907 F.3d at 162).

Defendants also respond to NEFSA's attempt to distinguish the MSA from the HISA based on the latter's "abrogate, add to, and modify" language, arguing multiple provisions of the MSA authorize the Secretary to add or modify rules, *id.* (citing 16 U.S.C. §§ 1854(b), (c)(1), (c)(6), (g); 1855(d)), and the Secretary holds "ultimate

authority" to repeal an FMP, even if this must involve consideration by Council. *Id*. As such, Defendants insist, the difference between HISA and the MSA "is a difference of degree, not of kind". *Id*. "Congress gave the Secretary the final say," Defendants claim, such that the Act comports with the private non-delegation doctrine. *Id*. at 15.

### c.    Claim against Defendant Rauch

Defendants insist Plaintiff forfeited its claim against Defendant Rauch by failing to raise it at the public comment stage, arguing his signature of the Proposed Rule provided sufficient notice for NEFSA to address this alleged constitutional issue at that time. *Id*. Defendants also address Plaintiff's standing to bring this claim, claiming they properly focused on "his 'power to issue rules," *id*. (citing *Pl.'s Resp*. at 14-15), because this power constituted "the thrust of Plaintiff's merits argument." *Id*. (citing *Pl.'s Mot*. at 34-35). Finally, Defendants argue the merits of the claim against Defendant Rauch fail because he merely "performed the 'ministerial task[]' of signing the Federal Rule for publication," while "[Assistant Administrator] Coit issued the rule." *Id*. As such, Defendants submit Defendant Rauch did not act as an officer and the claim should be dismissed. *Id*.

## IV.    LEGAL STANDARD FOR SUMMARY JUDGMENT

Both parties bring their motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.[7] FED. R. CIV. P. 56. The First Circuit has

---

[7]    After articulating the standard governing judicial review under the APA, NEFSA adds a footnote that it "also raise[s] claims *directly* under the constitution to enjoin unlawful executive action." *Pl.'s Mot*. at 7 n.3 (emphasis added by Plaintiff). It notes the claims are "substantively identical," and "may be evaluated on the same record," but does not articulate how raising a direct claim under the Constitution should be evaluated differently than a constitutional claim through the APA. *Id*.

94

described in detail the appropriate judicial inquiry to be applied to a motion for summary judgment when the underlying dispute involves a challenge to agency rulemaking, doing so specifically in the context of the MSA:

> [Summary judgment] has a special twist in the administrative law context. The Magnuson Act incorporates the familiar standard of review associated with the Administrative Procedure Act (APA). Where the APA standard obtains, a court may set aside an administrative action only if that action is arbitrary, capricious, or otherwise contrary to law. Because the APA standard affords great deference to agency decisionmaking and because the Secretary's action is presumed valid, judicial review, even at the summary judgment stage, is narrow. Consequently, our brief -- like that of the district court -- is only to determine whether the Secretary's decision to promulgate the fishery regulation was consonant with his statutory powers, reasoned, and supported by substantial evidence in the record.

*Associated Fisheries v. Daley*, 127 F.3d 104, 109 (1st Cir. 1997) (internal citations omitted). While a narrower review than a typical Rule 56 motion, the APA provides specific examples of what the court must "hold unlawful and set aside," which includes, as relevant here, agency actions, findings, or conclusions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(A)–(C).

As requested by the parties in the supplement to the parties' joint motion for approval of Local Rule 56(h) and granted in the Court's Local Rule 56(h) final order,

---

Here, the Court's inquiry under the APA reviews whether the actions taken were "contrary to constitutional right [or] power," and accordingly it agrees with the Plaintiff that determining the MSA's structure and grants of authority at issue to be unconstitutional "whether viewed through the lens of the [MSA] and its APA standards or the Constitution itself [] would entitle Plaintiff to all the relief requested in the Amended Complaint." *Id.*

the Court has "dispense[d] with the Statements of Fact typically filed with summary-judgment motions" and "[t]he factual record before the Court will be limited to (1) the administrative record compiled by Defendants and (2) the standing declaration(s) submitted by Plaintiff with its motion." *Supp. to Jt. Mot. for Approval of Local Rule 56(h)* at 3; *Local Rule 56(h) Final Order*. However, the Court will "afford no evidentiary weight to 'conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative.'" *Tropigas De P.R. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011) (quoting *Rogan v. City of Boston*, 267 F.3d 24, 27 (1st Cir. 2001)); *accord. Sutliffe v. Epping Sch. Dist.*, 584 F.3d 314, 325 (1st Cir. 2009).

Because, here, the parties have filed cross-motions for summary judgment, the court must evaluate each motion independently and "determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." *Matusevich v. Middlesex Mut. Assurance Co.*, 782 F.3d 56, 59 (1st Cir. 2015) (citing *Barnes v. Fleet Nat'l Bank, N.A.*, 370 F.3d 164, 170 (1st Cir. 2004)). As such, for cross-motions for summary judgment, the standard of review is applied to each motion separately, *Libertarian Party of N.H. v. Gardner*, 759 F. Supp. 2d 215, 221 (D.N.H. 2010), *aff'd*, 638 F.3d 6 (1st Cir. 2011), to ensure the presence of cross-motions for summary judgment "neither dilutes nor distorts" the summary judgment standard. *Mandel v. Bos. Phoenix, Inc.*, 456 F.3d 198, 205 (1st Cir. 2006).

## V.    ASSOCIATIONAL STANDING

### A.    Legal Standard

"Standing is a threshold issue in every federal case." *Me. Springs, LLC v. Nestlé Waters N. Am., Inc.*, No. 2:14-cv-00321-GZS, 2015 U.S. Dist. LEXIS 33259, at *13 (D. Me. Mar. 18, 2015) (citing *Pagan v. Calderon*, 448 F.3d 16, 26 (1st Cir. 2006)) (stating that "[a] federal court must satisfy itself as to its jurisdiction, including a plaintiff's Article III standing to sue, before addressing his particular claims"). "To satisfy the 'irreducible constitutional minimum of standing,' Plaintiff must show (1) that they have suffered an injury in fact, (2) that the injury is fairly traceable to the [Defendant's] allegedly unlawful actions, and (3) that 'it [is] likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *Nulankeyutmonen Nkihtaqmikon v. Impson*, 503 F.3d 18, 27 (1st Cir. 2007) (quoting *Lujan*, 504 U.S. at 560-61 (1992)).

The Supreme Court has described an "injury in fact" as "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (internal citations, footnote, and quotation marks omitted). "The party invoking federal jurisdiction bears the burden of establishing these elements," *Me. Springs, LLC*, 2015 U.S. Dist. LEXIS 33259, at *13 (quoting *Lujan*, 504 U.S. at 561), and must meet this standard "for each claim it brings." *DaimlerChrysler Corp. v. Cun*o, 547 U.S. at 352.

While these threshold standing requirements apply to all plaintiffs, an organizational litigant suing on behalf of its members must satisfy an additional standard to be granted so-called "associational standing":

> (1) at least one of the members possesses standing to sue in his or her own right; (2) the interests that the suit seeks to vindicate are pertinent to the objectives for which the organization was formed; and (3) neither the claim asserted nor the relief demanded necessitates the personal participation of affected individuals.

*AVX Corp.*, 962 F.2d at 116 (citing *UAW v. Brock*, 477 U.S. 274, 281-82 (1986); *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 342-43 (1977)).

## B. Discussion

As a threshold matter, the parties dispute the appropriate inquiry for a court to undertake at the summary judgment stage. Plaintiff emphasizes the Supreme Court's instruction that "[f]or standing purposes, we accept as valid the merits of appellees' legal claims." *Cruz*, 596 U.S. at 298; *see also Warth*, 422 U.S. at 500 ("standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal"). The Court will of course follow the process outlined by the Supreme Court, and thus assume at the standing stage that NEFSA's legal contentions are correct that any grant of federal power to the Council or Defendant Rauch is unconstitutional.[8]

However, Defendants correctly point out that, while accepting the legal arguments, the Court must determine whether "the challenger 'sustain[s] injury'

---

[8]     Defendants direct the Court to *Papasan*, 478 U.S. 265, in support of their position that NEFSA cannot "premise its standing on an erroneous legal conclusion." *Defs.' Mot.* at 19. However, *Papasan* reviewed standing under a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim, not Rule 56 summary judgment, and thus presents an inapposite standard of review for the present case. *Papasan*, 478 U.S. at 286.

98

from an executive act that allegedly exceeds the official's authority." *Seila Law*, 591
U.S. at 211 (quoting *Bowsher v. Synar*, 478 U. S. 714, 721 (1986)). At the summary
judgment stage, the Supreme Court explained: "the plaintiff can no longer rest on
such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific
facts,' FED. RULE CIV. PROC. 56(e), which for purposes of the summary judgment
motion will be taken to be true." *Lujan*, 504 U.S. at 561. The Court thus reviews the
motions and Administrative Record for specific facts to support NEFSA's assertions
that the actions of the Council or Defendant Rauch, in excess of their lawful authority,
caused their alleged injury. Before subjecting NEFSA's claims to standing analysis,
the Court first addresses the elements of standing undisputed by the Defendants in
either their motion or reply, and thus deemed waived. *United States v. Zannino*, 895
F.2d 1, 17 (1st Cir. 1990) (finding "issues adverted to in a perfunctory manner,
unaccompanied by some effort at developed argumentation, are deemed waived").

With regard to the elements of associational standing, Defendants do not
contest that the interests the suit seeks to vindicate are germane to NEFSA's purpose
nor that its claims and requested relief do not require the participation of individual
members based on the benefit of its requested prospective relief to all members. *Pl.'s
Mot.* at 36 (citing *Warth*, 422 U.S. at 515). Accordingly, the Court deems Defendants
to have also conceded that NEFSA satisfies these elements.

Instead, Defendants' standing arguments rely on their rebuke of the remaining
element of associational standing: standing of its members to sue in their own right.
*See AVX Corp.*, 962 F.2d at 116. Determining the standing of an individual member

to sue directs the Court to apply the traditional standing inquiry: (1) injury-in-fact, (2) causation, and (3) redressability. *See Lujan*, 504 U.S. at 560-61.

Among these traditional standing elements, Defendants seem to concede that NEFSA's allegations of its members' injury, which it describes as lost earnings, profits, and business opportunities stemming from compliance with the dramatic reductions in commercial groundfishing quotas under the Framework 65 Final Rule and implementing regulations, including a "more-than 90% cut for haddock and about 13% for white hake." *Defs.' Mot.* at 36-37 (citing *Osier Decl.* ¶¶ 6–17; *Campbell Decl.* ¶¶ 6–20). Defendants forcefully assert that the injury cannot be traced to the actions of NMFS or Defendant Rauch, and further cannot be redressed by the relief requested by the Plaintiff. As the crux of the parties' standing dispute hinges on these two elements—causation and redressability—the Court refines the scope of its analysis by focusing on the relevant jurisprudence and current state of the law on these elements before applying these details to each of NEFSA's claims.

First, regarding the element of causation, the "relevant inquiry is whether the plaintiffs' injury can be traced to 'allegedly unlawful conduct' of the defendant, not to the provision of law that is challenged." *Collins*, 594 U.S. at 243 (quoting *Allen v. Wright*, 468 U. S. 737, 751, (1984)). The Supreme Court distinguished fair traceability from the "but-for" variety of causation elsewhere in the law, explaining "[proximate cause] wrongly equates injury 'fairly traceable' to the defendant with injury as to which the defendant's actions are the very last step in the chain of causation." *Bennett v. Spear*, 520 U.S. 154, 168-69 (1997)). Rather, fair traceability

in this context includes "injury produced by determinative or coercive effect upon the action of someone else." *Id.* at 169.

On the element of redressability, the Supreme Court has instructed that plaintiffs must establish "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Laidlaw*, 528 U.S. at 181. As applied to a challenge to government action, the Supreme Court explained, where "the plaintiff is himself an object of the action . . . there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Lujan*, 504 U.S. at 561-62. The Plaintiff bears the burden of establishing the presence of these two disputed elements for each of its claims. *See Me. Springs, LLC*, 2015 U.S. Dist. LEXIS 33259, at *13 (quoting *Lujan*, 504 U.S. at 561); *DaimlerChrysler Corp.*, 547 U.S. at 352.

With these preliminary matters in mind, the Court turns to the claims brought by NEFSA in the present case.

### 1.  Standing for Counts I-III - Claims Relating to the Structure of the New England Council

#### a.  Causation

NEFSA posits that the New England Council exercises executive power in violation of the Appointments Clause and non-delegation doctrine, and in so doing, NMFS had the obligation to reject the proposed Framework Adjustment 65 as contrary to law. *Pl.'s Mot.* at 8-31. By instead accepting the proposal and proceeding forward with the Final Rule and implementing regulations, NEFSA asserts the Defendants violated the MSA by promulgating a final rule without ever receiving a

lawful proposal, which Plaintiff insists is "a legal and factual predicate to issuing any regulation under § 1854(b)." *Id.* at 37-38. NEFSA argues this unlawful action by NMFS and the Defendant Officials caused their members' injuries.

Defendants characterize the case differently, arguing that NEFSA's injury cannot be fairly traced to any unconstitutionality in the Council because NMFS exercised independent judgment in accepting the Council's proposed Framework Adjustment 65 and proceeding with the rulemaking process. *Defs.' Mot.* at 11-17. Defendants claim that Council proposals have no legal effect and that NEFSA does not dispute the authority of NMFS, through Defendant Coit, to issue the Final Rule, such that Plaintiff has failed to trace its injury to any act that exceeded lawful authority. *Id.*

Pursuant to the Supreme Court's directive in *Cruz*, the Court accepts NEFSA's legal argument regarding the unconstitutional structure of the New England Council for the purposes of evaluating standing. *Cruz*, 596 U.S. at 298. Stated clearly, NEFSA alleges the acceptance and subsequent promulgation of the constitutionally deficient proposal constituted an act by the Defendants that was "'contrary to [Plaintiff's] constitutional right[s]' and 'in excess of [the Secretary's] statutory jurisdiction, authority, or limitations, or short of [the Secretary's] statutory right." 5 U.S.C. § 706(2)(B)-(C). The Court thus proceeds to examine the record to determine if NEFSA has established that the Council's proposed Framework Adjustment 65, accepted as unconstitutionally produced, had a "determinative or coercive effect" on the Defendants' act of promulgating the Final Rule. *Bennett*, 520 U.S. 154, 168-69.

Defendants insist the "Councils under the [MSA] are simply advisory bodies and have no legal authority," claiming that any constitutional infirmity in the Council's development process did not cause the alleged injuries because the Secretary independently reviews and retains the discretion to approve or reject Council proposals. *Defs' Mot.* at 11-14.

The Court agrees with NEFSA that this argument "mischaracterizes Plaintiff's claims and its theory of standing." *Pl.'s Resp.* at 3. Plaintiff does not bring a claim against the Council nor do they derive their injury from its development of Framework Adjustment 65; at least, not in the manner described by the Defendants. Rather, they allege *the Defendants* acted unlawfully by *accepting* the proposal and by adopting its contents as a Final Rule and implementing regulations. The Court views these actions as distinct from asserting a claim against the Council for its development of the proposal. In fact, while Defendants cite *UCIDA* and *Brennan* as support for their position, those courts recognized the same distinction The Court is not bound to follow this Ninth Circuit precedent, but further it agrees with analysis recently performed on this issue by its sister court in the District of New Jersey to grant standing to bring constitutional challenges to fishery regulations in *Lofstad, et al. v. Raimondo, et al.*, Case No. 3:22-cv-07360-RK-TJB, 2024 U.S. Dist. LEXIS 34112 (D.N.J. Feb. 28, 2024), *rev'd on other grounds*, Case No. No. 24-1420, slip op. (3d Cir. Sep. 26, 2024). In *Lofstad*, the District Court explained: "*Brennen* cites no authority for its implied finding that the constitutional deficiency the plaintiffs identify—rather than the rule challenged in the suit—must have caused the plaintiffs' injury," and

expressed its concern that this finding contravenes the Supreme Court's fair traceability instruction in *Lujan*. *Id.* at 21. Further, *Brennan* based its denial of standing in part on the plaintiffs' failure to prove a constitutionally appointed Council would have passed different, less injurious regulations; the *Lofstad* court notes the Supreme Court expressly rejected any such requirement in *Seila Law*, published decades after *Brennen*. *Id.* (citing *Brennen*, 58 F.2d at 937). Finally, the *Lofstad* court states: "[t]he *UCIDA* decision likewise is silent on the heart of the parties' standing disagreement in this matter—whether the relevant actor's conduct for the causation analysis is the Secretary's or the Council's." *Id.* This describes much the same disagreement as the case presently at bar before this Court. The Third Circuit, in its review of the District Court's *Lofstad* decision, agreed with the standing analysis and upheld this portion of the opinion. *Lofstad v. Raimondo*, Case No. No. 24-1420, slip op. (3rd Cir. Sep. 26, 2024).

This Court's own analysis of the relevant caselaw reaches the same conclusion as in *Lofstad*. First, as previously discussed, the fair traceability inquiry for the purpose of standing imposes a standard distinct from traditional proximate cause. The Supreme Court clearly stated that the unlawful action need not be "the very last step in the chain of causation," but rather must only have a "determinative or coercive effect" on the cause of injury. *Bennett*, 520 U.S. at 168-69. The Court concludes the unlawful action alleged here—that is, NMFS's acceptance of an unconstitutional Framework Adjustment 65—had a "determinative or coercive effect" on the actions alleged by Plaintiff to have caused their injuries. *See id.* To put a finer point on the

matter, once a Council proposal is accepted, the Act compels NMFS to proceed with rulemaking and adopt implementing regulations. *See* 16 U.S.C. § 1854(b)(1)(A), (b)(3) (if an affirmative decision is made on a Council Proposal, the Secretary "shall promulgate final regulations within 30 days after the end of the comment period"). The Supreme Court has found "*de facto* causality" in the context of compulsory third party action, so long as the theory of standing "does not rest on mere speculation" and "relies instead on the predictable effect of Government action on the decisions of third parties." *Dep't of Commerce v. New York*, 588 U.S. 752, 768 (2019). Here, there is no third party, but the mandatory structure of the Act makes the effect of NFMS action equally predictable: once accepted, the Secretary is required to proceed with promulgating some version of the Council's proposal as law. *See, accord*, *Arnesen*, 2024 U.S. Dist. LEXIS 16775, at *26.

Finally, Defendants beseech the Court to apply the principle that "a litigant cannot, 'by virtue of his standing to challenge one government action, challenge other governmental actions that did not injure him.'" *Defs.' Mot.* at 16 (citing *Cruz*, 596 U.S. at 301-02) (quoting *DaimlerChrysler*, 547 U.S. at 353 n.5). However, as Plaintiff correctly notes, this sentence misses the crux of the Supreme Court's holding in *Cruz*: "[h]ere, however, appellees seek to challenge the *one* Government action that causes their harm: the FEC's threatened enforcement of the loan-repayment limitation, through its implementing regulation. In doing so, they may raise constitutional claims against Section 304, the statutory provision that, through the agency's regulation, is being enforced." 596 U.S. at 302 (emphasis in original). Based on the

foregoing, the Supreme Court in *Cruz* upheld the plaintiff's standing to challenge regulations enforcing the purportedly unconstitutional statute. *Id.*

NEFSA challenges the agency's action of issuing the Final Rule and implementing regulations pursuant to an allegedly unconstitutional statutory scheme; thus, here, the Court reaches the same conclusion as the *Cruz* Court. *See Cruz*, 596 U.S. at 301-02; *accord*, *Arnesen*, 2024 U.S. Dist. LEXIS 16775, at *19-20 (finding "despite the regulation being the 'cause that directly produce[d]' the injury 'and without which' the injury 'would not have occurred,' the statute was still traceable to the injury because the regulation could not have been enacted but for the statute") (citing *Cause*, BLACK'S LAW DICTIONARY (11th ed. 2019)).

Based on its analysis, the Court concludes that Plaintiff sufficiently established, for the purposes of standing, that its injury is fairly traceable to NMFS' acceptance of the Council's Framework Adjustment 65 and subsequent promulgation of the Final Rule and implementing regulations, in violation of its statutory directives under the MSA and APA. The Court proceeds to the second element of standing in dispute: redressability.

### b. Redressability

NEFSA posits its requested injunctive and declaratory relief would redress the injuries caused by the Framework Adjustment 65's reduced catch limits, as applicable to its members pursuant to the Final Rule and implementing regulations. *Pl.'s Mot.* at 23. It argues the unconstitutional components of the MSA cannot be severed without contravening the will of Congress and rendering the Act inoperable. *Id.* at

25.  Plaintiff further asserts prospective relief should be granted through vacatur to relieve ongoing subjugation to unconstitutional authority and through declaratory judgment to "declare the rights" of its members pursuant to 28 U.S.C. § 2201(a).  *Id.* at 27-28.

Defendants argue NEFSA fails to challenge the substance of the Final Rule, such that vacatur would not redress their claimed injury.  *Defs.' Mot.* at 18. Defendants further claim that a decision finding the Councils are constitutionally infirm would not change the fact that NMFS independently reviewed Framework Adjustment 65 and decided to issue it as law, such that it "would not justify invalidating the Final Rule, and thus would not redress the claimed injuries."  *Id.* (citing, e.g., *Baldrige*, 831 F.2d at 1464).

As a starting point, the Court recognizes the Supreme Court's admonition in *Lujan* that where "the plaintiff is himself an object of the [government] action . . . there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it."  504 U.S. at 561-62.  Defendants do not dispute that the Final Rule and implementing regulations govern the conduct of NEFSA's commercial fishermen members, including David Osier and Devyn Campbell.  As such, the Court concurs with NEFSA that vacating Framework Adjustment 65 and enjoining NMFS from enforcing its catch limits would reasonably serve to remedy the harms suffered by its members.

Defendants assert the requested relief constitutes a "mismatch" with the claims asserted, citing the Supreme Court as saying: "[a] court must find prospective

relief that fits the remedy to the wrong or injury that has been established." *Defs.' Reply* at 8 (quoting *Salazar*, 559 U.S. at 718). Defendants do not explain the basis for this assertion; without more, the Court finds the wrong alleged (NMFS accepting an unconstitutional proposal) and injury (restrictive catch limits) would both be addressed by NEFSA's requested relief of vacating Framework 65 and the Final Rule.

Defendants' reliance on *Baldrige* to claim injunctive relief should not be granted based on procedural deficiencies, *Defs.' Reply* at 8 (citing *Baldrige*, 831 F.2d at 1466), fails for two different reasons. First, Defendants do not explain why the Court should follow this Ninth Circuit decision, nor do they direct the Court to any similar authority within the First Circuit. Second, even if the Court accepted the *Baldrige* standard, its prohibition on "improper material being added to the administrative record," rings loudly in this case, as Plaintiff predicates its entire argument on its position that the Council lacked constitutional authority to propose Framework Adjustment 65 and thus the Council's record and proposal should never have been considered by NMFS, nor promulgated as a Final Rule. *Pl.'s Mot.* at 19. Thus, for the purposes of standing, NEFSA has established that its requested relief would redress its harms.

At bottom, based on conceded elements and the foregoing analysis with regard to causation and redressability, the Court finds NEFSA has standing to brings its claims against the Defendants relating to the unconstitutional structure of the New England Council.

2.    **Standing for Count IV - Claim Relating to the Actions of Defendant Rauch**

a.    **Causation**

NEFSA brings a separate claim against the actions of Defendant Rauch, arguing that his issuance of the Final Rule constituted an executive act in excess of his lawful authority, and in so doing caused its members' injuries.  Specifically, it traces its injuries to "Mr. Rauch's signature on the Final Rule [which] gave it effect." *Pl.'s Resp.* at 15.  Defendants reject NEFSA's characterization of Defendant Rauch's actions, arguing that any injuries stemming from the Final Rule cannot be fairly traced to Mr. Rauch's signature but, rather, to Assistant Administrator Coit, who Defendants assert truly issued the Final Rule and against whom Plaintiff brings no constitutional claims for improper appointment or insulation from removal.

As relevant to the claim against Defendant Rauch, NEFSA alleges he lacks the constitutional authority to exercise the federal executive power and claims "[a]t the standing stage, the sole question is whether Plaintiff's members were 'harmed by [Mr. Rauch's] action.'"  *Pl.'s Resp.* at 15 (citing *Collins*, 594 U.S. at 258-59 n.24).  Examining this footnote, however, reveals a citation to *Seila Law*, which requires, in relevant part, "that the challenger 'sustain[s] injury' from an executive act that allegedly exceeds the official's authority.  *Seila Law*, 591 U.S. 211 (quoting *Bowsher*, 478 U. S. at 721).  Thus, the inquiry has three parts: 1) an injury sustained by the plaintiff, 2) caused by an executive act, and 3) that act allegedly exceeds the official's authority.

The Defendants do not contest Plaintiff's asserted injuries as being subjected to catch limits pursuant to the Final Rule that reduce their constituent fishermen's earnings and business opportunities and, while evaluating standing, the Court will accept the merits of NEFSA's legal contention as true: that Defendant Rauch's insulation from removal violates the Constitution. What remains, then, is whether the injuries in question can be fairly traced to an executive act by Defendant Rauch based on specific facts in the record.

The Administrative Record leaves no ambiguity that Defendant Rauch signed the Proposed Rule, A.R. 6074; Final Rule, A.R. 6214-29; and Internal Memorandum certifying the consistency of Framework Adjustment 65 with the National Standards and other applicable law, A.R. 6201-11. NEFSA alleges these signatures constituted the formal execution of the rule, triggering its entrance into effect and causing the injuries suffered by its members. Defendants, on the other hand, distinguish the act of signature, "a ministerial task," from the executive action of issuing a rulemaking, which they attribute to Assistant Administrator Coit both generally and in the specific case of Framework Adjustment 65. *Defs.' Mot.* at 20.

After reviewing the Administrative Record, the Court agrees with the Defendants that Assistant Administrator Coit held the responsibility for accepting the proposed Framework Adjustment 65 and for issuing the Final Rule and exercised that responsibility here, despite the appearance of signature by Defendant Rauch.

Beginning at a general level, the NOAA Handbook incorporated into the record and referenced by both parties draws clear lines regarding delegations to respective

NMFS officials. *See* A.R. 4244-54. Several pages list the broad authority delegated to the Assistant Administrator for Fisheries, a role currently held by Ms. Coit. Multiple grants of authority hold relevance to the current case, beginning with the "Administrative/Management" duties of:

> 1. Signature of material for publication in the Federal Register and the Code of Federal Regulations.
>
> 2. Determinations under Executive Order 12866, for regulations promulgated by NMFS.
>
> 3. Initial decision to deny program information requested from fisheries records under the Freedom of Information Act, 5 U.S.C. 552.
>
> 4. Signature of certificates as Certifying Officer.
>
> 5. Exercise of NOAA's full Civilian Personnel Appointing Authority.

A.R. 6245. Regarding the MSA specifically, NOAA's Under Secretary broadly authorized the Assistant Administrator to "perform functions relating to" the Act, as well as the additional authority to perform the following as long as the Under Secretary is advised prior to final action:

> i. Establishing guidelines to assist in the development of fishery management plans (1851(b));
>
> ii. Appointing or removing members of the Regional Fishery Management Councils (1852(b)(2) or (5));
>
> iii. Issuing preliminary fishery management plans and implementing regulations, if the Assistant Administrator considers the action to be controversial (1821(h));
>
> iv. Approving, disapproving, partially disapproving, or issuing a fishery management plan or amendment, or issuing implementing or emergency regulations, if the Assistant Administrator considers the action to be controversial (1853 and 1854).

A.R. 6246-47.   By contrast, the Deputy Assistant Administrator for Regulatory Programs—Defendant Rauch—warrants only one mention in the eleven pages of delegated authority, for a sub-delegation from the Assistant Administrator for:

> Signature of material for publication in the Federal Register and the Code of Federal Regulations.

A.R. 6248.  Defendants emphasize the language of this sub-delegation, which includes none of the verbs used to describe the grant of substantive authority to the Assistant Administrator, such as "establish," "issue," or "approve."  A.R. 6246-47.  Rather, the Deputy Assistant Administrator may only "sign[] . . . for publication."  A.R. 6248.

The rulemaking process of Framework Adjustment 65 and the Final Rule reflects these general boundaries of authority.   Plaintiff accurately identifies Defendant Rauch's signature in three places: the Proposed Rule, A.R. 6074; Final Rule, A.R. 6214-29; and Internal Memorandum certifying consistency of the final rule, A.R. 6201-11.  *Pl.'s Mot.* at 6; *Pl.'s Resp.* at 14.  However, a closer look at the Administrative Record reveals his hand was guided, in each case, by the directives of Assistant Administrator Coit.   First, before submitting the proposed Framework Adjustment 65 for public comment on May 24, 2023, email records from May 17, 2023 show the proposal sent to Assistant Administrator Coit requesting her review, who responded: "I approve this moving forward."  A.R. 6072-73.  Similarly, before the Final Rule was published in the Federal Register on August 10, 2023, Assistant Administrator Coit received via email on August 2, 2023 a copy of the Final Rule and Internal Memorandum certifying consistency with the note:

> As Acting AA, Sam signed these documents indicating his concurrence with the rule and it has since proceeded to review in DOC GC/NOAA

GC. However, his decision was stipulated with the need to be ratified by you, upon your return. I am now sending you the package for your review/clearance.

A.R. 6212. Assistant Administrator responded the next day, stating: "I reviewed and clear this. Approved." *Id.*

NEFSA vigorously protests that Defendant Rauch's signature accompanying the published Final Rule reveals a clear connection between his action and their injuries. While Plaintiff may be correct that publication signals the rule entering into effect, the presence of his signature alone fails to demonstrate that their injuries can be fairly traced to Defendant Rauch. The record shows decisionmaking by Assistant Administrator Coit led to the acceptance of Framework Adjustment 65 and the publication of the Final Rule, not the signature by Defendant Rauch; as Plaintiff itself writes in their response, "Mr. Rauch could not have . . . declined to sign and publish the Rule." *Pl.'s Resp.* at 14. In our modern system of government, officials necessarily rely on their staffs to execute the minutiae of their duties based on their instructions. Here, Assistant Administrator Coit directed Defendant Rauch to sign the Rule for publication and this instruction had "determinative effect"; he exercised no independent judgment in doing so, no more than, for example, his secretary would have in sending his signed copy to the Federal Register or the Office of the Federal Register did in publishing the Rule once received. NEFSA argues "Mr. Rauch's signature on the Final Rule gave it effect," but the record indicates the decision to approve and give effect to the Final Rule was made, not by Defendant Rauch, but by Assistant Administrator Coit, who Plaintiffs do not contest possessed the authority to do so.

Though addressing a different question, the Supreme Court in *Bennett* noted the respondents had "wrongly equate[d] injury 'fairly traceable' to the defendant with injury as to which the defendant's actions are the very last step in the chain of causation." *Bennett*, 520 U.S. at 169-70. Here, the Court finds NEFSA makes a similar error; just because Defendant Rauch's signature accompanied the final act of publication does not inherently mean that act caused the injuries. The Court therefore agrees with the Defendants that "Coit's approval marked the culmination of the rulemaking process," and that NEFSA's injuries cannot be fairly traced to Defendant Rauch's signature. *Defs.' Reply* at 7.

For these reasons, NEFSA has failed to establish the unlawful conduct of Defendant Rauch caused their injury, and thus do not have standing to bring their claims relating to his purported conduct.

### b.    Redressability

Based on its conclusion that Plaintiff failed to establish causation against Defendant Rauch, the Court finds it unnecessary to address the element of redressability at length. However, as previously explained, the Administrative Record provides ample evidence that the acceptance of Framework Adjustment 65 and the publication of the Final Rule can be fairly traced to Assistant Administrator Coit, not Defendant Rauch. Notably, Assistant Administrator Coit, an inferior officer whose constitutional officer status NEFSA does not dispute, holds the same power of "[s]ignature of material for publication in the Federal Register and the Code of Federal Regulations" herself, A.R. 6245, making NEFSA's request to vacate the rule

and enjoin enforcement based on Defendant Rauch's signature an exercise in futility or, at least, inefficiency. Accordingly, the Court declines to grant Plaintiff's requested relief of declaring Defendant Rauch to be unconstitutionally insulated from removal or vacating the Final Rule and regulations on that basis.

For these reasons, the Court concludes that NEFSA has failed to establish its injuries can be fairly traced to Defendant Rauch or would be remedied by the relief requested against him, such that Plaintiff lacks standing to bring its claim relating to his allegedly unconstitutional insulation from removal.

## VI.  MERITS

### A. Counts I, II, and IV - Claims relating to Council Members as Officers under the Appointments Clause and the Take Care/Vesting Clauses

#### 1. Legal Standard

NEFSA brings several constitutional claims that require the same threshold determination of whether the implicated officials constitute federal officers; as such, the Court addresses these claims together. While the Supreme Court declined to create a brightline rule for the definition of a federal officer, it set out two clear requirements in *Lucia* that will guide the Court's analysis: first, "that an individual must occupy a 'continuing' position established by law," *Lucia*, 585 U.S. at 245 (quoting *Germaine*, 99 U.S. at 511), and second, that "they 'exercis[ed] significant authority pursuant to the laws of the United States.'" *Id.* (quoting *Buckley*, 424 U.S. at 126).

Supreme Court caselaw fills in the details for how a court should consider these two requirements. Regarding "continuing office established by law," the *Freytag*

Court noted that "the duties, salary, and means of appointment for that office are specified by statute," distinguishing this from a non-officer position described as "on a temporary, episodic basis, whose positions are not established by law, and whose duties and functions are not delineated in a statute." *Freytag*, 501 U.S. at 881. Similarly, the *Germaine* Court applied "the ideas of tenure, duration, emolument, and duties," to find the defendant in that case not a federal officer because "the duties are not continuing and permanent, and they are occasional and intermittent." *Germaine*, 99 U.S. at 511-12. The Court further considered that "the [official] is only to act when called on by the Commissioner [] in some special case." *Germaine*, 99 U.S. at 512.

With regard to "significant authority," the *Freytag* Court deemed federal officers those who "exercise significant discretion," and "perform more than ministerial tasks." *Freytag*, 501 U.S. at 868. The authority to make final decisions, while a powerful indication of officer status when present, "is [not] [the] *sine qua non* of officer status." *Lucia*, 595 U.S. at 247 n. 4; *see also id.*, 585 U.S. at 249 (finding officials constituted federal officers despite their "opinion count[ing] for nothing unless the regular judge adopts it as his own" because SEC ALJs "take testimony," "receive evidence," "examine witnesses," "conduct trials," "rule on the admissibility of evidence," and "have the power to enforce compliance with discovery orders").

Once a court deems an official a federal officer, the Constitution unambiguously imposes the requirements under which NEFSA brings its claims. First, the Constitution unequivocally assigned the power of appointment to the Executive, stating:

116

> [The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint… all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. CONST. art. II, § 2. This provision provides for two processes: "Principal officers are selected by the President with the advice and consent of the Senate. Inferior officers Congress may allow to be appointed by the President alone, by the heads of departments, or by the Judiciary." *Buckley*, 424 U.S. at 132. The Supreme Court distinguished between the two types of federal officers, primary and inferior, based on whether the officer was "directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate." *Edmond*, 520 U.S. at 663.

While not as straightforward in the text of the Constitution itself, Supreme Court precedent articulates just as forcefully a second requirement: that federal officers be subject to removal by the President. *See, e.g.*, *Myers*, 272 U.S. at 163-64. This power derives from the interplay between two constitutional provisions, often referred to as the Take Care Clause and the Vesting Clause, which state, respectively:

> The executive power shall be vested in a President of the United States of America.

> . . . he shall take Care that the Laws be faithfully executed.

U.S. CONST. art. II, § 1, cl. 1, and § 3. The Supreme Court has consistently interpreted these Clauses to require the President to retain "the authority to remove those who assist him in carrying out his duties," because "[w]ithout such power, the President

could not be held fully accountable for discharging his own responsibilities." *Free Enter. Fund*, 461 U.S. at 513-14.

However, the Supreme Court has recognized two categories of executive officials exempt from the general rule. "First, in *Humphrey's Executor*, . . . the Court upheld a statute that protected the Commissioners of the FTC from removal except for 'inefficiency, neglect of duty, or malfeasance in office,'" ruling this restriction permissible because the statute required the commission "to be non-partisan," "[its] duties are neither political nor executive, but predominantly quasi-judicial and quasi-legislative" and "its members are called up on to exercise the trained judgment of a body of experts." *Seila Law*, 591 U.S. at 215-16 (quoting *Humphrey's Executor*, 295 U.S. at 620, 624). Second, the Court upheld for-cause removal restrictions for an independent counsel in *Morrison*, finding that the officer's role had "limited jurisdiction and tenure and lack[ed] policymaking or significant administrative authority." *Id.* at 217-18 (quoting *Morrison*, 487 U.S. at 691).

In proceeding with its analysis on the merits of NEFSA's constitutional claims, the Court will first determine if the Council Members and Defendant Rauch, respectively, constitute federal officers under the factors articulated in *Lucia*; if the Court reaches an affirmative determination on this question, it will proceed to distinguishing whether their positions should be considered primary or inferior offices for purposes of adjudicating the lawfulness of their insulation from removal, and, finally, if either of the exceptions recognized in *Humphrey's Executor* or *Morrison* should apply.

### 2. Discussion

#### a. Counts I and II - Council Members as Officers of the United States

NEFSA asserts the Council Members hold continuing positions established by law and exercise significant authority, such that the Court should consider them to be federal officers. *Pl.'s Mot.* at 8-16. Plaintiff points out that Council Members failed to follow the constitutional appointment process for primary officers, nor were their positions assigned by the officials constitutionally permitted to appoint inferior officers. *Pl.'s Mot.* at 16-19. Thus, in Count I, NEFSA insists their positions violate the Appointments Clause. Plaintiff doubles down on this argument in Count II, arguing that, if federal officers, the President's inability to remove Council Members at will violates the Vesting and Take Care Clauses by interfering with the President's ability to faithfully execute the laws of the United States. *Pl.'s Mot.* at 20-23.

Defendants do not engage with NEFSA's attempts to distinguish between primary and inferior officers; rather, they insist as a threshold matter that Council Members neither hold continuing positions nor wield significant authority, such that they do not constitute federal officers at all, and thus should not be subjected to any constitutional requirements provided for in the Appointments, Vesting, or Take Care clauses or their progeny of Supreme Court caselaw. *Defs.' Mot.* at 21-24.

#### i. Holding Continuing Offices Established by Law

Based on the plain terms of the MSA, Councils and their Members trace their creation to federal law. *See* 16 U.S.C. § 1852. Defendants do not seriously contest this point; instead, they focus on the "continuing offices" element. Guided by the

Supreme Court's analysis, this Court considers several factors in evaluating whether Council membership should be deemed "continuing."  In *Germaine*, the Court stated, "the term ['officer'] embraces the ideas of tenure, duration, emolument, and duties." 99 U.S. 508 (citing *United States v. Hartwell*, 73 U.S. 385, 393 (1868)); *see also Comm'r v. Ogden*, 62 F.2d 34, 335 (1st Cir. 1932) (citing definition of "officer" from *Hartwell*).  The Supreme Court reaffirmed the scope of relevant inquiry in *Lucia*, where it ruled SEC ALJs constituted federal officers because they "receive[] a career appointment," and the statute specified the position's "duties, salary, and means of appointment." *Lucia*, 585 U.S. 248 (citing *Freytag* 510 U.S. at 881).  Accordingly, the Court examines the MSA for its contents regarding the tenure and duration, salary, and ongoing nature of the duties of the Council Members to determine whether they are "continuing."

The Court begins with the first factor: the tenure and duration of the Council Members positions.  NEFSA insists that the statute created permanent Council Member positions, commissioned them to perform ongoing duties, and provided for indefinite service by the state bureaucrat appointees, while further allowing the state-nominated Members to serve three-year terms that may be extended to a maximum of nine years.  It directs the Court to *Seila Law*, in which the Supreme Court found the CFPB Director's five-year term sufficient to deem him a federal officer. *Seila Law*, 591 U.S. at 207.  Defendants reject this characterization, arguing the Council Members serve only periodically and rarely, and that three-year term

limits pale in comparison to the career appointments found to constitute officer positions in *Lucia* and *Freytag*. *Defs.' Mot.* at 23-24.

Several of NEFSA's points are compelling. First, Defendants correctly point out that "[t]he Council typically meets five to six times a year, and each meeting lasts around three days." *Defs.' Mot.* at 22 (citing A.R. 2561-65; A.R. 5030-42; A.R. 5333-36). However, the Court looks to what the MSA permits, not merely how the Council has exercised this power; pursuant to 16 U.S.C. § 1852(e)(3), the Council may meet at any time "upon the request of a majority of its voting members." NEFSA fairly distinguishes this from the civil surgeons deemed to not be federal officers in *Germaine*, as those officials worked only "when called on by the Commissioner [] in some special case." *Pl.'s Resp.* at 8 (citing *Germaine*, 99 U.S. 508). As noted above, while the frequency of the civil surgeons' federal work in *Germaine* was limited to the instances in which they were "called on by the Commission," the MSA authorizes the Council Members to meet as often as a majority of its voting members choose. In other words, Council Members do not need a threshold determination from an external source to work and to receive compensation. As such, the statute permits the duration of the Council Member's service to be more frequently and for longer periods, such that the Defendants' argument regarding the brief, infrequent meetings falls short.

Further, the Court remains wary that, as Plaintiff writes, "some Council members serve *indefinitely* (as far as federal law is concerned)," referring to state bureaucrat Members. *Pl.'s Mot.* at 9 (emphasis added by Plaintiff). Examining the

121

statute, the Act provides that state bureaucrat Members serve "so long as the official continues to hold such position." 16 U.S.C. § 1852(b)(1)(B). Defendants raise the example of *qui tam* relators with indefinite terms as not being federal officers, *Defs.' Mot.* at 23, yet these roles inherently terminate upon the resolution of their civil case. The MSA provides for no such natural cessation or required turnover for these state bureaucrat Council Members; their tenure could theoretically persist long past the three-year terms of the governor-nominated Members largely relied upon as evidence by the Defendants.

Turning to the second factor, salary, the statute provides that governor-appointed Council Members "shall receive compensation at the daily rate . . . when engaged in the actual performance of duties for such Council." 16 U.S.C. § 1852(d). Parties dispute the relevant inquiry regarding compensation: Defendants assert the daily rate reveals the role's intermittency and highlights that other Members receive no compensation, while NEFSA claims any compensation expressly provided for in the statute satisfies this factor.

On this, the Court agrees with the Defendants. A "salary" usually refers to an overall sum disbursed at regular intervals, compared to a per-hour or per-day rate structure. *Salary*, BLACK'S LAW DICTIONARY (10th ed., 2014) ("An agreed upon compensation for services – esp. professional or semiprofessional services – usu. paid at regular intervals on a yearly basis, as distinguished from an hourly basis"). Additionally, *Lucia* and *Freytag* both specifically use the operative word "salary" in evaluating whether a position should be deemed "continuing." *Lucia*, 585 U.S. at 246;

*Freytag*, 501 U.S. at 881.  Thus, the compensation structure relevant to the nature of the role, and the daily rate provided for in the statute cut in favor of the Defendants' description of the Council Member roles as occasional and intermittent.

Finally, the Court examines whether the duties provided for in the statute contemplate ongoing or discrete actions by the Council.  NEFSA argues the Councils set long-term fishery policy and oversee ongoing research; Defendants fail to respond to these arguments regarding the temporal nature of the Council's duties.

Here, the text of the MSA supports Plaintiff's contention that the Council assumes continuing duties.  Most directly, the statute charges the Councils with the duty to "review on a continuing basis, and revise as appropriate, the assessments and specifications made pursuant to [16 U.S.C. § 1853(a)(3), (4)]," and to "develop, in conjunction with the scientific and statistical committee, multi-year research priorities . . . that are necessary for management purposes, that shall—(A) establish priorities for 5-year periods; (B) be updated as necessary."  16 U.S.C. § 1852(h)(5), (7).  Both of these provisions contemplate ongoing roles in which the Council functions "on a continuing basis" and with the vitality to "update[] as necessary."  *Id.*  As such, this factor favors NEFSA.

Based on its analysis of the MSA and relevant Supreme Court precedent, the Court concludes that Council Member positions satisfy the "continuing position established by law" requirement of a federal officer position, and the Court proceeds to the second requirement.

### ii.     Exercising Significant Authority

Both parties cite numerous statutory provisions to support their respective positions; at bottom, Defendants argue the Councils serve a purely advisory role, while NEFSA claims they exercise significant federal authority in specific contexts. Ultimately, the Court views the Councils as exercising significant authority in certain contexts by virtue of the MSA's grant of authority to the Councils to restrict the actions of the Secretary of Commerce.

Most notably, NEFSA draws the Court's attention to statutory circumstances that can be fairly described as instances in which NMFS must predicate its action on a preliminary determination made by the Council; specifically, this includes NMFS' inability to repeal FMPs or to impose a limited access system without prior approval by the Council. *Pl.'s Mot.* at 11, 17 (citing 16 U.S.C. §§ 1854(c)(3), (h)).  In evaluating the inability of the Secretary to unilaterally repeal an FMP or impose a limited access system, the Court considers the Third Circuit's close analysis of this issue in its review of the District Court of New Jersey's decision in *Lofstad v. Raimondo.  See Lofstad v. Raimondo*, Case No. No. 24-1420, slip op. at 9-11 (3d Cir. Sep. 26, 2024).[9] Likening these provisions to a functional "pocket veto," the Third Circuit emphasized that, by withholding their assent, the Councils "can refuse to let [the Secretary] set up her limited-access fisheries, . . . or repeal a plan." *Id.* at 11.  In so doing, the

---

[9]     The Third Circuit includes a third provision in what it describes as the Council's unconstitutional "pocket veto" powers: the required assent of a Council for the Secretary to delegate fishery management to a state pursuant to 16 U.S.C. § 1856(a)(3)(B).  *See Lofstad v. Raimondo*, Case No. No. 24-1420, slip op. at 9-11 (3d Cir. Sep. 26, 2024).  As confirmed at oral argument, the Plaintiff in this case has not argued this particular provision constitutes significant authority, and the Court thus declines to address this provision to avoid issuing an advisory opinion on an issue not presented.

Councils exercise a "fearsome power" and "undermine[] the democratic chain of command" by interfering with the President's ability to take care the laws of the United States are faithfully executed, because "no one can override the Council's pocket veto." *Id.* at 10-11.

The Third Circuit's analysis in *Lofstad* presents a compelling case for the ability to unilaterally block executive action as constituting its own affirmative exercise of significant authority. While the First Circuit has had little occasion to address this issue, Judge Gelpí's concurrence in *Federal Oversight and Management Board v. Hernández-Montañez* reflects a similar concern that a Board's "ample veto power" over the elected government serves to erode "the principle of the consent of the governed." *Fin. Oversight & Mgmt. Bd. v. Hernández-Montañez*, 82 F.4th 57, 59 (1st Cir. 2023) (Gelpí, J., concurring). Based on the foregoing, the Court concludes that the unreviewable pocket veto provisions of the MSA grant the Councils the power to exercise significant authority. As Plaintiff's counsel stated at oral argument, based on *Freytag* and other Supreme Court jurisprudence, officials cannot be "an officer on Monday and an employee on Tuesday"; once significant authority is delegated, the official is a federal officer. The Court concludes that the Council Members constitute officers of the United States and must comport with its constitutional requirements. *See, accord, Lofstad v. Raimondo*, Case No. No. 24-1420, slip op. at 11 (3d Cir. Sep. 26, 2024).

However, the Court is not persuaded that the rest of the powers implicated by NEFSA constitute significant federal authority in their own right. First, NEFSA

challenges the Council's role in developing and drafting plans and amendments, relying on two statutory provisions that, upon close analysis, do not purport to grant the significant authority that Plaintiff claims. NEFSA cites 16 U.S.C. § 1801(b)(5), in which the statute directs Councils to "to exercise sound judgment in the stewardship of fishery resources through the preparation, monitoring, and revision of such plans." *Pl's. Mot.* at 10 (citing 16 U.S.C. § 1801(b)(5)). However, the cited provision reflects Congress's purpose in this grant of authority, contained later in the sentence: to "enable the State, the fishing industry, consumer and environmental organizations, and other interested persons to participate in, *and advise on*, the establishment and administration of such plans." 16 U.S.C. § 1801(b)(5) (emphasis added). Similarly, Plaintiff cites 16 U.S.C. § 1852(a)(1)(A) as "vest[ing] Members with 'authority over the[ir] fisheries.'" *Pl.'s Mot.* at 10. But this argument ignores the purpose of this section in context, which describes the jurisdiction of the New England Council relative to the other Councils described in sections (B) through (H). 16 U.S.C. § 1852(a)(1)(A-H).

Plaintiff also fails to address other unambiguous language in the statute granting general authority, not to the Councils, but to the Secretary. *See* 16 U.S.C. § 1855 ("The Secretary shall have general responsibility to carry out any [FMP] or amendment approved or prepared by him, in accordance with the provisions of this Act"); *see, accord, Franklin*, 898 F.2d at 60 ("The [MSA] also unequivocally vests the Secretary with the discretion to determine whether a Council's progress on conservation and management is reasonable"). The structure of the Act further

126

makes clear that only the Secretary holds the power to legally effectuate an FMP through implementing regulations. *See* 16 U.S.C. § 1854(b), (c)(6); *see, accord, N. Carolina Fisheries Ass'n, Inc. v. Gutierrez*, 550 F.3d 16, 17 (D.C. Cir. 2008) (analyzing the MSA and finding that FMPs "do not themselves have any regulatory effect—implementing regulations must also be enacted in order to effectuate them").

NEFSA claims "[t]he Act's plain text confines NMFS review to errors of law, and thus preserves for the Council an exclusive zone of legal policy judgments." *Pl.'s Resp.* at 10. In the Court's view, however, this argument misreads the language of the statute, which directs the Secretary to review any Council-proposed plan or amendment to determine "whether it is consistent with the national standards, the other provisions of this Act, and any other applicable law." 16 U.S.C. § 1854(a)(1)(A). As Defendants counter, the National Standards provide ten broad, and sometimes contradictory, policy directives; by reviewing for consistency, the Secretary must inherently assess and make determinations of policy.

Next, NEFSA correctly notes that the "Supreme Court has 'explicitly reject[ed]' the 'theory that final decisionmaking authority is a *sine qua non* of officer status.'" *Id.* at 12-13 (quoting *Lucia*, 595 U.S. at 247 n. 4) (citing *Freytag*, 501 U.S. at 881-82). Admittedly so. However, while these principles hold true, the officials deemed federal officers in those two cases wielded substantially different authority than the policy development role of Council Members. In *Freytag*, the Tax Court's STJ's were authorized, while presiding over adversarial hearings, to "take testimony, conduct trials, rule on the admissibility of evidence, and have the power to enforce compliance

with discovery orders." *Freytag*, 501 U.S. at 881-82. The SEC ALJs held much the same power in *Lucia*. 585 U.S. at 249. Beyond that, if the SEC issued an order declining to review an ALJ decision, "the ALJ's decision itself 'becomes final' and is 'deemed the action of the Commission.'" *Id.* Council Members, however, do not serve in an adversarial setting and lack any power to enforce compliance. Rather, their policy proposals have no legal effect on private parties without NMFS going through the rulemaking process of accepting the proposal, publishing the proposed rule in the Federal Register and undergoing public notice and comment, and choosing to issue a final version of the rule with implementing regulations. *See, accord*, *Gulf Restoration*, 730 F. Supp. 2d. at 173-74 (finding an "FMP does not constitute final agency action without promulgation of the corresponding regulations: neither approval of the FMP nor failure to act on it marks the end of the decisionmaking process; nor does the FMP establish any rights or obligations or create any binding legal consequences").

NEFSA insists Councils hold unilateral rulemaking authority in certain contexts, revealing their significant authority. It directs the Court to 16 U.S.C. § 1854(a)(3), which provides that Council proposals "shall take effect as if approved" if NMFS fails to review it within the thirty-day period provided by statute. *Id.* Plaintiff again analogizes the ALJ decisions in *Lucia*, which "take effect" without agency approval, should the SEC decline to review them. *Pl.'s Mot.* at 13 (citing *Lucia*, 585 U.S. at 249); *see id.* at 13-14 (quoting 16 U.S.C. § 1854(a)(3)(C)) ("If the Secretary fails for any reason to 'notify a Council within 30 days . . . of the approval, disapproval, or

partial approval of the plan or amendment, then such plan or amendment *shall take effect as if approved*") (emphasis added by Plaintiffs).

However, the Court agrees with Defendants that a key factor distinguishes the Council proposals from the decisions of ALJs: without implementing regulations, an FMP has no legal effect affecting private parties. In *Lucia*, ALJs adjudicated the rights of private parties in adversarial contexts, such that the agency declining to review made these decisions final and enforceable. *Lucia*, 585 U.S. at 249. Under the MSA, FMPs lack legal effect in the absence of implementing regulations. *See, e.g.*, *Gutierrez*, 550 F.3d at 17 (finding FMPs "do not themselves have any regulatory effect—implementing regulations must also be enacted in order to effectuate them").

NEFSA protests that, even if not binding on private parties, an FMP taking effect as if approved limits the scope of regulations that NMFS can promulgate, as regulations legally must be consistent "with the [FMP] [or] plan amendment" they seek to implement. *Pl.'s Resp.* at 12. (citing 16 U.S.C. § 1854(b)(1)). However, the statutory section on regulations contains no mechanism for the Council's proposed regulations to take automatic effect. *See* 16 U.S.C. § 1854(b)(1)). Only the Secretary can promulgate regulations, and accordingly, only NMFS has the authority to issue binding rulemakings. *See, accord*, *Goethel*, 2016 U.S. Dist. LEXIS 99515, at *28 (D.N.H. July 29, 2016), *aff'd* on other grounds, *Goethel*, 854 F.3d 106.

NEFSA also directs the Court to 16 U.S.C. § 1854(b)(3), which it claims mandates the Secretary consult with the Council prior to amending any proposed regulations. Under this provision, Plaintiff says, a Council can refuse to consult and

effectively bar NMFS from revising its proposed regulations.  The Defendants dispute that this is how the statutory scheme functions in practice.  Without more, the Court is not convinced by the NEFSA's argument.  The Plaintiff has not presented evidence of a Council's refusal to consult, nor proven that such refusal would indeed prohibit NMFS from revising its proposed regulations, so long as NMFS solicited the Council's feedback and gave it an opportunity to respond.   Thus, the Court finds the consultation requirement does not establish an exercise of significant federal authority.  *Accord Lofstad v. Raimondo*, Case No. No. 24-1420, slip op. at 13 (3d Cir. Sep. 26, 2024).

NEFSA also highlights the statutory mechanism under which, by unanimous vote, a Council can require the Secretary to promulgate emergency regulations.  16 U.S.C. § 1855(c)(2)(A)).  However, taken in context, this power does not amount to the substantial exercise of authority NEFSA describes.  A Secretary who identifies an emergency situation can herself issue such regulations unilaterally, and, even when directed by unanimous vote of a Council, retains total control over the content of such emergency regulations.  *Id*.  The Council's demand cannot require a particular form of emergency regulation, and the Secretary retains the ability to block unanimous votes by having her representative, the Regional Director Council Member, vote against such measures to defeat unanimity.  Thus, this does not constitute the significant exercise of federal authority.  *See, accord, Lofstad v. Raimondo*, Case No. No. 24-1420, slip op. at 13 (3d Cir. Sep. 26, 2024).

### iii.     Principal vs. Inferior Officers

The Supreme Court has drawn a clear line between principal and inferior officers of the United States: inferior officers are those "directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate." *Edmond*, 520 U.S. at 663.  As explained above, the "pocket veto" provisions allow the Council to block certain federal actions—to wit, imposing a limited access system or repealing an FMP—and their decisions cannot be reviewed by any federal agency or officer.  In fact, the Councils exercise this power over a principal officer, the Secretary of Commerce.  For this reason, the Council Members constitute principal officers of the United States.  *See, accord, Lofstad v. Raimondo*, Case No. No. 24-1420, slip op. at 13-14 (3d Cir. Sep. 26, 2024).

As principal officers, the Constitution requires Council Members be appointed by the President and confirmed by the Senate.  *See* U.S. CONST. art. II, § 2.  The Defendants do not purport that this process took place here.  Thus, the appointments of the Council Members are unconstitutional.  *See, accord, Lofstad v. Raimondo*, Case No. No. 24-1420, slip op. at 14 (3d Cir. Sep. 26, 2024).

### iv.     Insulation from Removal

NEFSA insists the MSA violates the federal Constitution by appointing Council Members as federal officers who cannot be removed by the President in his execution of the Vesting and Take Care Clauses.  *Pl.'s Mot.* at 20-23.  Defendants do not engage with this argument, instead relying on their position that Council Members do not constitute federal officers because their positions are not continuing

and they do not exercise significant authority, and, thus, the constitutional doctrine against insulation from removal does not apply. *Defs.' Mot.* at 21-33.

Based on the prior conclusion that Council Members, in certain circumstances, do exercise significant authority and thus are officers of the United States, the Court concludes that the constitutional limits on removal protections apply and that the Defendants have forfeited their right to contest this point. *See Zannino*, 895 F.2d at 17 (finding "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived"). Regardless, the statute is clear on this point—the Secretary has no ability to remove the state bureaucrat or governor-nominated Council Members in the absence of financial integrity violations. 16 U.S.C. § 1852(b)(6). The Court concludes that this extremely narrow ground for removal of federal officers interferes with the ability of the President to take care the laws of the United States are being faithfully executed, and thus, violates the principles set forth by the federal Constitution.

### v.   Severability

NEFSA requests an order vacating Framework Adjustment 65 and enjoining its enforcement on the basis of the unconstitutional Council, as well as declaratory relief. It argues against severance, though, focusing largely on the Court's inability to sever the removal protections without contravening the purpose of the statute and the intent of Congress. *Pl.'s Mot.* at 25-27. Defendant did not substantially engage with this issue, instead asking for an opportunity to provide supplemental briefing on remedy and asserting that the remedy should be narrowly tailored to address any

constitutional infirmity identified by the court, such that they could not speculate prior to understanding the statutory flaw. *Defs.' Mot.* at 40.

The Court adopts the standard of review for severability provided by the Supreme Court in *Seila Law*: first, whether the law's "surviving provisions [are] capable of 'functioning independently,'" and second, if Congress would have passed it without its "invalid' components" in light of the law's "text [and] historical context." *Seila Law*, 591 U.S. at 234 (quoting *Free Enter. Fund*, 561 U.S. at 509); *see also Members of Jamestown Sch. Comm. v. Schmidt*, 699 F.2d 1 (1st Cir. 1983) ("Under the general rules concerning severability, the otherwise valid portion of a statute can stand if it is fully operative and there is no showing that the legislature would not have enacted the valid provisions independently") (citing *United States v. Jackson*, 390 U.S. 570, 20 L. Ed. 2d 138, 88 S. Ct. 1209 (1968)).  In considering severability, the Court "tr[ies] to limit the solution to the problem, severing any problematic portions while leaving the remainder intact."

Here, again, the Court finds the Third Circuit's recent analysis elegantly resolves this issue regarding the exercise of significant authority in the limited circumstances of the pocket veto provisions.  In that case, the Third Circuit noted "Even if we knock out the pocket vetoes, the statute remains 'fully operative.'" *Lofstad v. Raimondo*, Case No. No. 24-1420, slip op. at 14 (3d Cir. Sep. 26, 2024) (citing *Free Enter. Fund*, 561 U.S. at 508).  Quoting the District of the District of Columbia Court in *Natural Resources Defense Council v. National Marine Fisheries Service*, the Third Circuit explained that "[t]he Council's 'most significant

responsibility' is drafting proposed plans," and that severing the pocket veto provisions does nothing to impact that duty.  *Id.* (citing *NRDC v. Nat'l Marine Fisheries Serv.*, 71 F. Supp. 3d 35, 40 (D.D.C. 2014)).

The Court finds this solution comports with the Supreme Court's directive to "use a scalpel rather than a bulldozer" to cure constitutional defects.  *Seila Law*, 591 U.S. at 237.  Removing the ability of the Council to pocket veto the Secretary's desired adoption of a limited access system or to repeal an FMP does not interfere with the primary responsibility of the Councils as policy developers and advisors, nor does it reallocate the truly binding legal authority of the statute, issuing regulations, from the Secretary.  Moreover, in severing these limited provisions, the Court addresses both the Appointments Clause and constitutional removal claims, as, without these provisions, the Council Members do not exercise any significant authority, and thus, do not constitute officers of the United States.  This resolves the constitutional issues presented without invalidating an entire statutory scheme that has effectively governed the United States for decades or a regulation that did not involve either of the constitutional provisions identified in the case at bar.

Therefore, the Court grants judgment for the Plaintiff and orders 16 U.S.C. §§ 1854(c)(3), (h)) to be severed from the MSA as unconstitutional.

### b.  Count IV - Defendant Rauch as an Officer of the United States

For the same reasons as the Court concluded NEFSA lacks standing to challenge the conduct of Defendant Rauch as unconstitutional, the Court will briefly explain why the merits of this claim also fail.  However, before doing so, the Court

addresses the Defendants' argument that NEFSA has waived its claim against Defendant Rauch by failing to contest, via public comment, the authority of Defendant Rauch at the time of his signature of the Proposed Rule as published in the Federal Register. *Defs.' Mot.* at 38-39. This argument fails for several reasons. As Defendants themselves argue at length, the Proposed Rule took no legal effect, such that Defendant Rauch's signature of the proposal does not pose the same constitutional questions as does his signature of the Final Rule. While Defendants insist "[NEFSA] was aware that DAARP Rauch had signed the Proposed Rule and had no reason to believe he would not sign the Final Rule," any challenge raised at the proposal stage would have been purely speculative. Further, as NEFSA cites, Supreme Court precedent distinguishes constitutional claims from other challenges to agency rulemaking, writing: "agency adjudications are generally ill suited to address structural constitutional challenges, which usually fall outside the adjudicators' areas of technical expertise. As such, it is sometimes appropriate for courts to entertain constitutional challenges to statutes or other agency-wide policies even when those challenges were not raised in administrative proceedings." *Carr*, 593 U.S. at 92-93 (collecting cases) (internal citations omitted). For these reasons, the Court concludes NEFSA's failure to raise this issue during the public comment did not constitute waiver.

Turning to the merits of the claim against Defendant Rauch, as addressed in the Court's standing analysis, the crux of this dispute hinges on whether Defendant Rauch's signature truly constituted the "issuance" of the Rule. As explained in detail

in the standing section of this order, the Court concludes this act, while noteworthy with regard to when the public received notice of the Rule, did not indicate the exercise of significant authority by Defendant Rauch, but rather, the fruition of the rulemaking process determined by Assistant Administrator Coit. The Administrative Record unequivocally demonstrates that Assistant Administrator Coit expressly approved both the proposed and final versions of Framework Adjustment 65 before Defendant Rauch signed either version for publication in the Federal Register. *See* A.R. 6072-74; A.R. 6201-13. Without exercising significant federal authority, Defendant Rauch is not subject to the constitutional strictures on appointment and removal, and thus the Plaintiff's constitutional claim fails.

## B. Count III - Claim brought under the Private Non-Delegation Doctrine

### 1. Legal Standard

While not as well-known as its close cousin, the generic non-delegation doctrine, which applies to assignments of authority between federal branches of government which contravene the constitutional separation of powers, the private non-delegation doctrine instead governs, as suggested by its name, delegations of federal authority to non-federal entities. Justice Alito recently articulated a concise explanation of the private non-delegation doctrine, writing:

> Although no provision of the Constitution expressly forbids the exercise of governmental power by a private entity, our so-called "private nondelegation doctrine" flows logically from the three Vesting Clauses. Because a private entity is neither Congress, nor the President or one of his agents, nor the Supreme Court or an inferior Congress, the court established by Vesting Clauses would categorically preclude it from exercising the legislative, executive, or judicial powers of the Federal Government. In short, the "private nondelegation doctrine" is merely

136

one application of the provisions of the Constitution that forbid Congress
to allocate power to an ineligible entity, whether governmental or
private.

*DOT v. Ass'n of Am. R.R.*, 575 U.S. 43, 88 (2015) (Alito, J., con.). Defendants argue

that the private non-delegation doctrine should not be applied to the Councils because

certain Members "work[] in the public sector, specifically for state and federal

agencies," but, based on the foregoing, this argument fails to address the appropriate

inquiry relevant to the private non-delegation doctrine. Rather, the Court examines

whether the Council should be considered a governmental entity as a whole.

To do so, the Court finds helpful the Supreme Court's analysis with regard to

Amtrak, which it determined constituted a governmental entity based on "the

practical reality of federal control and supervision," citing as evidence that "[t]he

political branches created Amtrak, control its Board, define its mission, specify many

of its day-to-day operations, have imposed substantial transparency and

accountability mechanisms, and, for all practical purposes, set and supervise its

annual budget." *Id.* at 55. The Court further finds instructive the Supreme Court's

analysis in *Adkins*, which found legislative authority had not been impermissibly

delegated because the "members of the code function subordinately to the

Commission," as evidenced by the Commission's retaining "authority and

surveillance over the activities these authorities." *Adkins*, 310 U.S. at 399.

### 2. Discussion

Plaintiff takes the position that, should the Court find the Council Members

do not constitute federal officers, then they must be non-governmental and thus

contravene the private non-delegation doctrine. *Pl.'s Resp.* at 13. The Court agrees

with Defendants that this presents "a false choice," *Defs.' Reply* at 14, as it ignores the entire category of the federal government's "lesser functionaries" who serve, not as officers themselves, but "subordinate to officers of the United States," the requirements for which the Supreme Court has expressly declined to rule. *See Free Enter. Fund*, 561 U.S. at 506 (clarifying "nor do we decide whether 'lesser functionaries subordinate to officers of the United States' must be subject to the same sort of control as those who exercise 'significant authority pursuant to the laws'") (quoting *Buckley*, 424 U.S. at 126 n.162). The Court thus proceeds to analyze whether the Council constitutes a governmental entity under the inquiry outlined by the Supreme Court in *Department of Transportation v. Association of American Railroads* and whether the Council functions subordinately to any officer of the United States.

Based on the detailed directives provided by the MSA and ongoing supervision by NMFS, the Court deems the Councils to constitute a governmental entity. As conceded by both parties, the Councils derive their creation and duties from federal statute. 16 U.S.C. § 1852(a)(1), (h). Further, that statute provides clear instructions for both voting and non-voting membership of the Councils, 16 U.S.C. § 1852(b)-(c), as well as the compensation and reimbursement structure for Council Members' expenses in performance of their statutory duties. 16 U.S.C. § 1852(d). NMFS also controls the Council's actions, both through its front-end guidance via regulations interpreting the National Standards, 16 U.S.C. § 1851(b), and through its ongoing supervision of the Councils' proposals before any of them take legal effect. 16 U.S.C. § 1854; *see also Franklin*, 898 F.2d at 60 ("The [MSA] also unequivocally vests the

Secretary with the discretion to determine whether a Council's progress on conservation and management is reasonable").  Based on the foregoing analysis, the Court finds "the practical reality of federal control and supervision" of the Councils informs their status as governmental entities, such that the MSA does not violate the private non-delegation doctrine, nor was NMFS obligated to reject Framework Adjustment 65 as a proposal contrary to law.

Even if the Court mistook the Councils for a governmental entity, it further rejects NEFSA's contention that the Councils exercise federal power based on the Council's subordinate status to the NMFS and its constitutionally appointed federal officer, Assistant Administrator Coit.  Both parties spend substantial portions of their motions in drawing comparisons and distinctions between the MSA and the HISA; the best the Court can tell, the only issue disputed comes down to the effect of the new provision added as a response to the Fifth Circuit's decision in *Black*, 15 U.S.C. § 3053, which permits the Commission to "abrogate, add to, and modify the rules of the Authority promulgated in accordance with this Act." *Id.*; *see also Oklahoma*, 62 F.4th at 227.  Plaintiff claims NMFS contains no similar authority to abrogate FMPs without a three-quarters majority vote by the Council pursuant to 16 U.S.C. § 1854(h); Defendants concede this point but argue this distinction "is a difference of degree, not of kind" based on NMFS statutory authority to add or modify rules. *Defs.' Reply* at 14 (citing 16 U.S.C. §§ 1854(b), (c)(1), (c)(6), (g), 1855(d)).

Of these, the Court finds particularly compelling the Secretary's ability to unilaterally revise final regulations pursuant to 16 U.S.C. § 1855(b)(3).  While she

139

must consult with the Council and provide an explanation of the basis for changes, 16 U.S.C. § 1855(b)(3), this provision highlights the Secretary's role as superior to the Council's by granting her the ultimate discretion in choosing how to achieve the Act's policy directives. As previously discussed, courts recognize by consensus that the implementing regulations provide the legally binding thrust of the MSA. *See, e.g.*, *Lovgren*, 701 F.3d at 30 ("Congress has expressly delegated responsibility to NMFS to implement FMPs through binding regulations")*; Gutierrez*, 550 F.3d at 17 (FMPs "do not themselves have any regulatory effect—implementing regulations must also be enacted in order to effectuate them"). The Secretary's ultimate control over and ability to revise regulations clarifies the Council's role as advisory and subordinate to the Secretary, by way of NMFS and Assistant Administrator Coit, as a constitutionally appointed officer of the United States.

As Defendants point out, so long as the federal officer retains sufficient supervisory authority, federal circuit courts have routinely upheld the ability of an officer to receive policy proposals from their subordinates without violating the private non-delegation doctrine. *See, e.g.*, *R.H. Johnson*, 198 F.2d at 695; *Adkins*, 310 U.S. at 388; *Currin*, 306 U.S. at 15-16; *Lynn*, 502 F.2d at 59. As previously addressed, the few statutory sections that grant unreviewable authority to the Councils through a functional pocket veto do grant substantial authority, and thus have been severed as unconstitutional. However, the rest of the statute poses no private non-delegation issues because, as explained, the Secretary retains supervisory and ultimate decision-making authority over the adoption and implementation of FMPs, amendments, and

regulations, including when NFMS failure to review results in an FMP "tak[ing]
effect as if approved," such that these actions are advisory and do not constitute an
exercise of federal power. *See, accord, Lofstad v. Raimondo*, Case No. No. 24-1420,
slip op. at 11-13 (3d Cir. Sep. 26, 2024).

Thus, both because the New England Council constitutes a governmental
entity and because of its subordinate role to the Secretary, NMFS, and Assistant
Administrator Coit as a properly appointed officer of the United States, the Court
concludes that NEFSA's claim that the structure of the MSA violates the private non-
delegation doctrine fails and rejects its contention that NMFS was compelled to reject
Framework Adjustment 65 as unlawfully prepared pursuant to the APA.

## VII. SUMMARY

The Court considered cross motions for summary judgment; the Plaintiff
sought an order granting its relief sought, while Defendants asked for the Court to
dismiss the case on both standing and the merits. While the Court determined the
Plaintiff satisfied the requirements of standing for the purposes of bringing its claims
relating to the unconstitutional membership of the Fishery Councils under the MSA,
Counts I-II, the Court grants the Plaintiff's motion for summary judgment and denies
the Defendants cross motion for summary judgment on the merits because the
Plaintiff established that the Council Members are federal officers based on their
ability to block certain federal actions such that their appointment and insulation
from removal violates the Constitution. The Court concludes, however, that these

unconstitutional provisions can be severed without contravening the structure of the statute or the will of Congress.

Though granted standing to bring its private non-delegation claim, the Court determined the structure of the MSA with regard to the Fishery Councils, in light of the severance of the pocket veto provisions, does not violate the private non-delegation doctrine and dismisses this claim, Count III, on the merits.

Further, the Court determines the Plaintiff failed to establish that its injuries can be fairly traced to the actions of Defendant Rauch based on his signature for publication in the Federal Register. The Court dismisses this claim, Count IV, without prejudice for lack of standing.

## VIII. CONCLUSION

The Court hereby GRANTS, in part, and DENIES, in part, the Plaintiff's Motion for Summary Judgment (ECF No. 39). With regard to Counts I and II, the Court ORDERS the Defendants ENJOINED from applying 16 U.S.C. §§ 1854(c)(3), (h), the provisions prohibiting the National Marine Fisheries Service from repealing Fisheries Management Plans or imposing a limited access system without prior approval by the Council, and the Court further ORDERS these provisions SEVERED as unconstitutional from the Magnuson-Stevens Fishery Conservation and Management Act. The Court DENIES Plaintiff's Motion for Summary Judgment as to Counts III and IV.

Further, the Court GRANTS the Defendant's Cross-Motion for Summary Judgment (ECF No. 41) with regard to Counts III and IV and DENIES the Defendant's Cross-Motion with regard to Counts I and II.

SO ORDERED.


/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 30th day of December, 2024

**Constitution of the United States**

**U.S. Const. Art. II § 2, cl. 2**

He shall have Power, by and with the Advice and Consent of the
Senate, to make Treaties, provided two thirds of the Senators present
concur; and he shall nominate, and by and with the Advice and Consent
of the Senate, shall appoint Ambassadors, other public Ministers and
Consuls, Judges of the supreme Court, and all other Officers of the
United States, whose Appointments are not herein otherwise provided
for, and which shall be established by Law: but the Congress may by
Law vest the Appointment of such inferior Officers, as they think
proper, in the President alone, in the Courts of Law, or in the Heads of
Departments.

# United States Code

## Title 16. Conservation

## Chapter 38. Fishery Conservation and Management

## Subchapter I. Generally

## 16 U.S.C. § 1801

### § 1801. Findings, purposes and policy

### (a) Findings

The Congress finds and declares the following:

> **(1)** The fish off the coasts of the United States, the highly migratory species of the high seas, the species which dwell on or in the Continental Shelf appertaining to the United States, and the anadromous species which spawn in United States rivers or estuaries, constitute valuable and renewable natural resources. These fishery resources contribute to the food supply, economy, and health of the Nation and provide recreational opportunities.

> **(2)** Certain stocks of fish have declined to the point where their survival is threatened, and other stocks of fish have been so substantially reduced in number that they could become similarly threatened as a consequence of (A) increased fishing pressure, (B) the inadequacy of fishery resource conservation and management practices and controls, or (C) direct and indirect habitat losses which have resulted in a diminished capacity to support existing fishing levels.

> **(3)** Commercial and recreational fishing constitutes a major source of employment and contributes significantly to the economy of the Nation. Many coastal areas are dependent upon fishing and related activities, and their economies have been badly damaged

by the overfishing of fishery resources at an ever-increasing rate over the past decade. The activities of massive foreign fishing fleets in waters adjacent to such coastal areas have contributed to such damage, interfered with domestic fishing efforts, and caused destruction of the fishing gear of United States fishermen.

**(4)** International fishery agreements have not been effective in preventing or terminating the overfishing of these valuable fishery resources. There is danger that irreversible effects from overfishing will take place before an effective international agreement on fishery management jurisdiction can be negotiated, signed, ratified, and implemented.

**(5)** Fishery resources are finite but renewable. If placed under sound management before overfishing has caused irreversible effects, the fisheries can be conserved and maintained so as to provide optimum yields on a continuing basis.

**(6)** A national program for the conservation and management of the fishery resources of the United States is necessary to prevent overfishing, to rebuild overfished stocks, to insure conservation, to facilitate long-term protection of essential fish habitats, and to realize the full potential of the Nation's fishery resources.

**(7)** A national program for the development of fisheries which are underutilized or not utilized by the United States fishing industry, including bottom fish off Alaska, is necessary to assure that our citizens benefit from the employment, food supply, and revenue which could be generated thereby.

**(8)** The collection of reliable data is essential to the effective conservation, management, and scientific understanding of the fishery resources of the United States.

**(9)** One of the greatest long-term threats to the viability of commercial and recreational fisheries is the continuing loss of marine, estuarine, and other aquatic habitats. Habitat

considerations should receive increased attention for the conservation and management of fishery resources of the United States.

**(10)** Pacific Insular Areas contain unique historical, cultural, legal, political, and geographical circumstances which make fisheries resources important in sustaining their economic growth.

**(11)** A number of the Fishery Management Councils have demonstrated significant progress in integrating ecosystem considerations in fisheries management using the existing authorities provided under this chapter.

**(12)** International cooperation is necessary to address illegal, unreported, and unregulated fishing and other fishing practices which may harm the sustainability of living marine resources and disadvantage the United States fishing industry.

**(13)** While both provide significant cultural and economic benefits to the Nation, recreational fishing and commercial fishing are different activities. Therefore, science-based conservation and management approaches should be adapted to the characteristics of each sector.

## (b) Purposes

It is therefore declared to be the purposes of the Congress in this chapter—

**(1)** to take immediate action to conserve and manage the fishery resources found off the coasts of the United States, and the anadromous species and Continental Shelf fishery resources of the United States, by exercising (A) sovereign rights for the purposes of exploring, exploiting, conserving, and managing all fish, within the exclusive economic zone established by Presidential Proclamation 5030, dated March 10, 1983, and (B) exclusive fishery management authority beyond the exclusive economic zone

over such anadromous species and Continental Shelf fishery resources;

**(2)** to support and encourage the implementation and enforcement of international fishery agreements for the conservation and management of highly migratory species, and to encourage the negotiation and implementation of additional such agreements as necessary;

**(3)** to promote domestic commercial and recreational fishing under sound conservation and management principles, including the promotion of catch and release programs in recreational fishing;

**(4)** to provide for the preparation and implementation, in accordance with national standards, of fishery management plans which will achieve and maintain, on a continuing basis, the optimum yield from each fishery;

**(5)** to establish Regional Fishery Management Councils to exercise sound judgment in the stewardship of fishery resources through the preparation, monitoring, and revision of such plans under circumstances (A) which will enable the States, the fishing industry, consumer and environmental organizations, and other interested persons to participate in, and advise on, the establishment and administration of such plans, and (B) which take into account the social and economic needs of the States;

**(6)** to encourage the development by the United States fishing industry of fisheries which are currently underutilized or not utilized by United States fishermen, including bottom fish off Alaska, and to that end, to ensure that optimum yield determinations promote such development in a non-wasteful manner; and

**(7)** to promote the protection of essential fish habitat in the review of projects conducted under Federal permits, licenses, or other authorities that affect or have the potential to affect such habitat.

**(c) Policy**

It is further declared to be the policy of the Congress in this chapter—

> **(1)** to maintain without change the existing territorial or other ocean jurisdiction of the United States for all purposes other than the conservation and management of fishery resources, as provided for in this chapter;

> **(2)** to authorize no impediment to, or interference with, recognized legitimate uses of the high seas, except as necessary for the conservation and management of fishery resources, as provided for in this chapter;

> **(3)** to assure that the national fishery conservation and management program utilizes, and is based upon, the best scientific information available; involves, and is responsive to the needs of, interested and affected States and citizens; considers efficiency; draws upon Federal, State, and academic capabilities in carrying out research, administration, management, and enforcement; considers the effects of fishing on immature fish and encourages development of practical measures that minimize bycatch and avoid unnecessary waste of fish; and is workable and effective;

> **(4)** to permit foreign fishing consistent with the provisions of this chapter;

> **(5)** to support and encourage active United States efforts to obtain internationally acceptable agreements which provide for effective conservation and management of fishery resources, and to secure agreements to regulate fishing by vessels or persons beyond the exclusive economic zones of any nation;

> **(6)** to foster and maintain the diversity of fisheries in the United States; and

**(7)** to ensure that the fishery resources adjacent to a Pacific Insular Area, including resident or migratory stocks within the exclusive economic zone adjacent to such areas, be explored, developed, conserved, and managed for the benefit of the people of such area and of the United States.

# United States Code

## Title 16. Conservation

## Chapter 38. Fishery Conservation and Management

## Subchapter IV. National Fishery Management Program

## 16 U.S.C. § 1851

### § 1851.  National standards for fishery conservation and management.

**(a) In general**

Any fishery management plan prepared, and any regulation promulgated to implement any such plan, pursuant to this subchapter shall be consistent with the following national standards for fishery conservation and management:

> **(1)** Conservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry.

> **(2)** Conservation and management measures shall be based upon the best scientific information available.

> **(3)** To the extent practicable, an individual stock of fish shall be managed as a unit throughout its range, and interrelated stocks of fish shall be managed as a unit or in close coordination.

> **(4)** Conservation and management measures shall not discriminate between residents of different States. If it becomes necessary to allocate or assign fishing privileges among various United States fishermen, such allocation shall be **(A)** fair and equitable to all such fishermen; **(B)** reasonably calculated to promote conservation; and **(C)** carried out in such manner that no

particular individual, corporation, or other entity acquires an excessive share of such privileges.

**(5)** Conservation and management measures shall, where practicable, consider efficiency in the utilization of fishery resources; except that no such measure shall have economic allocation as its sole purpose.

**(6)** Conservation and management measures shall take into account and allow for variations among, and contingencies in, fisheries, fishery resources, and catches.

**(7)** Conservation and management measures shall, where practicable, minimize costs and avoid unnecessary duplication.

**(8)** Conservation and management measures shall, consistent with the conservation requirements of this chapter (including the prevention of overfishing and rebuilding of overfished stocks), take into account the importance of fishery resources to fishing communities by utilizing economic and social data that meet the requirements of paragraph (2), in order to **(A)** provide for the sustained participation of such communities, and **(B)** to the extent practicable, minimize adverse economic impacts on such communities.

**(9)** Conservation and management measures shall, to the extent practicable, **(A)** minimize bycatch and **(B)** to the extent bycatch cannot be avoided, minimize the mortality of such bycatch.

**(10)** Conservation and management measures shall, to the extent practicable, promote the safety of human life at sea.

## (b) Guidelines

The Secretary shall establish advisory guidelines (which shall not have the force and effect of law), based on the national standards, to assist in the development of fishery management plans.

# United States Code

## Title 16. Conservation

## Chapter 38. Fishery Conservation and Management

## Subchapter IV. National Fishery Management Program

## 16 U.S.C. § 1852 (excerpts)

### § 1852.  Regional Fishery Management Councils

**(a) Establishment**

**(1)** There shall be established, within 120 days after April 13, 1976, eight Regional Fishery Management Councils, as follows:

**(A) New England Council**

The New England Fishery Management Council shall consist of the States of Maine, New Hampshire, Massachusetts, Rhode Island, and Connecticut and shall have authority over the fisheries in the Atlantic Ocean seaward of such States (except as provided in paragraph (3)). The New England Council shall have 18 voting members, including 12 appointed by the Secretary in accordance with subsection (b)(2) (at least one of whom shall be appointed from each such State).

\*   \*   \*

**(2)** Each Council shall reflect the expertise and interest of the several constituent States in the ocean area over which such Council is granted authority.

**(3)** The Secretary shall have authority over any highly migratory species fishery that is within the geographical area of authority of

more than one of the following Councils: New England Council, Mid-Atlantic Council, South Atlantic Council, Gulf Council, and Caribbean Council.

**(b) Voting members**

(1) The voting members of each Council shall be:

(A) The principal State official with marine fishery management responsibility and expertise in each constituent State, who is designated as such by the Governor of the State, so long as the official continues to hold such position, or the designee of such official.

(B) The regional director of the National Marine Fisheries Service for the geographic area concerned, or his designee, except that if two such directors are within such geographical area, the Secretary shall designate which of such directors shall be the voting member.

(C) The members required to be appointed by the Secretary in accordance with paragraphs (2) and (5).

(2)(A) The members of each Council required to be appointed by the Secretary must be individuals who, by reason of their occupational or other experience, scientific expertise, or training, are knowledgeable regarding the conservation and management, or the commercial or recreational harvest, of the fishery resources of the geographical area concerned. Within nine months after November 28, 1990, the Secretary shall, by regulation, prescribe criteria for determining whether an individual satisfies the requirements of this subparagraph.

(B) The Secretary, in making appointments under this section, shall, to the extent practicable, ensure a fair and balanced apportionment, on a rotating or other basis, of the active participants (or their representatives) in the

commercial and recreational fisheries under the jurisdiction of the Council. On January 31, 1991, and each year thereafter, the Secretary shall submit to the Committee on Commerce, Science, and Transportation of the Senate and the Committee on Merchant Marine and Fisheries of the House of Representatives a report on the actions taken by the Secretary to ensure that such fair and balanced apportionment is achieved. The report shall—

> **(i)** list the fisheries under the jurisdiction of each Council, outlining for each fishery the type and quantity of fish harvested, fishing and processing methods employed, the number of participants, the duration and range of the fishery, and other distinguishing characteristics;

> **(ii)** assess the membership of each Council in terms of the apportionment of the active participants in each such fishery; and

> **(iii)** state the Secretary's plans and schedule for actions to achieve a fair and balanced apportionment on the Council for the active participants in any such fishery.

**(C)** The Secretary shall appoint the members of each Council from a list of individuals submitted by the Governor of each applicable constituent State. A Governor may not submit the names of individuals to the Secretary for appointment unless the Governor has determined that each such individual is qualified under the requirements of subparagraph (A) and unless the Governor has, to the extent practicable, first consulted with representatives of the commercial and recreational fishing interests of the State regarding those individuals. Each such list shall include the names and pertinent biographical data of not less than three individuals for each applicable vacancy and shall be accompanied by a

statement by the Governor explaining how each such individual meets the requirements of subparagraph (A). The Secretary shall review each list submitted by a Governor to ascertain if the individuals on the list are qualified for the vacancy on the basis of such requirements. If the Secretary determines that any individual is not qualified, the Secretary shall notify the appropriate Governor of that determination. The Governor shall then submit a revised list or resubmit the original list with an additional explanation of the qualifications of the individual in question. An individual is not eligible for appointment by the Secretary until that individual complies with the applicable financial disclosure requirements under subsection (k).

\*   \*   \*

**(3)** Each voting member appointed to a Council by the Secretary in accordance with paragraphs (2) and (5) shall serve for a term of 3 years; except that the Secretary may designate a shorter term if necessary to provide for balanced expiration to terms of office. No member appointed after January 1, 1986, may serve more than three consecutive terms. Any term in which an individual was appointed to replace a member who left office during the term shall not be counted in determining the number of consecutive terms served by that Council member.

**(4)** Successors to the voting members of any Council shall be appointed in the same manner as the original voting members. Any individual appointed to fill a vacancy occurring prior to the expiration of any term of office shall be appointed for the remainder of that term.

\*   \*   \*

**(6)** The Secretary may remove for cause any member of a Council required to be appointed by the Secretary in accordance with paragraphs (2) or (5) if—

**(A)** the Council concerned first recommends removal by not less than two-thirds of the members who are voting members and submits such removal recommendation to the Secretary in writing together with a statement of the basis for the recommendation; or

**(B)** the member is found by the Secretary, after notice and an opportunity for a hearing in accordance with section 554 of Title 5, to have committed an act prohibited by section 1857(1)(O) of this title.

## (c) Nonvoting members

**(1)** The nonvoting members of each Council shall be:

**(A)** The regional or area director of the United States Fish and Wildlife Service for the geographical area concerned, or his designee.

**(B)** The Commander of the Coast Guard district for the geographical area concerned, or his designee; except that, if two Coast Guard districts are within such geographical area, the commander designated for such purpose by the commandant of the Coast Guard.

**(C)** The executive director of the Marine Fisheries Commission for the geographical area concerned, if any, or his designee.

**(D)** One representative of the Department of State designated for such purpose by the Secretary of State, or his designee.

\* \* \*

## (d) Compensation and expenses

The voting members of each Council who are required to be appointed by the Secretary and who are not employed by the Federal Government or any State or local government, shall receive compensation at the daily rate for GS-15, step 7 of the General Schedule, when engaged in the actual performance of duties for such Council. The voting members of each Council, any nonvoting member described in subsection (c)(1)(C), and the nonvoting member appointed pursuant to subsection (c)(2) shall be reimbursed for actual expenses incurred in the performance of such duties, and other nonvoting members and Council staff members may be reimbursed for actual expenses.

**(e) Transaction of business**

> **(1)** A majority of the voting members of any Council shall constitute a quorum, but one or more such members designated by the Council may hold hearings. All decisions of any Council shall be by majority vote of the voting members present and voting.

> **(2)** The voting members of each Council shall select a Chairman for such Council from among the voting members.

> **(3)** Each Council shall meet at appropriate times and places in any of the constituent States of the Council at the call of the Chairman or upon the request of a majority of its voting members.

> **(4)** If any voting member of a Council disagrees with respect to any matter which is transmitted to the Secretary by such Council, such member may submit a statement to the Secretary setting forth the reasons for such disagreement. The regional director of the National Marine Fisheries Service serving on the Council, or the regional director's designee, shall submit such a statement, which shall be made available to the public upon request, if the regional director disagrees with any such matter.

> **(5)** At the request of any voting member of a Council, the Council shall hold a roll call vote on any matter before the Council. The official minutes and other appropriate records of any Council

meeting shall identify all roll call votes held, the name of each voting member present during each roll call vote, and how each member voted on each roll call vote.

## (f) Staff and administration

**(1)** Each Council may appoint, and assign duties to, an executive director and such other full- and part-time administrative employees as the Secretary determines are necessary to the performance of its functions.

**(2)** Upon the request of any Council, and after consultation with the Secretary, the head of any Federal agency is authorized to detail to such Council, on a reimbursable basis, any of the personnel of such agency, to assist such Council in the performance of its functions under this chapter.

**(3)** The Secretary shall provide to each Council such administrative and technical support services as are necessary for the effective functioning of such Council.

**(4)** The Administrator of General Services shall furnish each Council with such offices, equipment, supplies, and services as he is authorized to furnish to any other agency or instrumentality of the United States.

**(5)** The Secretary and the Secretary of State shall furnish each Council with relevant information concerning foreign fishing and international fishery agreements.

**(6)** Each Council shall determine its organization, and prescribe its practices and procedures for carrying out its functions under this chapter, in accordance with such uniform standards as are prescribed by the Secretary. The procedures of a Council, and of its scientific and statistical committee and advisory panels established under subsection (g), must be consistent with the procedural guidelines set forth in subsection (i)(2). Each Council

shall publish and make available to the public a statement of its organization, practices, and procedures.

**(7)** The Secretary shall pay—

**(A)** the compensation and expenses provided for in subsection (d);

**(B)** appropriate compensation to employees appointed under paragraph (1);

**(C)** the amounts required for reimbursement of other Federal agencies under paragraphs (2) and (4);

**(D)** the actual expenses of the members of the committees and panels established under subsection (g); and

**(E)** such other costs as the Secretary determines are necessary to the performance of the functions of the Councils.

## (g) Committees and advisory panels

**(1)(A)** Each Council shall establish, maintain, and appoint the members of a scientific and statistical committee to assist it in the development, collection, evaluation, and peer review of such statistical, biological, economic, social, and other scientific information as is relevant to such Council's development and amendment of any fishery management plan.

**(B)** Each scientific and statistical committee shall provide its Council ongoing scientific advice for fishery management decisions, including recommendations for acceptable biological catch, preventing overfishing, maximum sustainable yield, and achieving rebuilding targets, and reports on stock status and health, bycatch, habitat status,

social and economic impacts of management measures, and sustainability of fishing practices.

**(C)** Members appointed by the Councils to the scientific and statistical committees shall be Federal employees, State employees, academicians, or independent experts and shall have strong scientific or technical credentials and experience.

**(D)** Each member of a scientific and statistical committee shall be treated as an affected individual for purposes of paragraphs (2), (3)(B), (4), and (5)(A) of subsection (j). The Secretary shall keep disclosures made pursuant to this subparagraph on file.

**(E)** The Secretary and each Council may establish a peer review process for that Council for scientific information used to advise the Council about the conservation and management of the fishery. The review process, which may include existing committees or panels, is deemed to satisfy the requirements of the guidelines issued pursuant to section 515 of the Treasury and General Government Appropriations Act for Fiscal year 2001 (Public Law 106–554—Appendix C; 114 Stat. 2763A–153).

**(F)** In addition to the provisions of subsection (f)(7), the Secretary shall, subject to the availability of appropriations, pay a stipend to members of the scientific and statistical committees or advisory panels who are not employed by the Federal Government or a State marine fisheries agency.

**(G)** A science and statistical committee shall hold its meetings in conjunction with the meeting of the Council, to the extent practicable.

**(2)** Each Council shall establish such advisory panels as are necessary or appropriate to assist it in carrying out its functions under this chapter.

**(3) (A)** Each Council shall establish and maintain a fishing industry advisory committee which shall provide information and recommendations on, and assist in the development of, fishery management plans and amendments to such plans.

> **(B)** Appointments to a committee established under subparagraph (A) shall be made by each Council in such a manner as to provide fair representation to commercial fishing interests in the geographical area of authority of the Council.

**(4)** The Secretary shall establish advisory panels to assist in the collection and evaluation of information relevant to the development of any fishery management plan or plan amendment for a fishery to which subsection (a)(3) applies. Each advisory panel shall participate in all aspects of the development of the plan or amendment; be balanced in its representation of commercial, recreational, and other interests; and consist of not less than 7 individuals who are knowledgeable about the fishery for which the plan or amendment is developed, selected from among—

> **(A)** members of advisory committees and species working groups appointed under Acts implementing relevant international fishery agreements pertaining to highly migratory species; and

> **(B)** other interested persons.

**(5)** Decisions and recommendations made by committees and panels established under this subsection shall be considered to be advisory in nature.

**(h) Functions**

Each Council shall, in accordance with the provisions of this chapter—

**(1)** for each fishery under its authority that requires conservation and management, prepare and submit to the Secretary **(A)** a fishery management plan, and **(B)** amendments to each such plan that are necessary from time to time (and promptly whenever changes in conservation and management measures in another fishery substantially affect the fishery for which such plan was developed);

**(2)** prepare comments on any application for foreign fishing transmitted to it under section 1824(b)(4)(C) of this title or section 1824(d) of this title, and any fishery management plan or amendment transmitted to it under section 1854(c)(4) of this title;

**(3)** conduct public hearings, at appropriate times and in appropriate locations in the geographical area concerned, so as to allow all interested persons an opportunity to be heard in the development of fishery management plans and amendments to such plans, and with respect to the administration and implementation of the provisions of this chapter (and for purposes of this paragraph, the term "geographical area concerned" may include an area under the authority of another Council if the fish in the fishery concerned migrate into, or occur in, that area or if the matters being heard affect fishermen of that area; but not unless such other Council is first consulted regarding the conduct of such hearings within its area);

**(4)** submit to the Secretary such periodic reports as the Council deems appropriate, and any other relevant report which may be requested by the Secretary;

**(5)** review on a continuing basis, and revise as appropriate, the assessments and specifications made pursuant to section 1853(a)(3) and (4) of this title with respect to the optimum yield

from, the capacity and extent to which United States fish processors will process United States harvested fish from, and the total allowable level of foreign fishing in, each fishery (except as provided in section [4] subsection (a)(3)) within its geographical area of authority;

**(6)** develop annual catch limits for each of its managed fisheries that may not exceed the fishing level recommendations of its scientific and statistical committee or the peer review process established under subsection (g);

**(7)** develop, in conjunction with the scientific and statistical committee, multi-year research priorities for fisheries, fisheries interactions, habitats, and other areas of research that are necessary for management purposes, that shall—

    **(A)** establish priorities for 5-year periods;

    **(B)** be updated as necessary; and

    (C) be submitted to the Secretary and the regional science centers of the National Marine Fisheries Service for their consideration in developing research priorities and budgets for the region of the Council;

**(8)** in addition to complying with the standards and requirements under paragraph (6), sections 1851(a), 1853(a)(15), and 1854(e) of this title, and other applicable provisions of this chapter, have the authority to use fishery management measures in a recreational fishery (or the recreational component of a mixed-use fishery) in developing a fishery management plan, plan amendment, or proposed regulations, such as extraction rates, fishing mortality targets, harvest control rules, or traditional or cultural practices of native communities in such fishery or fishery component; and

**(9)** conduct any other activities which are required by, or provided for in, this chapter or which are necessary and appropriate to the foregoing functions.

## (i) Procedural matters

**(1)** Chapter 10 of title 5 shall not apply to the Councils, the Council coordination committee established under subsection (l), or to the scientific and statistical committees or other committees or advisory panels established under subsection (g).

\* \* \*

# United States Code

## Title 16. Conservation

### Chapter 38. Fishery Conservation and Management

### Subchapter IV. National Fishery Management Program

### 16 U.S.C. § 1853 (excerpts)

**§ 1853. Contents of fishery management plans**

**(a) Required provisions**

Any fishery management plan which is prepared by any Council, or by the Secretary, with respect to any fishery, shall—

> **(1)** contain the conservation and management measures, applicable to foreign fishing and fishing by vessels of the United States, which are—
>
>> **(A)** necessary and appropriate for the conservation and management of the fishery, to prevent overfishing and rebuild overfished stocks, and to protect, restore, and promote the long-term health and stability of the fishery;
>>
>> **(B)** described in this subsection or subsection (b), or both; and
>>
>> **(C)** consistent with the national standards, the other provisions of this chapter, regulations implementing recommendations by international organizations in which the United States participates (including but not limited to closed areas, quotas, and size limits), and any other applicable law;

**(2)** contain a description of the fishery, including, but not limited to, the number of vessels involved, the type and quantity of fishing gear used, the species of fish involved and their location, the cost likely to be incurred in management, actual and potential revenues from the fishery, any recreational interests in the fishery, and the nature and extent of foreign fishing and Indian treaty fishing rights, if any;

**(3)** assess and specify the present and probable future condition of, and the maximum sustainable yield and optimum yield from, the fishery, and include a summary of the information utilized in making such specification;

**(4)** assess and specify—

> **(A)** the capacity and the extent to which fishing vessels of the United States, on an annual basis, will harvest the optimum yield specified under paragraph (3),

> **(B)** the portion of such optimum yield which, on an annual basis, will not be harvested by fishing vessels of the United States and can be made available for foreign fishing, and

> **(C)** the capacity and extent to which United States fish processors, on an annual basis, will process that portion of such optimum yield that will be harvested by fishing vessels of the United States;

**(5)** specify the pertinent data which shall be submitted to the Secretary with respect to commercial, recreational, charter fishing, and fish processing in the fishery, including, but not limited to, information regarding the type and quantity of fishing gear used, catch by species in numbers of fish or weight thereof, areas in which fishing was engaged in, time of fishing, number of hauls, economic information necessary to meet the requirements of this chapter, and the estimated processing capacity of, and the

actual processing capacity utilized by, United States fish processors,

**(6)** consider and provide for temporary adjustments, after consultation with the Coast Guard and persons utilizing the fishery, regarding access to the fishery for vessels otherwise prevented from harvesting because of weather or other ocean conditions affecting the safe conduct of the fishery; except that the adjustment shall not adversely affect conservation efforts in other fisheries or discriminate among participants in the affected fishery;

**(7)** describe and identify essential fish habitat for the fishery based on the guidelines established by the Secretary under section 1855(b)(1)(A) of this title, minimize to the extent practicable adverse effects on such habitat caused by fishing, and identify other actions to encourage the conservation and enhancement of such habitat;

**(8)** in the case of a fishery management plan that, after January 1, 1991, is submitted to the Secretary for review under section 1854(a) of this title (including any plan for which an amendment is submitted to the Secretary for such review) or is prepared by the Secretary, assess and specify the nature and extent of scientific data which is needed for effective implementation of the plan;

**(9)** include a fishery impact statement for the plan or amendment (in the case of a plan or amendment thereto submitted to or prepared by the Secretary after October 1, 1990) which shall assess, specify, and analyze the likely effects, if any, including the cumulative conservation, economic, and social impacts, of the conservation and management measures on, and possible mitigation measures for—

**(A)** participants in the fisheries and fishing communities affected by the plan or amendment;

**(B)** participants in the fisheries conducted in adjacent areas under the authority of another Council, after consultation with such Council and representatives of those participants; and

**(C)** the safety of human life at sea, including whether and to what extent such measures may affect the safety of participants in the fishery;

**(10)** specify objective and measurable criteria for identifying when the fishery to which the plan applies is overfished (with an analysis of how the criteria were determined and the relationship of the criteria to the reproductive potential of stocks of fish in that fishery) and, in the case of a fishery which the Council or the Secretary has determined is approaching an overfished condition or is overfished, contain conservation and management measures to prevent overfishing or end overfishing and rebuild the fishery;

**(11)** establish a standardized reporting methodology to assess the amount and type of bycatch occurring in the fishery, and include conservation and management measures that, to the extent practicable and in the following priority—

**(A)** minimize bycatch; and

**(B)** minimize the mortality of bycatch which cannot be avoided;

**(12)** assess the type and amount of fish caught and released alive during recreational fishing under catch and release fishery management programs and the mortality of such fish, and include conservation and management measures that, to the extent practicable, minimize mortality and ensure the extended survival of such fish;

**(13)** include a description of the commercial, recreational, and charter fishing sectors which participate in the fishery, including its economic impact, and, to the extent practicable, quantify trends in landings of the managed fishery resource by the commercial, recreational, and charter fishing sectors;

**(14)** to the extent that rebuilding plans or other conservation and management measures which reduce the overall harvest in a fishery are necessary, allocate, taking into consideration the economic impact of the harvest restrictions or recovery benefits on the fishery participants in each sector, any harvest restrictions or recovery benefits fairly and equitably among the commercial, recreational, and charter fishing sectors in the fishery and;

**(15)** establish a mechanism for specifying annual catch limits in the plan (including a multiyear plan), implementing regulations, or annual specifications, at a level such that overfishing does not occur in the fishery, including measures to ensure accountability.

\*   \*   \*

## (c) Proposed regulations

Proposed regulations which the Council deems necessary or appropriate for the purposes of—

**(1)** implementing a fishery management plan or plan amendment shall be submitted to the Secretary simultaneously with the plan or amendment under section 1854 of this title; and

**(2)** making modifications to regulations implementing a fishery management plan or plan amendment may be submitted to the Secretary at any time after the plan or amendment is approved under section 1854 of this title.

**United States Code**

**Title 16. Conservation**

**Chapter 38. Fishery Conservation and Management**

**Subchapter IV. National Fishery Management Program**

**16 U.S.C. § 1854 (excerpts)**

**§ 1854. Action by Secretary**

**(a) Review of plans**

**(1)** Upon transmittal by the Council to the Secretary of a fishery management plan or plan amendment, the Secretary shall—

**(A)** immediately commence a review of the plan or amendment to determine whether it is consistent with the national standards, the other provisions of this chapter, and any other applicable law; and

**(B)** immediately publish in the Federal Register a notice stating that the plan or amendment is available and that written information, views, or comments of interested persons on the plan or amendment may be submitted to the Secretary during the 60-day period beginning on the date the notice is published.

**(2)** In undertaking the review required under paragraph (1), the Secretary shall—

**(A)** take into account the information, views, and comments received from interested persons;

**(B)** consult with the Secretary of State with respect to foreign fishing; and

**(C)** consult with the Secretary of the department in which the Coast Guard is operating with respect to enforcement at sea and to fishery access adjustments referred to in section 1853(a)(6) of this title.

**(3)** The Secretary shall approve, disapprove, or partially approve a plan or amendment within 30 days of the end of the comment period under paragraph (1) by written notice to the Council. A notice of disapproval or partial approval shall specify—

**(A)** the applicable law with which the plan or amendment is inconsistent;

**(B)** the nature of such inconsistencies; and

**(C)** recommendations concerning the actions that could be taken by the Council to conform such plan or amendment to the requirements of applicable law.

If the Secretary does not notify a Council within 30 days of the end of the comment period of the approval, disapproval, or partial approval of a plan or amendment, then such plan or amendment shall take effect as if approved.

**(4)** If the Secretary disapproves or partially approves a plan or amendment, the Council may submit a revised plan or amendment to the Secretary for review under this subsection.

**(5)** For purposes of this subsection and subsection (b), the term "immediately" means on or before the 5th day after the day on which a Council transmits to the Secretary a fishery management plan, plan amendment, or proposed regulation that the Council characterizes as final.

**(b) Review of regulations**

**(1)** Upon transmittal by the Council to the Secretary of proposed regulations prepared under section 1853(c) of this title, the Secretary shall immediately initiate an evaluation of the proposed regulations to determine whether they are consistent with the fishery management plan, plan amendment, this chapter and other applicable law. Within 15 days of initiating such evaluation the Secretary shall make a determination and—

> **(A)** if that determination is affirmative, the Secretary shall publish such regulations in the Federal Register, with such technical changes as may be necessary for clarity and an explanation of those changes, for a public comment period of 15 to 60 days; or

> **(B)** if that determination is negative, the Secretary shall notify the Council in writing of the inconsistencies and provide recommendations on revisions that would make the proposed regulations consistent with the fishery management plan, plan amendment, this chapter, and other applicable law.

**(2)** Upon receiving a notification under paragraph (1)(B), the Council may revise the proposed regulations and submit them to the Secretary for reevaluation under paragraph (1).

**(3)** The Secretary shall promulgate final regulations within 30 days after the end of the comment period under paragraph (1)(A). The Secretary shall consult with the Council before making any revisions to the proposed regulations, and must publish in the Federal Register an explanation of any differences between the proposed and final regulations.

**(c) Preparation and review of Secretarial plans**

**(1)** The Secretary may prepare a fishery management plan, with respect to any fishery, or any amendment to any such plan, in accordance with the national standards, the other provisions of this chapter, and any other applicable law, if—

> **(A)** the appropriate Council fails to develop and submit to the Secretary, after a reasonable period of time, a fishery management plan for such fishery, or any necessary amendment to such a plan, if such fishery requires conservation and management;

> **(B)** the Secretary disapproves or partially disapproves any such plan or amendment, or disapproves a revised plan or amendment, and the Council involved fails to submit a revised or further revised plan or amendment; or

> **(C)** the Secretary is given authority to prepare such plan or amendment under this section.

**(2)** In preparing any plan or amendment under this subsection, the Secretary shall—

> **(A)** conduct public hearings, at appropriate times and locations in the geographical areas concerned, so as to allow interested persons an opportunity to be heard in the preparation and amendment of the plan and any regulations implementing the plan; and

> **(B)** consult with the Secretary of State with respect to foreign fishing and with the Secretary of the department in which the Coast Guard is operating with respect to enforcement at sea.

**(3)** Notwithstanding paragraph (1) for a fishery under the authority of a Council, the Secretary may not include in any

fishery management plan, or any amendment to any such plan, prepared by him, a provision establishing a limited access system, including any limited access privilege program, unless such system is first approved by a majority of the voting members, present and voting, of each appropriate Council.

**(4)** Whenever the Secretary prepares a fishery management plan or plan amendment under this section, the Secretary shall immediately—

> **(A)** for a plan or amendment for a fishery under the authority of a Council, submit such plan or amendment to the appropriate Council for consideration and comment; and

> **(B)** publish in the Federal Register a notice stating that the plan or amendment is available and that written information, views, or comments of interested persons on the plan or amendment may be submitted to the Secretary during the 60-day period beginning on the date the notice is published.

**(5)** Whenever a plan or amendment is submitted under paragraph (4)(A), the appropriate Council must submit its comments and recommendations, if any, regarding the plan or amendment to the Secretary before the close of the 60-day period referred to in paragraph (4)(B). After the close of such 60-day period, the Secretary, after taking into account any such comments and recommendations, as well as any views, information, or comments submitted under paragraph (4)(B), may adopt such plan or amendment.

**(6)** The Secretary may propose regulations in the Federal Register to implement any plan or amendment prepared by the Secretary. In the case of a plan or amendment to which paragraph (4)(A) applies, such regulations shall be submitted to the Council with such plan or amendment. The comment period on proposed regulations shall be 60 days, except that the Secretary may

shorten the comment period on minor revisions to existing regulations.

**(7)** The Secretary shall promulgate final regulations within 30 days after the end of the comment period under paragraph (6). The Secretary must publish in the Federal Register an explanation of any substantive differences between the proposed and final rules. All final regulations must be consistent with the fishery management plan, with the national standards and other provisions of this chapter, and with any other applicable law.

\*   \*   \*

### (e) Rebuilding overfished fisheries

**(1)** The Secretary shall report annually to the Congress and the Councils on the status of fisheries within each Council's geographical area of authority and identify those fisheries that are overfished or are approaching a condition of being overfished. For those fisheries managed under a fishery management plan or international agreement, the status shall be determined using the criteria for overfishing specified in such plan or agreement. A fishery shall be classified as approaching a condition of being overfished if, based on trends in fishing effort, fishery resource size, and other appropriate factors, the Secretary estimates that the fishery will become overfished within two years.

**(2)** If the Secretary determines at any time that a fishery is overfished, the Secretary shall immediately notify the appropriate Council and request that action be taken to end overfishing in the fishery and to implement conservation and management measures to rebuild affected stocks of fish. The Secretary shall publish each notice under this paragraph in the Federal Register.

**(3)** Within 2 years after an identification under paragraph (1) or notification under paragraphs (2) or (7), the appropriate Council (or the Secretary, for fisheries under section 1852(a)(3) of this title)

shall prepare and implement a fishery management plan, plan amendment, or proposed regulations for the fishery to which the identification or notice applies—

>    **(A)** to end overfishing immediately in the fishery and to rebuild affected stocks of fish; or

>    **(B)** to prevent overfishing from occurring in the fishery whenever such fishery is identified as approaching an overfished condition.

**(4)** For a fishery that is overfished, any fishery management plan, amendment, or proposed regulations prepared pursuant to paragraph (3) or paragraph (5) for such fishery shall—

>    **(A)** specify a time period for rebuilding the fishery that shall—

>>    **(i)** be as short as possible, taking into account the status and biology of any overfished stocks of fish, the needs of fishing communities, recommendations by international organizations in which the United States participates, and the interaction of the overfished stock of fish within the marine ecosystem; and

>>    **(ii)** not exceed 10 years, except in cases where the biology of the stock of fish, other environmental conditions, or management measures under an international agreement in which the United States participates dictate otherwise;

>    **(B)** allocate both overfishing restrictions and recovery benefits fairly and equitably among sectors of the fishery; and

**(C)** for fisheries managed under an international agreement, reflect traditional participation in the fishery, relative to other nations, by fishermen of the United States.

**(5)** If, within the 2-year period beginning on the date of identification or notification that a fishery is overfished, the Council does not submit to the Secretary a fishery management plan, plan amendment, or proposed regulations required by paragraph (3)(A), the Secretary shall prepare a fishery management plan or plan amendment and any accompanying regulations to stop overfishing and rebuild affected stocks of fish within 9 months under subsection (c).

**(6)** During the development of a fishery management plan, a plan amendment, or proposed regulations required by this subsection, the Council may request the Secretary to implement interim measures to reduce overfishing under section 1855(c) of this title until such measures can be replaced by such plan, amendment, or regulations. Such measures, if otherwise in compliance with the provisions of this chapter, may be implemented even though they are not sufficient by themselves to stop overfishing of a fishery.

**(7)** The Secretary shall review any fishery management plan, plan amendment, or regulations required by this subsection at routine intervals that may not exceed two years. If the Secretary finds as a result of the review that such plan, amendment, or regulations have not resulted in adequate progress toward ending overfishing and rebuilding affected fish stocks, the Secretary shall—

**(A)** in the case of a fishery to which section 1852(a)(3) of this title applies, immediately make revisions necessary to achieve adequate progress; or

**(B)** for all other fisheries, immediately notify the appropriate Council. Such notification shall recommend further conservation and management measures which the Council

should consider under paragraph (3) to achieve adequate progress.

**(f) Fisheries under authority of more than one Council**

    **(1)** Except as provided in paragraph (3), if any fishery extends beyond the geographical area of authority of any one Council, the Secretary may—

        **(A)** designate which Council shall prepare the fishery management plan for such fishery and any amendment to such plan; or

        **(B)** may require that the plan and amendment be prepared jointly by the Councils concerned. No jointly prepared plan or amendment may be submitted to the Secretary unless it is approved by a majority of the voting members, present and voting, of each Council concerned.

    **(2)** The Secretary shall establish the boundaries between the geographical areas of authority of adjacent Councils.

**(g) Atlantic highly migratory species**

    **(1)** Preparation and implementation of plan or plan amendment

        The Secretary shall prepare a fishery management plan or plan amendment under subsection (c) with respect to any highly migratory species fishery to which section 1852(a)(3) of this title applies. In preparing and implementing any such plan or amendment, the Secretary shall—

        **(A)** consult with and consider the comments and views of affected Councils, commissioners and advisory groups appointed under Acts implementing relevant international fishery agreements pertaining to highly migratory species,

and the advisory panel established under section 1852(g) of this title;

**(B)** establish an advisory panel under section 1852(g) of this title for each fishery management plan to be prepared under this paragraph;

**(C)** evaluate the likely effects, if any, of conservation and management measures on participants in the affected fisheries and minimize, to the extent practicable, any disadvantage to United States fishermen in relation to foreign competitors;

**(D)** with respect to a highly migratory species for which the United States is authorized to harvest an allocation, quota, or at a fishing mortality level under a relevant international fishery agreement, provide fishing vessels of the United States with a reasonable opportunity to harvest such allocation, quota, or at such fishing mortality level;

**(E)** review, on a continuing basis (and promptly whenever a recommendation pertaining to fishing for highly migratory species has been made under a relevant international fishery agreement), and revise as appropriate, the conservation and management measures included in the plan;

**(F)** diligently pursue, through international entities (such as the International Commission for the Conservation of Atlantic Tunas), comparable international fishery management measures with respect to fishing for highly migratory species; and

**(G)** ensure that conservation and management measures under this subsection—

> **(i)** promote international conservation of the affected fishery;

**(ii)** take into consideration traditional fishing patterns of fishing vessels of the United States and the operating requirements of the fisheries;

**(iii)** are fair and equitable in allocating fishing privileges among United States fishermen and do not have economic allocation as the sole purpose; and

**(iv)** promote, to the extent practicable, implementation of scientific research programs that include the tagging and release of Atlantic highly migratory species.

\*   \*   \*

## (h) Repeal or revocation of a fishery management plan

The Secretary may repeal or revoke a fishery management plan for a fishery under the authority of a Council only if the Council approves the repeal or revocation by a three-quarters majority of the voting members of the Council.

\*   \*   \*

United States Code

Title 16. Conservation

Chapter 38. Fishery Conservation and Management

Subchapter IV. National Fishery Management Program

16 U.S.C. § 1855 (excerpts)

**§ 1855. Other requirements and authority.**

\* \* \*

**(c) Emergency actions and interim measures**

**(1)** If the Secretary finds that an emergency exists or that interim measures are needed to reduce overfishing for any fishery, he may promulgate emergency regulations or interim measures necessary to address the emergency or overfishing, without regard to whether a fishery management plan exists for such fishery.

**(2)** If a Council finds that an emergency exists or that interim measures are needed to reduce overfishing for any fishery within its jurisdiction, whether or not a fishery management plan exists for such fishery—

**(A)** the Secretary shall promulgate emergency regulations or interim measures under paragraph (1) to address the emergency or overfishing if the Council, by unanimous vote of the members who are voting members, requests the taking of such action; and

**(B)** the Secretary may promulgate emergency regulations or interim measures under paragraph (1) to address the emergency or overfishing if the Council, by less than a unanimous vote, requests the taking of such action.

**(3)** Any emergency regulation or interim measure which changes any existing fishery management plan or amendment shall be treated as an amendment to such plan for the period in which such regulation is in effect. Any emergency regulation or interim measure promulgated under this subsection—

**(A)** shall be published in the Federal Register together with the reasons therefor;

**(B)** shall, except as provided in subparagraph (C), remain in effect for not more than 180 days after the date of publication, and may be extended by publication in the Federal Register for one additional period of not more than 186 days, provided the public has had an opportunity to comment on the emergency regulation or interim measure, and, in the case of a Council recommendation for emergency regulations or interim measures, the Council is actively preparing a fishery management plan, plan amendment, or proposed regulations to address the emergency or overfishing on a permanent basis;

**(C)** that responds to a public health emergency or an oil spill may remain in effect until the circumstances that created the emergency no longer exist, Provided, That the public has an opportunity to comment after the regulation is published, and, in the case of a public health emergency, the Secretary of Health and Human Services concurs with the Secretary's action; and

**(D)** may be terminated by the Secretary at an earlier date by publication in the Federal Register of a notice of termination, except for emergency regulations or interim measures promulgated under paragraph (2) in which case such early termination may be made only upon the agreement of the Secretary and the Council concerned.

**(d) Responsibility of Secretary**

The Secretary shall have general responsibility to carry out any fishery management plan or amendment approved or prepared by him, in accordance with the provisions of this chapter. The Secretary may promulgate such regulations, in accordance with section 553 of title 5, as may be necessary to discharge such responsibility or to carry out any other provision of this chapter.

\* \* \*

**(f) Judicial review**

**(1)** Regulations promulgated by the Secretary under this chapter and actions described in paragraph (2) shall be subject to judicial review to the extent authorized by, and in accordance with, chapter 7 of title 5, if a petition for such review is filed within 30 days after the date on which the regulations are promulgated or the action is published in the Federal Register, as applicable; except that—

> **(A)** section 705 of such title is not applicable, and

> **(B)** the appropriate court shall only set aside any such regulation or action on a ground specified in section 706(2)(A), (B), (C), or (D) of such title.

**(2)** The actions referred to in paragraph (1) are actions that are taken by the Secretary under regulations which implement a fishery management plan, including but not limited to actions that establish the date of closure of a fishery to commercial or recreational fishing.

**(3) (A)** Notwithstanding any other provision of law, the Secretary shall file a response to any petition filed in accordance with paragraph (1), not later than 45 days after the date the Secretary is served with that petition, except that the appropriate court may

extend the period for filing such a response upon a showing by the Secretary of good cause for that extension.

> **(B)** A response of the Secretary under this paragraph shall include a copy of the administrative record for the regulations that are the subject of the petition.

**(4)** Upon a motion by the person who files a petition under this subsection, the appropriate court shall assign the matter for hearing at the earliest possible date and shall expedite the matter in every possible way.

\*   \*   \*